**2023-1674, 23-1701**

# United States Court of Appeals for the Federal Circuit

ANCORA TECHNOLOGIES, INC.,

*Appellant,*

– v. –

ROKU, INC., VIZIO, INC., NINTENDO CO., LTD., NINTENDO OF AMERICA INC.,

*Appellees.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01406 and IPR2021-01338*

## NON-CONFIDENTIAL BRIEF FOR APPELLANT

ANDRES HEALY
STEVEN M. SEIGEL
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

ALEXANDRA G. WHITE
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366
awhite@susmangodfrey.com

*Counsel for Appellant*

JULY 10, 2023

COUNSEL PRESS, LLC (888) 277-3259

# PATENT CLAIM AT ISSUE

Claim 1 of U.S. Patent No. 6,411,941

1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:

selecting a program residing in the volatile memory,

*using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record*,

verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and

acting on the program according to the verification.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1674

**Short Case Caption** Ancora Technologies, Inc. v. Roku, Inc.

**Filing Party/Entity** Ancora Technologies, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/10/2023

Signature: /s/ Andres Healy

Name: Andres Healy

Case: 23-1674 Document: 14 Page: 2 Filed: 04/10/2023

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Ancora Technologies, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Fitch, Even, Tabin & Flannery LLP: David A. Gosse | | |
| Fitch, Even, Tabin & Flannery LLP: Nicholas T. Peters | | |
| Fitch, Even, Tabin & Flannery LLP: Karen J. Wang | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


STATEMENT OF RELATED CASES ........................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES ........................................................ 2

STATEMENT OF THE CASE ........................................................ 3

I. The ’941 Patent and the Claim 1 “Agent” Limitation ........................ 7

II. The Challenged Claims ........................................................ 10

III. The Prior Art ........................................................ 11

IV. Proceedings Before the Patent Office ........................................ 13

SUMMARY OF ARGUMENT ........................................................ 14

STANDARD OF REVIEW ........................................................ 15

ARGUMENT ........................................................ 15

I. The Court should reverse the Board’s obviousness determination based simply on its incorrect construction of the “agent” term. ........ 16

A. The claimed “agent” is an OS-level software program. .......... 19

B. At a minimum, the claimed “agent” is software only. .............. 29

C. The extrinsic evidence supports Ancora’s construction. .......... 33

D. The Board’s obviousness conclusion must be reversed when the “agent” is properly construed. .................................. 36

II. The Board’s obviousness conclusion lacks substantial evidence even under the Board’s broad construction. ........................ 38

A. The Hellman/Chou Combination ........................................... 39

B. The Board’s obviousness determination that Hellman and Chou teach “using an agent to set up a verification structure” lacks substantial evidence. .................... 42

i. The asserted combination is inoperable. ........................42

ii. The asserted combination is redundant at best. .............44

iii. Hellman's memory "address H" is not a verification structure. ........................................................................46

III. The Board's obviousness conclusion must be vacated because the Board failed to consider and account for objective indicia of nonobviousness. ........................................................................49

A. The Board improperly determined that direct praise of the '941 patent lacked a nexus to the '941 patent. .........................50

B. The Board improperly rejected Ancora's evidence showing Ancora received license payment in single-patent licenses. .......................................................................55

CONCLUSION ............................................................................................63

CERTIFICATE OF SERVICE ......................................................................65

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS.........................................................................................66

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from pages *v*, 3, 4, 7, 14, 15, 50, and 55-63, contain descriptions of confidential license agreements between Ancora Technologies, Inc., and certain third parties relating to U.S. Patent No. 6,411,941. Specifically, the information omitted from pages 3, 4, 7, 14, 15, 55 and 56 includes the names of the third-party licensees and the confidential payment terms of those licenses. The material omitted from pages 57-63 includes the names of the third-party licensees. The material omitted from page *v* includes confidential payment terms. And the material omitted from page 50 is a royalty rate contained in a confidential license agreement between Ancora and a third party.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
346 F.3d 1075 (Fed. Cir. 2003) ....................................................................23

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014) ....................................................................*passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ....................................................................*passim*

*In re Anova Hearing Labs, Inc.*,
809 F. App'x 840 (Fed. Cir. 2020) ....................................................................45

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................................................................52, 56, 63

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ....................................................................15

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ....................................................................21, 22

*Campbell Soup Co. v. Gamon Plus, Inc.*,
2021 WL 3671366 (Fed. Cir. Aug. 19, 2021) ....................................................................27

*Canopy Growth Corp. v. GW Pharma Ltd.*,
2023 WL 3048243 (Fed. Cir. Apr. 24, 2023) ....................................................................19

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F. 2d 1387 (Fed. Cir. 1988) ....................................................................53

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ....................................................................49

*Evans v. Jeff D.*,
475 U.S. 717 (1986) ....................................................................57

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) ....................................................................33

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966)....................................................................................50

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................................................................45

*In re Hodges*,
882 F.3d 1107 (Fed. Cir. 2018) ..............................................................37, 38

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ..............................................................52, 60

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ..............................................................58, 61

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) ....................................................................20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................................57

*LiquidPower Specialty Prod. Inc. v. Hughes*,
749 F. App’x 965 (Fed. Cir. 2018)................................................................54

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ....................................................................42

*Nintendo Co. Ltd. et al. v. Ancora Technologies, Inc.*,
No. 23-1701 (Fed. Cir.) ..............................................................................1, 13

*Outdry Techs. Corp. v. Geox S.p.A.*,
859 F.3d 1364 (Fed. Cir. 2017) ....................................................................15

*Personalized Media Commc’ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ...................................................15, 17, 18, 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .........................................18, 33, 36

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
600 F. App’x 755 (Fed. Cir. 2015)................................................................42

*Polaris Indus. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................................................................43

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ....................................................................55

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) ......................................................................53

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ....................................................................58

*Shire Development, LLC v. Watson Pharms., Inc.*,
787 F.3d 1359 (Fed. Cir. 2015) ....................................................................18

*South-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*,
748 F. App'x 1003 (Fed. Cir. 2018) ........................................................45, 46

*St. Clair Intell. Prop. Consultants, Inc. v. Canon Inc.*,
412 F. App'x 270 (Fed. Cir. 2011) ................................................................25

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340 (Fed. Cir. 2012)...............................................59, 60

*Trs. Of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ....................................................................19

*Univ. of Mass. v. L'Oreal SA*,
36 F.4th 1374 (Fed. Cir. 2022) .....................................................................18

*In re Vivint, Inc.*,
14 F.4th 1342 (Fed. Cir. 2021) .....................................................................63

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ...............................................................53, 54

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ....................................................................57

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ..............................................................................2

35 U.S.C. § 101 ................................................................................................2

35 U.S.C. § 282(b) .........................................................................................15

35 U.S.C. § 311 .......... 2

**Other Authorities**

37 C.F.R. § 42.64(b)(1) .......... 63

37 C.F.R. § 42.64(c) .......... 63

37 C.F.R. § 42.100(b) .......... 15

77 Fed. Reg. 48,756-01 (Aug. 14, 2012) .......... 62

## STATEMENT OF RELATED CASES

This appeal arises from two final decisions of the Patent Trial and Appeal Board ("Board"), in which the Board invalidated for obviousness claims 1-3, 6-14, and 16 of U.S. Patent No. 6,411,941 (the '941 patent). Patent-Owner/Appellant Ancora Technologies, Inc., identifies *Nintendo Co. Ltd. et al. v. Ancora Technologies, Inc.*, No. 23-1701 (Fed. Cir.), as the only case from the same proceedings that is before this or any other appellate court. This Court consolidated this appeal and the *Nintendo* appeal.

Ancora also identifies the following proceedings which are currently stayed pending the outcome of this appeal:

- *Ancora v. HTC America, Inc.*, No. 2:16-cv-01919 (W.D. Wash.)
- *Ancora v. Nintendo Co., Ltd.,* No. 6:21-cv-00738 (W.D. Tex.)
- *Ancora v. VIZIO, Inc.*, No. 2:21-cv-08534 (C.D. Cal.)
- *Ancora v. Roku, Inc.*, No. 6:21-cv-00737 (W.D. Tex.)
- *Ancora v. Google, LLC*, No. 6:21-cv-00735 (W.D. Tex.)
- *Ex Parte* Control No. 90/014,865

This Court previously resolved in Ancora's favor two appeals concerning the '941 patent. In *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732 (Fed. Cir. 2014), the Court vacated a district court's order granting summary judgment of non-infringement. In *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed. Cir.

2018), the Court reversed a district court's judgment invalidating all claims of the '941 patent under 35 U.S.C. § 101.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction over these *inter partes* reviews filed by Petitioner/Appellee Nintendo Co. Ltd. and Nintendo of America, Inc. ("Nintendo") and Petitioners/Appellees Roku, Inc. and Vizio, Inc. ("Roku/Vizio") (collectively "Petitioners"). 35 U.S.C. § 311. The Board entered final decisions on January 25, 2023, in IPR2021-01338 (Nintendo) and February 15, 2023, in IPR2021-01406 (Roku/Vizio). Ancora timely appealed. Appx796, Appx5179. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

"The ['941] patent describes and claims methods of limiting a computer's running of software not authorized for that computer to run." *Ancora v. HTC*, 908 F.3d at 1344. And consistent with the applicants' statements during prosecution, this Court has recognized that a key aspect of how the patent accomplishes its function (and what "differed from the prior art") is that the "agent" it uses to perform the required "data storage" task "*both* operated as an application running through an operating system *and* used the BIOS level for data storage and retrieval—a combination that was not previously taught and that an ordinarily skilled application writer would not employ." *Ancora v. Apple*, 744 F.3d at 735-36.

This appeal thus asks the Court to reverse the Board's cancellations of claims 1-3, 6-14, and 16 of the '941 patent because the Board erred by:

1. Cancelling as obvious all challenged claims based on its erroneous refusal to credit the applicants' statements (recognized by the Examiner and this Court) that the claim 1 "agent"—which was added to the claim during prosecution—is limited to being an "*(OS) level* program." Appx2979 (emphasis added).

2. Cancelling as obvious all challenged claims because—even under the Board's incorrect "agent" construction—the asserted combination of Hellman and Chou is inoperable, redundant, and does not disclose using an agent to set up a verification structure in BIOS memory.

3. Finding that (i) a leading BIOS manufacturer's direct praise of and decision to license the '941 patent; and (ii) three licenses to only the '941 patent by [redacted] ([redacted]), [redacted] ([redacted]), and [redacted] ([redacted]) lacked a nexus to the '941 patent.

## STATEMENT OF THE CASE

From day one, the '941 patent has been lauded for teaching a novel and remarkably innovative way of "limiting a computer's running of software not authorized for that computer to run." *Ancora v. HTC*, 908 F.3d at 1344. Specifically, as this Court has recognized, it disclosed new software functionality that enabled an OS-level software program to save certain verification information in "BIOS

memory," which is "typically used for storing programs that assist in the start-up of a computer, not verification structures comparable to the software-licensing structure embodied by the claimed invention." *Id.* at 1345. As this Court thus explained, its innovation resided in the fact that it "*both* operated as an application ***running through an operating system*** *and* used the BIOS level for data storage and retrieval—a combination that was not previously taught and that an ordinarily skilled application writer would not employ." *Ancora v. Apple*, 744 F.3d at 735-36 (bolded emphasis added).

This Court is not the only one to have to have recognized the novelty of the '941 patent. The Examiner stated during prosecution that none of "the closest prior art systems, singly or collectively, … teach licensed programs ***running at the OS level*** [i.e., the claimed agent] interacting with a program verification structure stored in the BIOS." Appx2988-2989. The industry shared that view. Shortly after the patent issued, a leading BIOS manufacturer licensed and heaped praise on the '941 patent's invention—stating it saw "great value for consumers" in commercializing the '941 patent. Appx4120. And [redacted] in royalty fees paid by such industry [redacted] as [redacted], [redacted], and [redacted] for a license to *only* the '941 patent further reinforces just how innovative and important the '941 patent invention was.

Despite all of this—this Court's prior conclusions, the statements of the Examiner, and the remarkable industry evidence demonstrating the novelty and

importance of the ’941 patent—the Board nevertheless concluded that the ’941 patent was obvious in light of two prior art references, Hellman and Chou, *neither of which disclosed the use or ability of OS-level software to interact with BIOS*. Hellman teaches a hardware-only control system that discloses neither an operating system nor BIOS, Appx22-24, and Chou teaches only standard BIOS-level software, Appx24-25.

As one might expect given the stark absence of the core innovative feature of the ’941 patent from either of the purportedly invalidating references, the Board’s decision contains numerous critical errors. Fortunately, however, this Court need not consider all of them because one error stands out—and is dispositive: the Board’s refusal to credit the applicants’ clear and unequivocal statements during prosecution that the claim 1 “agent” was limited to being an “(OS) level program,” Appx2979, and instead construing the “agent” to refer to any program or hardware, Appx19.

That decision was clearly wrong. During prosecution, the applicants expressly defined the “agent” term—which was added during prosecution—to be limited to being an “*(OS) level* program.” Appx2979 (emphasis added). Not only did the Examiner understand this, but he agreed that the “agent” term referred to “programs running at the *OS level*.” Appx2988-2989. This Court likewise has agreed with this treatment. As noted, in its prior decisions regarding the ’941 patent, including one affirming its validity and inventiveness, this Court agreed that a key innovation of

the ’941 patent was that it “operate[s] as an application *running through an operating system*” that “use[s] the BIOS level for data storage and retrieval.” *Ancora v. Apple*, 744 F.3d at 735-36 (emphasis added). In short, everyone but the Board has understood the term “agent” as used in claim 1 of the ’941 patent to be limited to OS-level software, just as the applicants explained when they added the term during prosecution. The Board erred in concluding otherwise.

Further, the implications of the Board’s claim-construction error are clear. The Board itself conceded that its refusal to credit the applicants’ statements (echoed by the Examiner and this Court) was “[n]ecessary” to its obviousness conclusion. Appx7. There is a reason. Neither prior art reference discloses or uses an OS-level software agent that stores a verification structure (and license data) in BIOS memory. Because the Board’s claim construction was wrong, it is also “necessary” to reverse the Board’s obviousness decision without any need to consider Ancora’s other arguments.

Of course, were this Court to consider Ancora’s other arguments, they would only further demonstrate the Board’s error. Even under the Board’s erroneous construction, its obviousness conclusion must be reversed because it ignores that the asserted Hellman/Chou combination is inoperable, redundant, and fails to teach using an agent to set up a “verification structure.”

Moreover, only by applying incorrect legal standards could the Board find that Ancora's compelling objective indicia of nonobviousness—the license payment in royalty fees paid by licensee, licensee, and licensee for a license to *only the '941 patent* and a leading BIOS company's praise *of the '941 patent*—lacked a nexus *to the '941 patent*. Indeed, the Board appeared to hold such secondary indicia against Ancora—stating during the hearing that "it seems like maybe you struck the lotto a couple times." Appx5167. This speculation has no evidentiary basis. And the nexus standard the Board ultimately applied was so legally flawed that no patent holder could ever satisfy it.

## I. The '941 Patent and the Claim 1 "Agent" Limitation

This Court has twice addressed claim 1 of the '941 patent—both times agreeing with the patentee's[1] position and reversing decisions finding the patent not infringed and invalid. *Ancora v. Apple*, 744 F.3d 732; *Ancora v. HTC*, 908 F.3d 1343. Although the Court has never been asked to construe claim 1's "agent" term directly, the Court has described both the agent's task and its essential attributes in addressing the limitation at issue: "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS." Appx117.[2]

---

[1] Consistent with the Court's terminology in *Ancora v. Apple*, 744 F.3d at 739, "patentee" describes post-issuance activities; "applicants" describes pre-issuance activities.

[2] Not surprisingly given that it has twice considered the '941 patent, the Court has described claim 1 at length, including its "tangible technological benefit" and the

As the Court explained, the agent's ***task*** involves "us[ing] a modifiable part of the BIOS memory—not other computer memory—to store the information that can be used, when a program is introduced into the computer, to determine whether the program is licensed to run on that computer." *Ancora v. HTC*, 908 F.3d at 1345. To do this, claim 1 requires its "agent" store this data—which claim 1 describes as a "verification structure" that contains a "license record"—in BIOS memory. As this Court recognized, using BIOS memory for this purpose offered a key advantage over the prior art, including:

> BIOS memory is typically used for storing programs that assist in the start-up of a computer, not verification structures comparable to the software-licensing structure embodied by the claimed invention. Using BIOS memory, rather than other memory in the computer, improves computer security, the patent indicates, because successfully hacking BIOS memory (*i.e.*, altering it without rendering the computer inoperable) is much harder than hacking the memory used by the prior art to store license-verification information.

*Ancora v. HTC*, 908 F.3d at 1345.

As to the agent's ***essential attributes***, this Court explained that the software component required to perform this "data storage" task—the claim 1 "agent"—

---

portions of the intrinsic record supporting its recognition that the patent "differed from the prior art in that it *both* operated as an application running through an operating system *and* used the BIOS level for data storage and retrieval." *Ancora v. Apple*, 744 F.3d at 735; *see Ancora v. HTC*, 908 F.3d at 1344-46, 1350. Ancora agrees with these descriptions—which the Board refused to abide—in toto.

"differed from the prior art in that it *both* operated as an application running through an operating system *and* used the BIOS level for data storage and retrieval—a combination that was not previously taught and that an ordinarily skilled application writer would not employ." *Ancora v. Apple*, 744 F.3d at 735-36 (emphases in original). This Court reiterated that "the applicants were clear that the OS-level language referred to the [claimed] verifying software." *Id.* at 737. And it confirmed that the patent claims a "software innovation[]" that excludes "[h]ardware-based methods." *Ancora v. HTC*, 908 F.3d at 1344, 1347; *see Ancora v. Apple*, 744 F.3d at 733-34 ("[The] method makes use of the existing computer hardware (eliminating the expense and inconvenience of using additional hardware).").

This Court's descriptions of the agent were correct—and amply supported by the prosecution-history excerpts it cited. In particular, the applicants added the term "agent" to claim 1 during prosecution to overcome a § 112 rejection in which the Examiner mistakenly thought (initially) that the applicants were seeking to claim "hardware" based approaches that would "add, remove and modify a license record stored in an EEPROM." Appx2934. As the applicants explained, the invention did *not* cover such material. Rather, the applicants disclaimed hardware-dependent approaches in a November 9, 2001 interview and accompanying November 16, 2001 amendment—explaining that the entity that stored the verification structure data in

the BIOS memory must be an "agent," Appx2953, Appx2956, which they explained in a subsequent response was an "***operating system (OS) level program***." Appx2979.

After these clarifications, the Examiner had no difficulty understanding that the "agent" term was limited to an OS-level software program—or how novel that was. He explained that he understood that the "present invention" constituted a "program[] ***running at the OS level*** interacting with a program verification structure stored in the BIOS" by "***using an agent*** to set up a verification structure in the erasable, non-volatile memory of the BIOS." Appx2988-2989. And he explained that none of "the closest prior art systems, singly or collectively, … teach licensed programs ***running at the OS level*** [*i.e.*, the claimed agent] interacting with a program verification structure stored in the BIOS." *Id.*; *Ancora v. HTC*, 908 F.3d at 1348-49 (crediting Examiner's "reasons for allowance, summarizing patent's solution of '*using an agent* to set up a verification structure in the erasable, non-volatile memory of the BIOS'").

**II. The Challenged Claims**

Petitioners challenged independent claim 1 and dependent claims 2-3, 6-14, and 16 of the '941 patent. The focus of this appeal is claim 1, particularly its limitation expressly requiring "*using an agent* to set up a verification structure in the erasable, non-volatile memory of the BIOS." The patent's only other independent

claim is claim 18, which incorporates all of claim 1's requirements but adds encryption-related steps.

## III. The Prior Art

Two prior art references are relevant on appeal: Hellman and Chou. The Board incorrectly concluded that Hellman disclosed the claim 1 "agent," and that Hellman and Chou in combination teach or render obvious the claim 1 step of "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS."

A more detailed description of each is set forth below. But, at a high level, ***Hellman*** is a "pay per use software control system"—a device that limits the number of times a piece of software can be used. Appx1264 (5:39-40). The Board relied on Hellman to disclose the "agent." But the "agent" identified in Hellman ("update unit 36") is hardware. It is connected to other hardware, like software player 42, by "wires" and an "epoxy"-covered switch 41. Appx1267 (11:5-10.)




FIG_8

FIG. 8 is a block diagram of a base unit during use of software in a pay per use software control system of FIG. 1.

As reflected above, it also is undisputed that Hellman does not expressly disclose a BIOS, BIOS memory, or an operating system. Hellman thus not teach any form of interaction between BIOS and OS, let alone an OS-level software agent that sets up a verification structure in BIOS memory. In fact, the only "software" Hellman describes is the software whose use Hellman seeks to restrict. Appx1257.

Unlike Hellman, ***Chou*** *does* disclose a BIOS. But that is effectively all the Board relied on Chou to disclose. Chou teaches inserting a "security routine" into normal BIOS software routines to prevent "theft of personal computer systems" by requiring a password. If the user-entered password is correct, the BIOS continues

executing, letting the computer start. If incorrect, the BIOS stops executing, rendering the computer inoperable. Appx1276-1277 (4:1-5, 4:18-19, 5:55-62.)

Like Hellman, Chou does not disclose an OS-level software agent writing a verification structure to BIOS memory. Instead, Chou discloses a *BIOS-only* routine that inserts password-protection functions into standard BIOS operations. Appx1276 (3:52-56). It is nearly identical to the Ewertz reference the applicants distinguished in prosecution, which "disclosed storage in the BIOS memory area by the BIOS software itself." *Ancora v. Apple*, 744 F.3d at 735; *see* Appx2979.

## IV. Proceedings Before the Patent Office

In two proceedings before the Board, Petitioners argued that claims 1-3, 6-14, and 16 are obvious over combinations of Hellman and Chou (Ground 1), and Hellman, Chou, and Schneck (Ground 2).[3] Appx6. Because the Board's decisions are substantively the same, Ancora cites mostly to the *Nintendo* final decision below, Appx1-54, except as specifically noted in parentheses.

The Board found that "Ground 1 is subsumed by Ground 2" and invalidated all challenged claims under Ground 1—concluding that Hellman's hardware-dependent system disclosed the claim 1 "agent" and that a POSITA would have found it obvious to use such hardware-dependent "agent" in conjunction with the

[3] Schneck is irrelevant to this appeal because Petitioners did not rely on it for claim 1's "using an agent to set up a verification structure" limitation.

BIOS disclosed by Chou. Appx22-39. Notably, in doing so, the Board explained that its rejection of Ancora's request that the claim 1 "agent" term be construed to require "OS-level software" was "[n]ecessary" to its decisions, Appx7, and instead "construe[d] 'agent' in claim 1 to mean a 'computer program or routine' wherein such computer program or routine does not exclude hardware components." Appx19.

## SUMMARY OF ARGUMENT

**I.** The Board erred in construing the claimed "agent" to encompass *any* software or hardware. It arrived at its overbroad construction by disregarding unambiguous prosecution history statements defining the "agent" as OS-level software, including the applicants' direct statement that the agent was an "***operating system (OS) level program***." When "agent" is properly construed as OS-level software, neither Hellman nor Chou disclose it, as Hellman teaches a hardware-dependent device, and Chou teaches BIOS-only software.

**II.** The Board erred by ignoring that the asserted combination of Hellman and Chou is inoperable, redundant, and does not disclose using an agent to "set up" a "verification structure" in BIOS memory.

**III.** The Board erred by applying an incorrect "nexus" standard to conclude that a leading BIOS company's praise *of* the '941 patent lacked a nexus *to* the '941 patent, and that Ancora's licenses of *only* the '941 patent to [redacted] ([redacted]),

[redacted] ([redacted]), and [redacted] ([redacted]) also lacked a nexus to the ’941 patent.

## STANDARD OF REVIEW

Obviousness is a question of law with underlying questions of fact. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017). This Court “review[s] the Board’s legal determination of obviousness *de novo* and its factual findings for substantial evidence.” *Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1367 (Fed. Cir. 2017).

Accordingly, this Court “review[s] *de novo* the Board’s ultimate claim constructions and any supporting determinations based on intrinsic evidence.” *Personalized Media Commc’ns, LLC v. Apple Inc.* (“*PMC*”), 952 F.3d 1336, 1339 (Fed. Cir. 2020). It “review[s] any subsidiary factual findings involving extrinsic evidence for substantial evidence.” *Id.* The Board must apply “the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).” 37 C.F.R. § 42.100(b) (2019).

## ARGUMENT

Although the Board’s decision contains many legal and logical faults, this appeal focuses on three: (1) the Board’s incorrect construction of “agent,” including its refusal to credit the applicants’ statements (recognized by the Examiner and this Court) that the claim 1 “agent” is limited to being an “*(OS) level* program,”

Appx2979 (emphasis added); (2) the Board's failure to address Ancora's unrebutted evidence that the Hellman/Chou combination the Board relied on would be inoperable and redundant, and lacks an agent that sets up a "verification structure," and (3) the Board's reliance on an erroneous "nexus" standard to disregard extensive evidence of licensing and direct praise of the '941 patent.

And even among these errors, one stands out: the Board's refusal to credit the applicants' explanation during prosecution that the "agent" was an OS-level program. Because that decision was so clearly wrong (at odds with not only the applicants' and Examiner's statements but this Court's descriptions of the '941 patent in its prior decisions), and because the Board conceded that its refusal to limit the term to the meaning the applicants provided was "necessary" to its decision, the Court can and should reverse for that reason alone.

## I. The Court should reverse the Board's obviousness determination based simply on its incorrect construction of the "agent" term.

The most straightforward error the Board made was its refusal to credit the applicants' repeated statements regarding the meaning of the term "agent," which they explained was limited to being an "*(OS) level* program." Appx2979 (emphasis added).

Indeed, the Board approached its claim-construction task by doing exactly what this Court says it ***cannot*** do: it ignored the prosecution-history "evidence because, in its view, [the applicants'] statements during prosecution did not

constitute a clear and unmistakable surrender sufficient to rise to the level of disclaimer." *PMC*, 952 F.3d at 1345 (citation omitted); *see* Appx14-16.

Frankly, that the prosecution history contains the most on-point evidence of the scope of the "agent" term is logical: the "agent" term was added during prosecution. Yet the Board disregarded the applicants' prosecution-history statements explaining and defining that term because, in the Board's view, they "lack[] a clear and unambiguous disavowal." Appx15. This was error.

To be clear, the applicants' statements absolutely rose to the level of an express disavowal. The applicants *unambiguously* defined the "agent" as OS-level software—including by stating that the agent's function of "stor[ing] … the verification structure or license information … in the BIOS" must be performed by "***operating system (OS) level program[s]***." Appx2979. This unambiguous history makes clear what this Court already recognized: that (1) "the applicants were clear that the OS-level language referred to the [claimed] verifying software," *Ancora v. Apple*, 744 F.3d at 737, (2) "the[] invention … *both* operated as an application running through an operating system *and* used the BIOS level for data storage and retrieval," *id.* at 735-36; and (3) the patent claims a "software innovation[]" that excludes "[h]ardware-based methods." *Ancora v. HTC*, 908 F.3d at 1344, 1347.

But "even where 'prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.'" *PMC*, 952 F.3d at

1345 (citation omitted). Indeed, of particular relevance here is this Court's teaching that "[a]n applicant's repeated and consistent remarks during prosecution can define a claim term." *Id*. "Similarly, an applicant's amendment accompanied by explanatory remarks can define a claim term." *Id.*[4] Thus, the applicants' repeated description of the "agent" as OS-level software was a critical fact that should have informed (and ultimately controlled) the Board's analysis.

Further, the Board did not limit its error to refusing to credit the applicants' clear statements defining the "agent" term; it compounded that error by relying instead on extrinsic sources—*Markman* briefs, district court opinions, claim construction statements, and dictionary definitions—to discern a definition of "agent" as "understood in the computer industry." Appx10, Appx18. The Board's approach was legally backwards. As this Court has explained, tribunals must not "start[] with the broad dictionary definition" and then turn to intrinsic evidence to see if it "whittl[es] it down," as doing so risks "systematic overbreadth." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc). And even ignoring the legal flaw in its analysis, this "evidence" actually only further supports Ancora.

Moreover, these errors were critical. The Board admitted that its rejection of Ancora's construction was "necessary" to its obviousness determination. Appx7.

---

[4] *Accord Univ. of Mass. v. L'Oreal SA*, 36 F.4th 1374, 1379 (Fed. Cir. 2022); *Shire Development, LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015).

There is a reason. Neither reference the Board relied upon (Hellman nor Chou) discloses an OS-level software agent. Hellman uses a hardware-dependent approach, and Chou discloses BIOS-only software. As a result, under the proper construction of "agent," neither could disclose the '941 invention.

In sum, as explained in detail below, the record in this case—most particularly the prosecution history—makes unmistakably clear that the claimed "agent" is an OS-level software program. The Board erred by refusing to credit such evidence and by turning instead to extrinsic evidence to define the term. Because the Board admitted that its obviousness conclusion depended on its overbroad construction of "agent" as any program or routine (including ones based *entirely in hardware*), the Court must reverse the Board's decision.

### A. The claimed "agent" is an OS-level software program.

"The only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). Claim construction requires consulting the entire intrinsic record to construe a claim term in "context." *Id.*

And contrary to what the Board concluded, that includes the prosecution history. The "prosecution history clarifies the meaning of the claim language both directly and, by clarifying the specification's disclosures, indirectly." *Canopy Growth Corp. v. GW Pharma Ltd.*, No. 2022-1603, 2023 WL 3048243, at *4 (Fed.

Cir. Apr. 24, 2023). Thus, "[e]ven where 'prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.'" *PMC*, 952 F.3d at 1345 (citation omitted). In particular, it is well understood that "an applicant's amendment accompanied by explanatory remarks can define a claim term." *Id.* That is precisely what occurred here.

As explained, the applicants added the "agent" term to claim 1 *during* prosecution to overcome an initial rejection. And when they did so, they expressly defined "agent" as an "(OS) level program[]." Appx2979. Such statements "must [be] give[n] … weight," and the Board's refusal to credit them because they purportedly did not rise to the level of a disclaimer was error. *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003) (holding that, where "phrase[s] were added to gain allowance, … [w]e must therefore give them weight, for the patentability of the claims hinged upon their presence in the claim language"). For this reason alone, the Court can and should reverse.

But that is not all. Consistent with their defining the term, the applicants uniformly described the agent and its task of writing data to BIOS memory as being performed by non-BIOS, OS-level software. For example, a key segment of the prosecution history begins with a January 15, 2002 non-final action, in which the Examiner rejected claim 1's "using an agent limitation" as obvious. The Examiner found the limitation taught by the combination of Misra and Ewertz—stating that

Misra purportedly taught "*using an agent* to set up a verification structure in computer memory," Appx2969, and "*programs ('agent')* used in the license collation process," Appx2970-2971, while Ewertz purportedly taught "expanding non-volatile memory (e.g. BIOS) … for maintaining data such as software licenses." Appx2971.

The applicants responded in a February 5, 2002 amendment. And critically, the applicants stated unequivocally that, when storing "the verification structure or license information … in the BIOS as is required by the present claims" (i.e., the "agent" limitation at issue), the "***present invention" is an "operating system (OS) level program***." Appx2979. This too is compelling evidence showing that the Board erred in failing to construe the agent as OS-level software. A description of "the present invention" to overcome an examiner rejection "narrowly define[s] the claim phrase at issue," even without disavowal or disclaimer. *See Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1372 (Fed. Cir. 2008).

Moreover, consistent with that statement, the applicants then relied on the stated scope of the "agent" term to distinguish its "present invention" from Ewertz, which taught a BIOS program storing data in BIOS memory. As the applicants explained, "Ewertz teaches that writing to the BIOS area is performed by the BIOS routines." Appx2979. In contrast, "[s]oftware license management applications,

*such as the one of the present invention, are operating system (OS) level programs*." *Id*.

The applicants also relied on the stated scope of the agent term to distinguish Misra—explaining that, although Misra was an "OS program," it did not interact with BIOS as the applicants' invention required. Appx2979. As the applicants explained, "the systems described in Misra and Ewertz are an OS program and a BIOS program, respectively, that cannot run at the same time. Therefore, there is no teaching or suggestion to combine these programs." *Id*.

Further, the applicants also relied on the stated scope of the "agent" term (*i.e.*, that it was limited to being an OS-level program) when explaining how the invention "proceeds against conventional wisdom in the art." *First*, they explained that, because conventional wisdom teaches that "[t]here is no OS support … to write data to the system BIOS[,] … an ordinary person skilled in the art would not consider the BIOS as a possible storage medium." Appx2980. *Second*, they explained that, because conventional wisdom teaches that BIOS lacks an "OS file system to arrange and manage data structures[,] … OS level application programmers would not consider the BIOS as a storage medium for license data." *Id.* They thus explained that the invention proceeds against this wisdom by using an OS-level program to store data in BIOS. *Id.*

And even that is not all. In support of what the applicants stated the term "agent" meant, they submitted to the Examiner a white paper describing the applicants' "Beeble" product.[5] In that paper, the applicants described how their Beeble embodiment uses a "kernel mode ***windows*** driver" to store data in BIOS memory using $E^2$PROM manipulation commands to "write DMI structures to EEPROM," Appx3007, Appx3009-3010—just as the specification describes. Appx115-116 (2:1-6; 3:4-9.) Indeed, before the Board, every expert agreed that the Beeble paper described "OS-level agents." Appx1502 (¶36); Appx6636-6637.

Further, the applicants were not alone in their understanding. The Examiner readily appreciated the applicants' distinctions and the careful (and narrow) lines they drew regarding the "agent" term. Specifically, "[t]he examiner's Reasons for Allowance make clear that the examiner and the applicant[s] understood that the invention requires" that the '941 patent's "agent" be OS-level software. *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003).

For example, in response to the applicants' arguments about Ewertz and Misra, the Examiner allowed the claims—emphasizing that the agent was a component of a "program[] running at the OS-level interacting with a program

[5] The applicants discussed the white paper in a November 9, 2001 interview and appended it to a November 16, 2001 amendment: "As requested by the Examiner during the interview, a description of a *specific embodiment of the invention* is attached hereto." Appx2955.

verification structure stored in the BIOS" and explaining that nothing in "the closest prior art systems, singly or collectively, … teach licensed ***programs running at the OS level*** [i.e., the claimed agent] interacting with a program verification structure stored in the BIOS":

> [T]he key distinction between the present invention and the closest prior art, is that the Misra et al.… and the Ewertz et al. system run at the operating system level and BIOS level, respectively. More specifically, ***the closest prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS*** to verify the program using the verification structure and having a user act on the program according to the verification. Further, it is well known to those of ordinary skill of the art that a computer BIOS is not setup to manage a software license verification structure. ***The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS.***

Appx2988 (emphases added).

This Court likewise appreciated the narrowly defined scope of the "agent" term. Addressing the February 5, 2002 amendment in its *Ancora v. Apple* decision, the Court recognized that the claimed agent "***r[an] through an operating system***"—explaining:

> [T]he applicants distinguished their invention over a combination of two references: one disclosed storage in the BIOS memory area by the BIOS software itself [Ewertz]; the other disclosed software implemented in or through an operating system [Misra]. The applicants explained that their invention differed from the prior art in

> that it *both* operated ***as an application running through an operating system*** *and* used the BIOS level for data storage and retrieval—a combination that was not previously taught and that an ordinarily skilled application writer would not employ.

744 F.3d at 735-36 (bolded emphasis added). Indeed, the Court concluded that the applicants disclaimed "storage in the BIOS memory area by the BIOS software itself." *Id.*

And finally, the patent's reexamination record also confirms the agent is OS-level software. *St. Clair Intell. Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 275-76 (Fed. Cir. 2011) (examiner remarks in reexamination inform construction). In defining BIOS, the Examiner stated that data residing in BIOS can be considered "part of the BIOS only if it is made and used by the functions of the BIOS itself." Appx2602. The Examiner then explained that its definition "does not preclude such material being also used or modified *by programs located outside of BIOS, such as applications running in an operating system.*" *Id.* The requesting party, Microsoft, also confirmed its understanding that the applicants "distinguish[ed] low-level programs that regularly access the BIOS from ***operating system level programs such as the claimed system***." Appx2443.

The evidence cited above is compelling. It shows that everyone—the applicants, the Examiner, and this Court—understood the "agent" term to be limited to an "(OS) level" program. Only the Board understood it differently. But that

understanding was erroneous on its own terms—even ignoring the Board's legal error in requiring disavowal or disclaimer as a precondition for consulting the prosecution history.

*First*, the Board erroneously concluded that the "[t]he Applicant[s] never argued to the Examiner in the '941 patent's prosecution that the agent itself is 'OS-level.'" Appx15. The applicants' February 5, 2002 amendment did just that: disclaiming Ewertz' "teach[ing] that writing to the BIOS area is performed by the BIOS routines," and affirmatively defining the "present invention, [as] operating system (OS) level programs" with respect to the agent's task of setting up a verification structure. Appx2979. These "representations, made in distinguishing prior art, concerned software that implemented the invented method." *Ancora v. Apple*, 744 F.3d at 736. "[T]he applicants were clear that the OS-level language referred to the [claimed] verifying software." *Id.* at 737.

*Second*, the Board concluded that the Examiner's statement of allowance (Appx2988-2989) was ambiguous in describing the invention as "*programs* running at the OS level" because the Board speculated that "the Examiner's statement … *may* be directed to 'an entity different from the agent.'" Appx15. But the Board never explains what other "entity" the Examiner could have referred to. Nor could it. The agent is the *only* "entity" that stores data in BIOS memory, as the prosecution history confirms and as this Court recognized in explaining the invention "*both* operated as

an application running through an operating system *and* used the BIOS level for ***data storage*** and retrieval." *Ancora v. Apple*, 744 F.3d at 735 (bold italics added).

*Third*, nothing in the intrinsic record favors the Board's construction. *See Campbell Soup Co. v. Gamon Plus, Inc.*, No. 2020-2322, 2021 WL 3671366, at *5 (Fed. Cir. Aug. 19, 2021) (refusing to limit claim scope where "we do not see anywhere in the specification or the prosecution history that contemplates a [contrary] embodiment"). The *only* descriptions of the "agent" and its task of "setting up a verification structure" are of OS-level programs. Indeed, consistent with the fact that "agent" was added during prosecution, the specification does not directly reference the term. Nevertheless, the specification teaches that the task of writing to BIOS memory requires OS-to-BIOS interactions.

For example, as this Court recognized in *Ancora v. HTC*, the specification describes "storage of a license record … by 'using $E^2$PROM manipulation commands.'" 908 F.3d at 1345 (citing Appx115 (1:65-2:5)). Ancora's expert testified that using such commands constitutes "OS level activity." Appx6599. Petitioners' expert did too. Dr. Wolfe described the Beeble embodiment's use of $E^2$PROM manipulation commands as "OS-level agents." Appx1502 (¶36).

The specification also describes the agent's function—setting up a verification structure in BIOS memory—as "*interacting with* the BIOS." Appx116 (3:6-7). By writing data to BIOS, the invention achieves a higher level of security because "the

required level of system programming expertise that is necessary to intercept or modify *commands*, *interacting with the BIOS*, is substantially higher than those needed for tampering with data residing in volatile memory such as hard disk." Appx116 (3:5-9). The common meaning of "interact" requires reciprocal action between two entities. *See Oxford English Dictionary Online,* https://www.oed.com/view/Entry/97519?redirectedFrom=interaction#eid ("Interaction, *n.* … Reciprocal action; action or influence of persons or things on each other.") (last visited June 19, 2023). The agent cannot be BIOS because it "interact[s] with the BIOS." In contrast, as the Examiner explained, anything "made and used by the functions of the BIOS" is "part of the BIOS." Appx2602. The agent is not "part of the BIOS," but rather is OS-level software.

*Finally*, the Board ignored the parts of the prosecution history that directly contradict its broad construction, including the applicants' express disclaimer of Ewertz' BIOS-to-BIOS solution; Appx2979, and the Beeble "windows driver" embodiment, Appx3007, Appx3009-3010.

In sum, the entirety of the intrinsic record—most pointedly the prosecution history—unequivocally and uniformly defines the claimed "agent" as an OS-level program that stores data in BIOS memory. The Board erred by concluding otherwise.

### B. At a minimum, the claimed "agent" is software only.

The Board separately erred in construing "agent" as a "computer program or routine" that "does not exclude *hardware* components." Appx19. The '941 patent is a "*software* innovation[]." *Ancora v. HTC*, 908 F.3d at 1347. The plain and ordinary meaning of "agent" in context excludes hardware-dependent methods. The Board's inclusion of hardware within the term's scope independently requires reversal because the Board relied on its overbroad construction in finding that Hellman (a hardware-dependent reference) disclosed the claimed agent. Appx29.

As an initial matter, the applicants' clear and repeated statements that the agent was an "OS-level" software program preclude it from being satisfied by a hardware-dependent approach. Thus, for the reasons set forth at pages 19-28, this Court can and should conclude that the Board erred. To be clear, however, the specification and prosecution history independently show that the applicants disclaimed a hardware-dependent approach—which is all that Hellman discloses.

**Specification:** The specification expressly rejected reliance on "hardware-based methods" for "the identifying and restricting of an unauthorized software program's operation." *Ancora v. HTC*, 908 F.3d at 1344. Prior art "Hardware-based methods exist that require inserting a dongle into a computer port to authenticate the software authorization, but those methods are costly, inconvenient, and not suitable for software sold and downloaded over the internet. *Id.* (citing Appx115 (1:27-32).

The claimed method of using an agent to store and retrieve license data in BIOS "substantially reduce[s] or overcome[s] the drawbacks" of the earlier methods. Appx115 (1:33-35.)

The specification also explains that the '941 patent's specific software-based solution is more secure than prior methods because "the required level of system *programming* expertise that is necessary to intercept or modify commands, interacting with the BIOS, is substantially higher than those needed for tampering with data residing in volatile memory such as hard disk." Appx116 (3:4-9). It also explains that the method is implemented with a "*conventional computer having a conventional BIOS module*," confirming that it is not dependent on any specific or special-purpose hardware. Appx115 (1:45-46).

This Court confirmed that the '941 patent eschews "additional hardware" beyond "the existing computer hardware" on which it runs by "mak[ing] use of the existing computer hardware (eliminating the expense and inconvenience of using additional hardware)." *Ancora v. Apple*, 744 F.3d at 733-34. It also confirmed that the patent involved a "software innovation" in which "the claimed advance is a concrete assignment of specified functions among a computer's components." *Ancora v. HTC*, 908 F.3d at 1344, 1347.

**Prosecution History:** The prosecution history confirms the applicants rejected a hardware-dependent solution. In a December 20, 2000 office action, the

Examiner rejected all claims over Ginter, Appx2963-2939, which disclosed an "operating system level" solution, Appx2988. In a May 21, 2001 amendment and response, the applicants acknowledged that Ginter described a method of restricting software usage but explained that it "suffers from the deficiency" identified in the specification by requiring a hardware-dependent implementation. Appx2920. As the applicants explained, because Ginter requires "add-on hardware" that is "not part of the PC," Appx2921, it "cannot support a business model where the [software] distributor doesn't know the final target machine." Appx2920. The applicants further explained that what the Examiner relied on in Ginter to "describe the step of setting up a verification structure ... describe[s] the elements of the *proprietary hardware of Ginter*." Appx2922. Thus, in contrast to the '941 solution, "[t]he functionality described in these portions of Ginter et al. is the *different functionality that add-on hardware … can perform*." Appx2922.

In another exchange, the Examiner on June 22, 2001 issued a § 112 rejection because he incorrectly believed that "EEPROMs require a special or programmer *voltage* to program it," and that "the Applicants do not teach the *device* necessary to edit an EEPROM" to "write and erase its data." Appx2934-2935. The applicants explained the Examiner's error in a November 9, 2001 interview in which "Agreement [] was reached" to "edit[] independent claim language." Appx2945. In the resulting amendment, the applicants "amended [claim 1] as agreed during the

interview," Appx2953, by adding the "using an agent" limitation, Appx2956, confirming its intent that $E^2$PROMs would be programmed with a *software* agent instead of a hardware "device" that required "special or programmer voltage" to "write and erase [EEPROM] data." Appx2934. In so doing, the applicants again disclaimed a hardware-dependent method.

In a January 15, 2002 office action, the Examiner again equated "agent" with "program." In rejecting all then-pending claims as obvious in view of Misra and other art, the Examiner stated that "Misra ... teach[es] … *programs ('agent')* used in the license collation process." Appx2970-2971; *see* Appx2972 (Examiner statement that "Smith et al. teach … *using an agent program*.")

The Examiner confirmed in his reasons for allowance that the invention proceeded against the conventional wisdom by doing something "the closest prior art systems, singly or collectively, do not teach[:] licensed *programs* running at the OS level interacting with a program verification structure stored in the BIOS." Appx2988-2989. That included "*using an agent* to set up a verification structure in the erasable, non-volatile memory of the BIOS." Appx2988-2989.

The Beeble paper also confirms the agent is software only and is not dependent on any particular hardware. It explains that "writing to EEPROMs can be accomplished through *software*; therefore Beeble *does not require any additional hardware* to be added to the PC." Appx3006. "Beeble is a *software product*."

Appx3011. The "kernel mode windows driver" that gives "Beeble direct access to BIOS EEPROM" is "responsible for ... *executing the proper instruction* set for writing data to the Flash chip." Appx3007, Appx3009. The "driver's memory footprint is ... 50KB," and its "impact on the CPU cycles is minimal." Appx3010.

The reexamination record also shows that the "agent" is software only. The Requester, Microsoft, argued that the "broadest reasonable interpretation" of "agent" is "a *program* to perform a task." Appx2457; *see* Appx2447 ("[T]he 'agent' is a program."). Microsoft's statements provide extrinsic evidence that a skilled artisan understood the agent was software. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

The only descriptions of the agent in the intrinsic record are software, and the prosecution history confirm that the agent *cannot* depend on specific hardware.

### C. The extrinsic evidence supports Ancora's construction.

Rather than crediting the applicants' statements, the Board appears to have done exactly what this Court forbids: starting with an extrinsic definition and considering only whether the intrinsic record disclaimed any aspects of that extrinsic definition—an "error" that this Court has recognized "will systematically cause the construction of the claim to be unduly expansive." *Phillips*, 415 F.3d at 1321.

Here, the Board stated that "agent" had a "well-defined and understood [meaning] *in the computer industry*" but offered no reasoning to support that

conclusion. Appx10. Instead, it cited without explanation an expert declaration, four sets of *Markman* briefs, two *Markman* orders, and two joint-claim-construction statements. Appx10 (citing Exs. 2004 (Appx2726), 1073 (Appx2270), 1074 (Appx2301), 1070 (Appx2175), 1071 (Appx2212), 1072 (Appx2249), 1012 (Appx1353), 1013 (Appx1358), 2012 (Appx3133), and 1075 (Appx2319)). Other than the declaration, none of these are traditional sources of extrinsic authority, and none reflect any "industry" agreement about the term's meaning, let alone its meaning in the context of the '941 patent.

Frankly, they do the opposite. They include over a dozen statements by Ancora and a district court describing the '941 patent's agent as "OS-level software." For example, Exhibit 1071 is an Ancora Markman brief that repeatedly describes the claimed agent as "OS-level software":

| | |
|---|---|
| Appx2221 | Describing embodiment as "an ***OS-level software agent***." |
| Appx2222 | Describing "***OS-level*** extensions" in treatise as "agents." |
| Appx2231 | "[T]he '941 invention ... requir[ed] that the ***OS-level software agent*** use [BIOS] to set up a verification structure." |
| | It must be "possible for an ***OS-level software agent*** to 'set up a verification structure.'" |
| Appx2232 | "[T]he present invention overcomes … us[es] an ***[OS-level software] agent***." (brackets in original) |
| Appx2234 | "[T]he ***OS-level 'agent'*** is required only to 'set up a verification structure….'" |
| Appx2235 | "[T]o the extent an ***OS-level program/application was required***—the claims were amended to expressly refer to an 'agent.'" |

Exhibit 1072 is another Markman brief that describes the agent as "OS-level software":

| | |
|---|---|
| Appx2258 | The patent "taught a 'software' solution that … enable[es] BIOS to be recognized—and used—by ***OS-level software agents*** ... to store data." |
| Appx2264 | The "prosecution history…merely reflects the proposition that an OS-level program…must participate in the claimed process…. As it has said, the 'setting up' step ***requires the involvement of an OS-level software program or routine (i.e., an agent)***." |
| Appx2265 | "'[T]he present invention overcomes this difficulty by using an ***[OS-level] agent*** to setup a verification structure in the ... BIOS.'" (brackets in original) |

And Exhibit 1013 is a claim construction order which, consistent with Ancora's arguments, repeatedly describes the "agent" as "OS-level software":

| | |
|---|---|
| Appx1382-1383 | "Ancora points out that only the 'setting up' step is performed by an ***agent at the OS-level***." |
| | "[T]he prosecution history … demonstrates that the applicants and the Examiner understood that Claim 1 … did not require ***the OS-level agent*** to perform the 'acting' step." |
| Appx1388 | "The term 'agent' was added during prosecution to specifically elucidate that 'the closest prior art systems, singly or collectively, do not teach licensed ***programs running at the OS level*** interacting with a program verification structure stored in BIOS. The Examiner repeatedly acknowledged his understanding that ***the word "agent" refers to such programs***." (citations omitted) |
| Appx1389 | "The [Beeble] Paper explained how ... ***an OS-level software agent*** could be used to set up the verification structure." |
| Appx1391 | "The history clearly recites an agent as a 'licensed program[] ***running at the OS level*** interacting with a program verification structure stored in BIOS." |
| | "A [PHOSITA] would understand that agent is referring to software ***because of its complete interaction with the OS***." |

Additionally, the Board appeared to rely on the Oxford Dictionary of Computing to conclude that the agent "*may be … hardware*." Appx18. Frankly, by its own terms, this definition does not even apply. It states that the hardware agents it refers to are "robot[s]," which the dictionary contrasts with "[s]oftware agents [that] operate in symbolic environments." Appx1691. The Board also ignored four other dictionary definitions provided by Ancora that only describe agents as software. *See* Appx2814-2819, Appx2820-2822, Appx2823-2826, Appx2832-2833. Most importantly, though, such definition was refuted by the applicants' statements during prosecution. Accordingly, the Board's approach demonstrates exactly why this Court cautions tribunals not to "start[] with the broad dictionary definition" and attempt to "whittl[e] it down" based on intrinsic evidence as doing so risks "systematic overbreadth." *Phillips*, 415 F.3d at 1321.

In sum, not only was the Board's approach legally backwards, but the "evidence" it cites does not support its apparent conclusion that there is an industry-standard definition of "agent."

### D. The Board's obviousness conclusion must be reversed when the "agent" is properly construed.

If the Court agrees that the "agent" must be an OS-level software program or, at a minimum, that the "agent" *cannot* be hardware alone, the Board's obviousness determination must be reversed.

As explained above, the Board identified Hellman's "update unit 36 ... act[s] as the required 'agent,'" Appx34, and rejected Ancora's argument that Hellman does not disclose the claimed "agent" because "it relies upon Patent Owner's proposed claim construction … [of] 'agent' as 'an OS-level software program or routine'" which "we decline to adopt." Appx35-36. As also explained, the Board freely admitted that its rejection of Ancora's claim construction argument was "[n]ecessary" to its decision. Appx7.

Accordingly, if the agent is construed to be OS-level software, the Board's obviousness ruling lacks substantial evidence and must be reversed (as opposed to merely vacated and remanded) because "the only permissible factual finding that can be drawn from [Hellman] is that the [agent] is *not* [OS-level] as required by the claims." *In re Hodges*, 882 F.3d 1107, 1113 (Fed. Cir. 2018) (reversing Board's obviousness finding). Certainly the Board made no finding that Hellman alone, or Hellman in combination with Chou, would disclose the agent if it were construed to be an OS-level software program. Appx36. Nor could it. Hellman discloses only hardware, *see id.* (referring to "Hellman's hardware"), and Chou discloses only a "BIOS routine" that is materially indistinct from the Ewertz reference that the applicants overcame during prosecution. Appx24-25.

Likewise, the Board's obviousness conclusion would also lack substantial evidence and need to be reversed even if the agent is construed to be software-only.

As the Board acknowledged, Hellman discloses a hardware-dependent control system. Appx29, Appx36. The Board nonetheless rejected Ancora's argument because it was "premised on [its] proposed claim construction requiring that the agent is 'software only,' which, as discussed above, we decline to adopt." Appx29. The Board thus did not conclude—because it could not—that Hellman would disclose an "agent" if that term were construed to exclude hardware. *Hodges*, 882 F.3d at 1113.

## II. The Board's obviousness conclusion lacks substantial evidence even under the Board's broad construction.

Without more, the Board's claim construction errors warrant reversal of its obviousness conclusion. But even ignoring the Board's erroneous construction of the "agent" term, the Board committed at least three *additional* errors, each of which independently warrants reversal. *First*, the asserted Hellman/Chou combination is inoperable as it would allow software-authorization data to overwrite BIOS data. *Second*, the combination is redundant because, under the Board's reasoning that all computers have a BIOS, there is no reason to "add" Chou's BIOS to Hellman. *Third*, no evidence supports the Board's finding that Hellman's memory address H—which is just a location in memory—constitutes a "verification structure" that must be "set up" by the agent in BIOS memory.

Before addressing each of these failures, Ancora first provides additional descriptions of Hellman, Chou, and the asserted combination.

### A. The Hellman/Chou Combination

**Hellman** claims a "pay per use software control system" that limits "the number of uses of software" on a hardware base station 12. Appx1264 (5:1-2), Appx1262 (1:5-7). Hellman teaches using hardware-control elements within "base unit" 12 to control whether its "software player" 42 will be "activated," thereby allowing a user to play the pay-per-use software. Appx1266 (10:50-54).

Hellman starts with a user buying software. Appx1264 (5:46-50). An "authorization and billing unit" 13 receives the user's request, generates authorization A for the base unit to use a software package N number of times, and sends the authorization A as a signal to the base unit. Appx1264 (6:3-8).

The base unit's hardware-control elements then come into play. As shown in Figure 8, a one-way-hash generator 33, update unit 36, nonvolatile memory 37, and switch 41 dictate whether software player 42 is "activated" and thus allowed to play a record or run a software program. Notably, the Board identified update unit 36 as corresponding to the claim 1 "agent."




FIG_8

Base unit 12 feeds the purchased software package into a one-way hash generator 33: a "microprocessor" that outputs a signal representing hash value H. Appx1266 (10:34-38). Hash generator 33 sends signal H to "update unit" 36, the purported "agent." As noted, Update unit 36 is hardware, connected to other hardware elements by wires and an epoxy-covered switch 41. Appx1267 (11:5-10).

Update unit 36 then uses H as a memory address for retrieving data from non-volatile memory 37. Appx1091 ("The base unit retrieves the value stored in the memory address represented by hash value H."). The "value" stored at address H is called "M." M represents the number of times the use-limited software package can be used. Appx1266 (10:38-43).

If value M is greater than 0 uses, the update unit 36 sends a control signal to switch 41, which "activates software player 42" so it can use the use-limited

software/record. Appx1266 (10:44−54). Update unit 36 also sends a signal back to non-volatile memory 37 to change the value of M to M-1 at address H—*i.e.*, 15 uses drops to 14. If M=0, the user has exhausted its authorized uses, and update unit 36 will not send a control signal to switch 41; software player 42 never gets activated; and the software package can't be played. *Id.*[6]

Because switch 41 is a linchpin of the control system—by controlling whether software player 42 gets "activated"—Hellman instructs that "base unit 12 should be physically constructed so that switch 41 is not readily accessible to the user." Appx1267 (11:4-19). This prevents a user from hot-wiring the software player, *i.e.*, "cut[ting] the wire sending the control signal from update unit 36 to software player 42 and forc[ing] the control signal to always activate software player 42." *Id.* Hellman says to "use … epoxy to encapsulate switch 41 and the wire connecting it to update unit 36." *Id.*

Hellman does not expressly disclose a BIOS. Instead, Petitioners and their expert insisted that Hellman implicitly discloses "BIOS because effectively all computers at that time had BIOS." Appx724; Appx1058 (¶50).

**Chou** is, as noted above, a "BIOS routine[] which incorporates [a] security function." Appx1276 (3:4). The security function is just a password "prompt" that

---

[6] Although not relevant, Hellman discloses how "M" first gets stored in nonvolatile memory 37 using a similar process. Appx1260 (Fig. 6), Appx1266 (9:50-10:14).

either allows the BIOS to continue booting (if the password is correct) or stops the BIOS from booting (if the password is incorrect). Appx1278 (7:55-60), Appx1276 (4:1-5).

**<u>The Hellman/Chou Combination</u>**: Petitioners asserted, and the Board held, that Hellman and Chou render obvious the claim 1 "using an agent…" limitation because Hellman and Chou teach:

> to use an agent ([Hellman's] update unit 36) to set up a verification structure ([Hellman's] memory location in non-volatile memory 37 as defined by hash value H) in the erasable, non-volatile memory of the BIOS ([Hellman's] non-volatile memory 37 provided as EEPROM, storing [Chou's] BIOS as taught by Chou), with the verification structure accommodating data that includes at least one license record ([Hellman's] authorized uses value M).

Appx92-93 (Roku/Vizio); *see* Appx34-37 (Nintendo).

### B. The Board's obviousness determination that Hellman and Chou teach "using an agent to set up a verification structure" lacks substantial evidence.

For three reasons, the Board's finding that Hellman and Chou teach or render obvious the claim 1 "using an agent to set up a verification structure" limitation lacks substantial evidence.

#### i. The asserted combination is inoperable.

*First*, inoperable solutions "teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001); *see Plas-Pak Indus., Inc. v. Sulzer*

*Mixpac AG*, 600 F. App'x 755, 759-60 (Fed. Cir. 2015). As a result, it was error for the Board to ignore Ancora's evidence and fail to even address Ancora's explanation that the Board's proposed combination would be inoperable. *Polaris Indus. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1061, 1067-70 (Fed. Cir. 2018) (vacating Board decision that failed to consider how modification would render prior art "vehicle less stable").

Specifically, the Board's combination relies on using "Hellman's *existing* non-volatile memory 37 ... 'for storing [Chou's] BIOS.'" Appx85 (Roku/Vizio); *see* Appx33 (Nintendo). As shown in the diagram below (annotated by Petitioners' expert), Petitioners' combination requires repurposing Hellman's nonvolatile memory 37 and using it to store a BIOS.




Appx1499.

This combination creates a critical failure. By requiring Hellman's non-volatile memory 37—a hash table for storing "M" values—to *also* store BIOS

instructions *and* the data those instructions use, the combination creates the very risk the applicants foretold of using BIOS memory to store non-BIOS data: that "data residing in the BIOS (which is necessary for the computer's operability) is inadvertently changed." Appx116 (3:10-15).

And in fact, Ancora's expert explained that the Hellman/Chou combination ultimately would 'brick' itself because Hellman's hash value H—which determines where Hellman's authorization data is stored in the non-volatile memory 37—is randomly generated. Appx3428-3429 (¶189). If a randomly-generated hash value H directs update unit 36 to save software-authorization data where BIOS data is stored, Hellman's "base unit [will] overwrite the BIOS instructions or other critical BIOS information with [M], rendering the entire system unusable." Appx3429 (¶190).

The Board ignored this inoperability problem—never addressing it in its decision, much less explaining how this problem could be overcome. Appx34-37. Nor did Petitioners. As a result, there is no evidence to support the Board's obviousness conclusion and reversal is required.

**ii. The asserted combination is redundant at best.**

*Second*, the Board's finding that a skilled artisan would have been motivated to "add" Chou's BIOS to Hellman is logically untenable because it ignores the redundancy created by the Board's conclusion that all computers inherently have a BIOS. A "reasonable fact finder" should consider whether, as here, redundancies in

the asserted prior art "yield an unappetizing combination." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (affirming Board finding of no motivation to combine).

Specifically, Petitioners argued, and the Board agreed, that "Hellman's system must have BIOS even though it is not explicitly disclosed." Appx1508 (¶50); Appx724 ("Hellman … has BIOS." "[T]here would be BIOS."); Appx27 (citing prosecution history for proposition that "all computers must have a BIOS"). If true, then the necessary takeaway is that "Hellman['s] … computer (Base unit 12)" already has a BIOS. Appx33.

The Board nevertheless saw fit to combine Hellman and Chou because, in its view, a "POSITA would have been motivated to *add a BIOS to the computer (base unit 12)* of Hellman." Appx82 (Roku/Vizio). And critically, neither Petitioners nor the Board ever explained why, if "Hellman's system must have BIOS," Appx1508, a skilled artisan would have been motivated to "add" *a second*, redundant BIOS to Hellman. This error is fatal.

In *In re Anova Hearing Labs, Inc.*, this Court vacated an obviousness decision where "[t]he Board … does not explain why a person of ordinary skill in the art would be motivated to modify Brown, which already includes vents, to address occlusion effect." 809 F. App'x 840, 843 (Fed. Cir. 2020). Similarly, in *South-Tek Sys., LLC v. Engineered Corrosion Sols., LLC*, this Court rejected an argument that

a skilled artisan "would have been motivated to use Wood's drain to allow water to drain from Viking's system" where "Viking's system already includes a drum drip drain that serves this purpose." 748 F. App'x 1003, 1006-07 (Fed. Cir. 2018).

Because here, too, the Petitioners' and the Board's failure to explain why a skilled artisan would be motivated to "add" Chou's BIOS to Hellman despite the unavoidable redundancy created by that combination provides an independent basis to reverse the Board's obviousness determination for lacking substantial evidence.

#### iii. Hellman's memory "address H" is not a verification structure.

*Third*, the Board's conclusion that Hellman's memory "address H" is a "verification structure" lacks substantial evidence. Specifically, the Board concluded only that Hellman *has* a "verification structure" in the form of a memory address. But claim 1 requires that the *agent* "set up" a verification structure. Accordingly, even if a memory address alone could be a "verification structure" (it cannot) the Board never concluded that the agent sets it up, as claim 1 requires.

Claim 1 requires "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record." Appx117. As the Court explained in *Ancora v. HTC*, this requires that "*a structure containing a license record is stored* in a … portion of the computer's BIOS." *Ancora v. HTC*, 908 F.3d at 1348 (emphasis added). And the agent must do the "storing." As

Petitioners' expert explains: "the claim … requires that *an agent* be 'used' to set up the claimed verification structure." Appx1485 (¶7).

Petitioners argued, and the Board held, that the "verification structure" is taught by Hellman's memory "address H," and that the "license record" that this verification structure contains is taught by Hellman's "number of uses [value] M." Appx35.

Recall that Hellman works as follows: a software package is fed into a hash generator 33, which spits out a hash value called "H." The hash generator sends "H" to update unit 36 (the alleged agent), which uses "H" as an address for nonvolatile memory 37. Memory "address H" is where the update unit stores a piece of data called "M." "M" represents the number of software uses that remain.




FIG_8

The problem with the Board's conclusion is that "address H" is just that: an address for a specific location in memory. Like a physical address, "address H" merely identifies a location. But a bare memory address *is not a structure*. And it necessarily cannot be the claimed "verification structure" because the alleged "agent" (update unit 36) never sets it up.

To be sure, the Board concluded that non-volatile memory 37 has some form of memory structure. It relied on Petitioners' conclusory expert statement that "Hellman discloses a 'verification structure' in the form of the *memory structure* of non-volatile memory 37 storing at least one value M at memory address[] … H." Appx37. But even if non-volatile memory 37 has some form of memory structure, that does not satisfy the claim requirements because the agent does not set it up.

The Board never even concluded that *update unit 36* (the alleged agent) sets up any data structure at all. For good reason. Petitioners' expert stated that all that update unit 36 *does* with "H" is use it to locate where "M" values can be retrieved or stored in memory. Appx1124-1125 (¶¶135-136) (update unit 36 uses "H" "as an 'interrogatory signal' to the non-volatile memory 37"). Claim 1 requires more. As Petitioners' concede, "the claim … requires that an *agent* be 'used' to set up the claimed verification structure." Appx1485 (¶7).

Analogizing to a physical address, claim 1 requires that a postman (the agent) set up a mailbox (the verification structure) that includes a piece of mail (a license

record). The Board concluded only that some unidentified, pre-existing "structure" may exist in memory—but it never concluded that the postman set it up.

The Board's conclusion that non-volatile memory 37 has some form of "verification structure" is independently flawed because it depends entirely on Petitioners' expert's conclusory statement that "Hellman discloses a 'verification structure' in the form of the memory structure of non-volatile memory 37." Appx37; Appx1124-1125 (¶¶135-136). But Dr. Wolfe never specifies what the "memory structure" is, how it is structured, and where in Hellman there is any disclosure that "update unit 36" is what sets that unidentified "structure" up in memory. Such "'conclusory statements and unspecific expert testimony' are insufficient to support the Board's findings" that Hellman discloses an agent that sets up a "verification structure" in BIOS memory. *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1376-77 (Fed. Cir. 2018) (citation omitted).

The Board's finding that Hellman discloses a "verification structure" that is set up by the claimed agent lacks substantial evidence.

### III. The Board's obviousness conclusion must be vacated because the Board failed to consider and account for objective indicia of nonobviousness.

The Board independently erred by disregarding Ancora's evidence of objective indicia of nonobviousness. Such evidence "guard[s] against slipping into use of hindsight," and helps "resist the temptation to read into the prior art the

teachings of the invention in issue." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966). In concluding that Ancora's evidence lacked a nexus to the '941 patent, the Board relied on an erroneous legal standard and made factual findings squarely contradicted by the evidence. If the Court does not reverse, it should vacate the Board's obviousness determination and remand with instruction to account for Ancora's evidence of industry praise and commercial success through licensing.

### A. The Board improperly determined that direct praise of the '941 patent lacked a nexus to the '941 patent.

The Board first erred by concluding that Ancora's evidence of industry praise *of the '941 patent* lacked a nexus *to the '941 patent*. That conclusion rested on legal error and thus lacked substantial evidence.

Ancora's evidence comprises two documents describing Ancora's dealings with American Megatrends, Inc., an undisputed leading manufacturer of BIOS. AMI was "best known for its BIOS, but also supplie[d] state-of-the-art hardware, software and utilities to over 55 percent of today's high-tech manufacturers." Appx4121.

Ancora's first piece of evidence is a March 2005 Alliance Agreement between Ancora and AMI in which AMI licensed *only* the '941 patent in exchange for promising Ancora [redacted] of all software royalty revenue generated using "Ancora Technology." Appx4127. The agreement defined "Ancora Technology" as "U.S Patent 6,411,941." Appx4125. The agreement conveyed no other patent license and was entered without threat of litigation.

The second piece of evidence is an April 2005 joint press release from AMI and Ancora. Appx4120-4121. The Alliance Agreement obligated the parties to announce their alliance in a joint release to be approved in writing by both parties. Appx4126 (¶3.1(3)), Appx4135 (¶12.13). The joint release stated that "BIOS pioneer American Megatrends Inc. (AMI) and Ancora Technologies Inc. announce [a] strategic alliance to offer BIOS based security products utilizing Ancora's Platform Security Anchor™ (PSA) technology (as described in US Patent 6,411,941)." Appx4120. It praised the technology as promising "great value" for consumers. *Id.* And it explained that the to-be-commercialized technology is precisely what claim 1 recites: storing verification structures in BIOS memory to render it more secure than prior-art methods:

> PSA™ … embeds encryption keys in the core of the PC, its motherboard. This approach achieves a higher level of reliability and security than software-based technologies and a higher level of convenience than hardware-based ones (i.e. tokens and smart cards).

Appx4120.

Although both documents praise *the '941 patent* expressly, the Board held that the evidence lacks a "nexus" to the '941 patent because it does not show "that the *subject matter recited by claim 1 of the '941 patent, itself*, was the object of the alleged AMI praise or the reason for the agreement to commercialize." Appx44. The Board erred in this conclusion for at least eight reasons.

*First*, AMI praised (and licensed) claim 1 because AMI praised and licensed the entire ’941 patent. “Evidence that the industry *praised a claimed invention*” suffices to show nexus. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (emphasis added). AMI “praised [the] claimed invention.” *Id.*; *see* Appx4127, Appx4120.

*Second*, even if AMI cared about only a *subset* of the ’941 patent’s claims (and no evidence suggests it did), that subset necessarily includes claim 1. The patent has only two independent claims: 1 and 18. Claim 18 incorporates all of claim 1 and adds only narrowing limitations: extracting, encrypting, storing, and verifying “license information.” Appx118. Claim 1 is thus incorporated into *every* claim of the patent. When AMI praised the ’941 patent, it also praised *claim 1* of the patent.

*Third*, in doubting that “the subject matter recited by claim 1 of the ’941 patent, itself, was the object of the alleged AMI praise or the reason for the agreement to commercialize,” Appx44, the Board committed legal error by speculating that the praise targeted the “technology *described* in the patent but not claimed.” *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013). This “theoretical possibility”—that objective indicia relates only to technology “*described* … but not claimed”—cannot serve to discount the “strong probative value” of such evidence. *Id.* Here, Ancora’s evidence shows “that the ’941 patent was the object of industry praise.” Appx44.

*Fourth*, no evidence suggests (and patentees are not required to disprove) that the praise was directed to unchallenged claims. "A requirement for proof of the negative … would be unfairly burdensome, and contrary to the ordinary rules of evidence." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F. 2d 1387, 1392 (Fed. Cir. 1988). The press release that AMI helped write, Appx1531 (49:4-5), flowed directly from the parties' Alliance Agreement, which identified the '941 patent as the focus of the parties' licensing and commercialization plans. Appx4127, Appx4120. The joint release linked AMI's praise to a key advantage of the claimed features: "embed[ding] encryption keys in the core of the PC, its motherboard ... achieves a higher level of reliability and security than" earlier methods. Appx4120. Nothing more is required. "When," as here, "the patentee has presented undisputed evidence" tying the praise to "the invention disclosed in the challenged claims, it is error for the Board to find to the contrary without further explanation." *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 747 (Fed. Cir. 2016).

*Fifth*, the Board erred by requiring that Ancora show proof of a "product [that] embodies the claimed features and is coextensive with the claims." Appx45. Ancora's evidence presents the rare case where the praise is directed to *the patent itself*. A patentee need only provide evidence "that the industry *praised a claimed invention* ***or*** a product which embodies the patent claims." *WBIP, LLC v. Kohler*

*Co.*, 829 F.3d 1317, 1334 (Fed. Cir. 2016) (emphases added). And Ancora provided direct evidence "that the industry praised a claimed invention." *Id.*

*Sixth*, even if Ancora were not entitled to a "presumption" of nexus, the Board was still obliged to evaluate the "extensive direct evidence of nexus and arguments related thereto presented by [Ancora]," particularly where "[t]here is no evidence in the record that this ... industry praise was due to any unclaimed features" or was unrelated to claim 1 and the other challenged claims. *LiquidPower Specialty Prod. Inc. v. Hughes*, 749 F. App'x 965, 968 (Fed. Cir. 2018).

*Seventh*, Nintendo did not even *challenge* Ancora's showing of nexus. Roku and Vizio relied only on conclusory attorney argument to challenge the praise's nexus to the patent. Appx4985. And neither cited any record "evidence ... that this ... industry praise was" unrelated to the challenged claims. *LiquidPower*, 749 F. App'x at 968.

*Eighth*, the Board erred in determining that, even if there were nexus, the evidence "would be entitled to little weight" because the "joint press release by two parties in business relationship is not a statement by a third party." Appx103 (Roku/Vizio); Appx45-46 (Nintendo). This conclusion lacks substantial evidence because it contradicts the Alliance Agreement itself, which states expressly that the agreement created ***no*** joint venture or partnership between AMI and Ancora. Appx4128 (¶5.2). The conclusion also rests on a legal error because no case holds

that industry praise may be disregarded because the praising entity licensed the patent. Indeed, such a rule would conflict with this this Court's precedent holding that "licenses showing industry respect for the invention" are affirmative evidence of nonobviousness. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013).

Ancora's industry-praise evidence was expressly linked to the '941 patent. The Board erred in ignoring and preemptively discounting it.

### B. The Board improperly rejected Ancora's evidence showing Ancora received [redacted] in single-patent licenses.

Continuing its flawed understanding of nexus, the Board also ignored Ancora's compelling evidence that industry [redacted] [redacted], [redacted], and [redacted] licensed the '941 patent (and only the '941 patent) for sums far exceeding the cost of litigation. Despite acknowledging that "[t]hose licenses do directly relate to this patent," Appx782, and despite Petitioners' admission to the Board that "the value of the licenses were well in excess of the median litigation costs," Appx5174, the Board nonetheless found that Ancora "d[id] not demonstrate a sufficient nexus between the challenged claims and the evidence offered." Appx48. This finding rested on legal error and lacked substantial evidence.

A stronger factual record establishing nexus between a patent and its licenses is harder to imagine. The below table summarizes the evidence showing the payment

terms of each license, the circumstances under which they were executed, and the fact that each license extended *only* to the ’941 patent.[7]

| **Licensee** | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| **Scope** | ’941 patent (Appx4181) | ’941 patent (Appx4141) | ’941 patent (Appx2070) |
| **Litigation** | Settled after 4 years of litigation. | Settled within a month of trial. | Settled one day before trial. |
| **Amount** | [redacted] (Appx4184) | [redacted] (Appx4143) | [redacted] (Appx2072) |

The Board disregarded these licenses by concluding that “Patent Owner relies merely on *the existence of the licenses to show a nexus*.” Appx50. That is wrong. As detailed below, the record included the license themselves, along with undisputed evidence showing that (1) the license payments far exceeded the cost of litigation; (2) the licenses covered only the ’941 patent; (3) the licenses were all entered at the tail end of litigation in which Ancora asserted the *same* claims challenged in these IPRs; and (4) Ancora’s licensees were aware of the prior art references at issue in this appeal. Only by ignoring this evidence could the Board conclude (erroneously) that Ancora relied only on “the *existence* of the licenses” themselves to show nexus.

Further, the Board’s error was material. First, the undisputed fact that Ancora received [redacted] from just these three licenses—attributable only to the ’941

[7] Ancora produced an additional four licenses with the following terms: [redacted] (Appx2146), [redacted] (Appx2104), [redacted] (Appx2098) and $0 (Appx2097).

patent—is compelling evidence of commercial success. As this Court held in affirming a district court's finding of "'strong indicia'" of nonobviousness in *WMS Gaming, Inc. v. International Game Technology*, evidence that key industry players "have licensed the rights to the Telnaes patent and paid millions of dollars in royalties"—including one licensee who "'alone has paid [the patentee] over $2 million in royalties'"—shows commercial success. 184 F.3d 1339, 1360 (Fed. Cir. 1999); *cf. LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to …. a reasonable royalty[;] … such actual licenses most clearly reflect the economic value of the patented technology in the marketplace.").

The Board also erred by ignoring Ancora's undisputed evidence showing that the median cost of patent litigation for cases like Ancora's was $4 million "inclusive of … appeal." Appx4198. "Most defendants are unlikely to settle unless the cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation, are greater than the cost of the settlement package." *Evans v. Jeff D.*, 475 U.S. 717, 734 (1986). Here, Ancora's unrebutted evidence showed that [redacted] paid over [redacted] times the cost of litigation; [redacted] almost [redacted] times that cost; and [redacted] almost [redacted] times that cost.

Ancora's unrebutted evidence also shows that the settlements occurred late in litigation. [redacted] and [redacted] both settled on the eve of trial, while [redacted] settled after

four years of litigation. Appx4524. When considering the probative value of settlement licenses in the damages context, this Court has held that "the parties' agreement seems especially probative if reached after the litigation was far enough along that the issue was already well explored and well tested." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369 (Fed. Cir. 2017).

Instead of addressing Ancora's cost-of-litigation evidence and the licensees' litigation postures, the Board cited *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004), and concluded it was unable to "assess whether the [licensee] license represented a business decision based on the magnitude of the potential risk [of litigation exposure] or an acquiescence to the strength of the '941 patent." Appx49. The evidence here shows that this case is the opposite of *Iron Grip*.

In *Iron Grip*, the patentee did not put the licenses into evidence, failed to "explain [the licenses'] terms," and offered no facts showing "the circumstances under which they were granted." 392 F.3d at 1324. The patentee thus could not show that its licensees wouldn't have found it "cheaper to take licenses than to defend infringement suits." *Id.* Ancora's unrebutted evidence shows that litigation was orders-of-magnitude "cheaper" than a license. The record also includes the licenses, the cost of litigation, and the fact that the licenses were signed when "the litigation was far ... along" in each case. *Prism*, 849 F.3d at 1369.

This case is instead like *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, where this Court reversed a district court's grant of JMOL of obviousness where the district court "seems not to have credited [patentee] Transocean's licensing evidence" because it erroneously concluded that the licenses "were due primarily to litigation or threat of litigation." 699 F.3d 1340, 1353 (Fed. Cir. 2012). This Court held that the district court's conclusion lacked substantial evidence because Transocean offered evidence showing that "the licenses exceed[ed] any litigation costs." *Id.* Specifically:

> From Transocean's testimony regarding the value of the licenses relative to litigation costs and regarding licenses with companies under no apparent threat of litigation, a reasonable jury could have found that the licenses reflect the value of the claimed invention and are not solely attributable to litigation.

*Id.* Like Transocean, Ancora gave unrebutted evidence that [redacted], [redacted], and [redacted] took licenses far exceeding litigation costs, and that leading BIOS manufacturer AMI took a license without any litigation at all.

The Board also ignored the undisputed evidence showing that [redacted], [redacted], and [redacted] were aware of the prior art asserted by Petitioners here, and that [redacted] and [redacted] entered the licenses even *after* the Board had instituted review on grounds identical to those presented in the Petitions on appeal. Appx9184-9189, Appx9260-9265 This evidence shows that Ancora's licensees, armed with knowledge of these references, could assess the risk that a jury would find (and this

Court would affirm) findings of infringement and validity, and set the "value of the licenses" at many multiples higher "relative to litigation costs." *Transocean*, 699 F.3d at 1353.

To the extent the Board's no-nexus finding rested on a conclusion that the licenses were not to "the *challenged claims*," Appx48, that too was error. This Court in *Institut Pasteur* held that "[t]he Board too finely parsed Pasteur's licensing activities" when it concluded that the licenses "did not establish that the third parties specifically licensed the patent family to gain access to the subject matter *claimed* in the '545 patent, rather than other technology *described* in the patent but not claimed or claimed in related patents." 738 F.3d at 1347. The Board's objections to the licenses here are even more "finely parsed" than in *Institut Pasteur*, as even the Board acknowledged that the [redacted], [redacted], and [redacted] "licenses do directly relate to this patent." Appx782. In any event, as explained above on page 52, licensing the '941 patent necessarily conveys a right to all of the challenged claims, including claim 1, whose limitations are incorporated into every claim of the patent.

The Board also suggested (albeit with muddled reasoning) that Ancora's settlement licenses with "TCL and Sony for less than the cost of litigation" outweighed (or weighed against) the high-value [redacted], [redacted], and [redacted] licenses. Appx47. To the extent the Board relied on these licenses to find a lack of nexus, that was error. This Court has never held that a low-dollar license can countermand an

otherwise strong showing of objective indicia of obviousness. This Court instead has held that licenses for less than the cost of litigation are "of little significance" in the obviousness analysis. *Iron Grip*, 392 F.3d at 1324. Regardless, even if the Board included the TCL and Sony licenses in its analysis, the evidence still shows that the average license value for all of Ancora's licenses ($13.5 million) is still well over *three times higher* than the cost of litigation.

The Board also improperly ignored the [redacted] license by speculating incorrectly that its "Exhibit B" might list additional patents that Ancora licensed to [redacted]. Appx48-49. That is incorrect. The license itself states that Exhibit B contains only the "*Jobaline* Patents," and that such patents are ***excluded*** from the scope of the license.[8] Appx4181-4182. The evidence shows Ancora did not grant [redacted] a license to anything listed in Exhibit B. The Board's speculation otherwise lacks substantial evidence.

The Board also disregarded the [redacted] license because it claimed not to know "what claims [Ancora] asserted [in the [redacted] litigation]." Appx49. But the record shows that Ancora asserted the same claims against [redacted] as are challenged in these IPRs. Appx2182 ("Defendants [[redacted] and [redacted]] infringed Claims 1-3, 6-14, and 16 of the '941 patent.").

[8] All redactions were imposed by [redacted]—not Ancora—and the Board *granted* Ancora's request on Apple's behalf to file the license subject to [redacted] confidentiality demands. Appx450, Appx637.

The Board also erred in requiring proof of Ancora's damages "demand" to [redacted] as a precondition of finding nexus. Appx49. No authority requires such information. Petitioners did not request it. And it has no probative value. Whether Ancora sought $50 or $500 million (or only injunctive relief) does nothing to detract from [redacted] considered decision to pay Ancora [redacted] *times* the cost of litigation.

Finally, for at least four reasons, the Board abused its discretion when, citing no authority, it "decline[d] to consider [Ancora's] license with [redacted]" because it "was only produced in response to Petitioner's discovery request and was not identified in Patent Owner's … Response." Appx48.[9] *First*, the Board identified no rule or procedural requirement that Ancora violated with respect to the [redacted] license. It also identified no authority that it possessed to exclude the evidence.

*Second*, Ancora could rely on the [redacted] license because *Petitioners* put the license into the record. Appx620-623. The Office Patent Trial Practice Guide states that "A party may rely upon evidence that has been previously submitted in the proceeding." 77 Fed. Reg. 48,756-01, 48,768 (Aug. 14, 2012). Petitioners "previously submitted" the [redacted] license.

[9] Ancora did not include the [redacted] license with its initial response because a confidentiality clause prohibited its disclosure without [redacted] approval, which Ancora could not secure before its response came due. Appx564. With Ancora's agreement, Petitioners moved for an "order requiring [Ancora] to produce" all of its licenses, which allowed Ancora to produce it. *Id*.

*Third*, no party objected to the license under 37 C.F.R. § 42.64(b)(1), nor moved to exclude it under § 42.64(c). Petitioners even confirmed at trial that "The evidence before us includes the [redacted], [redacted], [and] [redacted] … licenses." Appx5161.

*Fourth*, the Board did not "decline to consider" the TCL and Sony licenses even though they were produced under the same circumstances as the [redacted] license. Considering the former but not the latter is an abuse of discretion. *In re Vivint, Inc.*, 14 F.4th 1342, 1352 (Fed. Cir. 2021) (agency abuses its discretion by treating similar situations differently).

The [redacted], [redacted], and [redacted] licenses provide strong evidence of commercial success through licensing, and the Board erred in disregarding them.

## CONCLUSION

For the foregoing reasons, the Board's decision that claims 1-3, 6-14, and 16 are unpatentable as obvious should be reversed. At a minimum, the Court should set aside the construction of "agent," vacate the cancellation of all challenged claims, and remand.

Dated: July 10, 2023

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: */s/ Andres C. Healy*
Andres C. Healy
Steven M. Seigel
SUSMAN GODFREY L.L.P.

401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

Alexandra G. White
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366
awhite@susmangodfrey.com

*Attorneys for Appellant*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 49
Entered: February 7, 2023

PUBLIC VERSION

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

NINTENDO CO., LTD., and NINTENDO OF AMERICA INC.,
Petitioner,

v.

ANCORA TECHNOLOGIES, INC.,
Patent Owner.

IPR2021-01338
Patent 6,411,941 B1

Before THU A. DANG, KEVIN W. CHERRY, and RYAN H. FLAX, *Administrative Patent Judges*.

DANG, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background*

In response to a Petition (Paper 1, "Pet.") filed by Nintendo Co., Ltd. and Nintendo of America Inc. (collectively, "Petitioner"), we instituted *inter partes* review ("IPR") of claims 1−3, 6−14, and 16 ("the challenged claims") of U.S. Patent No. 6,411,941 B1 (Ex. 1001, "the '941 patent"). *See* Paper 9 ("Decision" or "Dec. Inst."). During the trial, Ancora Technologies, Inc. ("Patent Owner") filed a Response (Papers 22, 23, "PO Resp."), to which Petitioner filed a Reply (Papers 32, 33, "Pet. Reply."). In turn, Patent Owner filed a Sur-Reply. Papers 38, 39 ("PO Sur-Reply"). An oral hearing was held with the parties on October 3, 2022. A transcript of the hearing has been entered into the record. Paper 46 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has proven by a preponderance of the evidence that claims 1−3, 6−14, and 16 of the '941 patent are unpatentable.

## *B. The '941 patent*

According to the '941 patent, software products have been developed to validate authorized software usage by writing a license signature onto the computer's volatile memory. Ex. 1001, 1:19–21. However, the '941 patent recognizes that these products are vulnerable to attack by "hackers" and the license signatures are "subject to the physical instabilities of their volatile memory media." *Id.* at 1:21–26. The '941 patent also recognizes that

hardware-based products developed to validate authorized software usage are "expensive, inconvenient, and not particularly suitable for software that may be sold by downloading." *Id.* at 1:27–32.

Thus, the '941 patent discloses a method of restricting software operation within a license limitation that relies on the use of a key and a record, which have been written into the non-volatile memory of a computer. *Id.* at 1:39–42. In particular, the method is applicable for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area (*see* below discussion of Figure 1). *Id.* at code (57). According to the '941 patent, the method includes the steps of selecting a program residing in the volatile memory, setting up a verification structure in the non-volatile memories, verifying the program using the structure, and acting on the program according to the verification. *Id.*

In a "specific non-limiting example," a conventional computer includes a conventional Basic Input / Output System ("BIOS") module in which a key constituting a unique identification code for the host computer was embedded at the read-only memory ("ROM") section thereof during manufacture, wherein the key is stored in a non-volatile portion of the BIOS where it cannot be removed or modified. *Id.* at 1:44–49. A verification structure is set in the BIOS so as to indicate that the specified program is licensed to run on the specified computer. *Id.* at 1:59–62. The encrypted license record is stored in another (second) non-volatile section of the BIOS, e.g., the electrically erasable programmable read-only memory ("EEPROM") section. *Id.* at 1:62–2:1. Unlike the first non-volatile section,

the data in the second non-volatile memory may be erased or modified so as to enable to add, modify or remove licenses. *Id.* at 2:1–5.

Figure 1 of the ’941 patent is reproduced below.




Figure 1 above shows a schematic diagram of computer processor 1 and license bureau 7. *Id.* at 5:9−16. Computer processor 1 is associated with input operations 2 and output operations 3. *Id.* Computer processor 1 contains first non-volatile memory area 4 (e.g., the ROM section of the BIOS), second non-volatile memory area 5 (e.g., the EEPROM section of the BIOS), and volatile memory area 6 (e.g., the internal random access memory (“RAM”) of the computer). *Id.*

As shown in Figure 1, computer processor 1 is in temporary telecommunications linkage with license bureau 7. *Id.* at 5:17–18. The first

non-volatile memory includes pseudo-random identification key 8, which constitutes unique identification of the computer, and which exclusively or in combination with other information (e.g., user name), is sufficient to uniquely differentiate the first non-volatile memory from all other first non-volatile memories. *Id.* at 5:19–24. The second non-volatile memory includes license-record-area 9, which contains encrypted license records 10–12, and the volatile memory accommodates license program 16 having license record fields 1–15 appended thereto. *Id.* at 5:15–29.

### *C. The Challenged Claims*

Of the challenged claims, only claim 1 is independent. Claims 2, 3, 6−14, and 16 directly or indirectly depend from claim 1.[1] Claim 1 is illustrative:

> 1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
>
> selecting a program residing in the volatile memory,
>
> using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
>
> acting on the program according to the verification.

Ex. 1001, 6:59–7:4.

---

[1] Claims 4, 5, 15 and 17–19 are not challenged in this proceeding. *See generally* Pet.

*D. Prior Art Relied Upon*

Petitioner relies upon the references listed below (Pet. 6–7):

| Reference | Date | Exhibit No. |
|---|---|---|
| Hellman, U.S. Patent No. 4,658,093 | Apr. 14, 1987 | Ex. 1004 |
| Chou, U.S. Patent No. 5,892,906 | July 19, 1996 | Ex. 1005 |
| Schneck, U.S. Patent No. 5,933,498 | November 5, 1997 | Ex. 1006 |

*E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability (Pet. 7):

| Claims Challenged | 35 U.S.C. §[2] | References |
|---|---|---|
| 1, 2, 11, 13 | 103(a) | Hellman, Chou |
| 1–3, 6–14, 16 | 103(a) | Hellman, Chou, Schneck |

Petitioner relies on the Declarations of Andrew Wolfe, Ph.D. (Exs. 1003, 1033) in support of its unpatentability contentions. Patent Owner provides the Declarations of Jon B. Weissman, Ph.D. (Exs. 2003, 2006), Ian Jestice (Exs. 2004, 2017), and David Martin, Ph.D. (Ex. 2018).

[2] The '941 patent was filed on October 1, 1998, and claims priority to a foreign-filed application dated May 21, 1998. Ex. 1001, codes (22), (30). These dates are before the AIA revisions to 35 U.S.C. § 103 took effect on March 16, 2013. 35 U.S.C. § 100 (note). Therefore, pre-AIA § 103(a) applies. Our decision is not impacted by which version of the statute applies.

Dr. Wolfe was cross-examined by Patent Owner, and a transcript of his deposition was entered into the record. Ex. 2026.

## II. ANALYSIS

### *A. Claim Construction*

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the Specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) ("*Phillips*").

Only those terms in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In light of the parties' arguments and supporting evidence, we find that it is necessary to address only the claim term "agent" recited in claim 1.

"agent"

Claim 1 recites "using an *agent* to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record." Ex. 1001,

6:64−67 (emphasis added). The claim term also appears in claims 7, 14, and 18. *Id.* at 7:5–8:64.

Patent Owner proposes that the claim term "agent" requires construction. PO Resp. 30–36. Patent Owner contends that the term "agent" should be understood as "an 'OS-level software program or routine,' in view of file history that firmly establishes that the claimed 'agent' runs separate from the BIOS." *Id.* at 32. Patent Owner further argues that the plain meaning of "agent" as "a software program or routine" excludes hardware in the context of the '941 patent, since the '941 patent "specifically distinguishes prior art hardware-based products." PO Sur-Reply 2 (citing Ex. 1001, 1:27–35; Ex. 2018 ¶ 61 ("the '941 patent discloses using existing computer hardware with 'a conventional BIOS module.'")).

According to Patent Owner, the district courts have recognized "agent" as "a software program or routine." PO Resp. 32. Similarly, Patent Owner contends that the court in the prior litigation involving the '941 patent held that "the plain and ordinary meaning [of] 'agent' is 'a software program or routine.'" *Id.* at 33 (citing Ex. 1012, 3; Ex. 1013, 36). Patent Owner contends that construing "agent" as software-only is consistent with its plain meaning and the disclosure of the '941 patent. PO Sur-Reply 3–5.

Although Patent Owner contends that a person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field," Patent Owner also contends that "[t]he prosecution history also plays a role in claim interpretation." PO Resp. 30–31 (citing *Phillips*, 415 F.3d at 1317–18). Patent Owner then argues "[r]emarks made both by the applicants and the examiner during

prosecution of the ’941 patent require a narrower interpretation of ‘agent.’” PO Resp. 33 (citing *Rembrandt Wireless Techs. LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017); *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1354 (Fed. Cir. 2020)). Patent Owner contends that, during prosecution of the ’941 patent, “the applicant and the examiner both filed remarks that limit the ‘agent’ to an ‘OS-level software program or routine,’ by distinguishing references in which *BIOS programs* stored information in the BIOS,” and, in view of these remarks, the Examiner allowed the claims. *Id.* at 34. According to Patent Owner, such interpretation of “agent” to be an “OS level software program or routine” is not inconsistent with positions it adopted in related district court cases, wherein, throughout claim construction briefing, it “noted that the claimed ‘agent’ is OS-level.” PO Sur-Reply 5–6.

Patent Owner argues that “disavowal of claim scope can be shown by the applicant’s actions during prosecution of a patent, particularly when the examiner accedes to the applicant’s position.” PO Sur-Reply 7. Patent Owner refers to the prosecution history of the ’941 patent, wherein “the examiner’s reasons for allowance explained that the cited references ‘do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS’ and that ‘a computer BIOS is not set up to manage a software license verification structure.” *Id.* at 9 (citing Ex. 2011, 162) (emphasis omitted).

Petitioner points out that the written description of the ’941 patent doesn’t mention “agent.” Pet. Reply 4. Specifically, the only mention of “agent” in the ’941 patent is in the claims as issued. *See generally* Ex. 1001.

Petitioner argues that Patent Owner's narrowing construction on "agent" is unsupported in the disclosure of the '941 patent. Pet. Reply 1–11. Petitioner contends that a claim term is given its "plain and ordinary meaning absent lexicography or disavowal." *Id.* at 3 (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). According to Petitioner, Patent Owner's narrowing of "agent" can "only be justified on the basis of disavowal," but the statements that Patent Owner relies on "do not meet the exacting standard for disavowal." *Id.* at 4.

a. Plain and Ordinary Meaning

We are persuaded by Petitioner's contention with provided evidence that the plain and ordinary meaning of "agent" is "well-defined and understood in the computer industry" as "a software program or routine." Pet. Reply 3–4 (citing Ex. 2004, 1; Ex. 1073, 12; Ex. 1074, 7; Ex. 1070, 17; Ex. 1071, 2–3; Ex. 1072, 8; Ex. 1012, 3; Ex. 1013, 28–26; Ex. 2012 ¶¶ 93–94; Ex. 1075, 3). Even Patent Owner acknowledges that the district courts have held that "the plain and ordinary meaning [of] 'agent' is 'a software program or routine.'" PO Resp. 33.

b. Law of Lexicography and Disavowal

As Petitioner points out, a claim term is given its "plain and ordinary meaning absent lexicography or disavowal." Pet. Reply 3 (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). That is, "[t]here are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the Specification or during prosecution." *See Thorner*, 669 F.3d at 1365.

For lexicography, "[e]ven when guidance is not provided in explicit definitional format, the Specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)). For example, "a patent's repeated and consistent description of a claim term may inform its construction." *Groove Digital, Inc. v. United Bank*, 825 Fed. App'x 852 (Fed. Cir. 2020) (nonprecedential) (citing *Abbott*, 696 F.3d at 1150).

For disavowal, a patentee disavows the full scope of a claim term either in the Specification or during prosecution. *See Thorner*, 669 F.3d at 1365. For disavowal in the Specification to be applicable, "the [S]pecification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (quotations and citations omitted). For disavowal during prosecution, "[t]he party seeking to invoke prosecution history disclaimer bears the burden of providing the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." *Mass. Inst. Of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Circ. 2016).

c. Disavowal

Patent Owner does not cite to any portion of the Specification that may define "agent" explicitly or implicitly. As discussed above, the only mention of "agent" in the '941 patent is in the claims as issued. *See generally* Ex. 1001. Patent Owner's briefing instead relies heavily on the

prosecution history of the ’941 patent to construe “agent” as “OS level software program or routine.” *See* PO Resp. 31–36; PO Sur-Reply 7–10.

However, as Petitioner points out, the Specification of the ’941 patent does not mention “OS-level” or even “operating system.” Pet. Reply 4; *see also generally* Ex. 1001. In fact, during oral arguments, Patent Owner acknowledges that the ’941 patent does not mention “operating system.” Tr. 34 (“JUDGE CHERRY: Does your patent talk about operating system? MR. GOSSE: No, Your Honor, not explicitly.”). Thus, we focus our attention there.

i. Prosecution History Overview

As Patent Owner suggests, in order to construe the meaning of the term “agent” in claim 1, we look at the history of the ’941 patent as well as claim 1 itself. As shown in the history of the ’941 patent, the application as originally filed, including the originally filed claims, does not mention “agent.” *See* Ex. 2011, 21–35.

As shown in the prosecution history of the ’941 patent, in an office action dated June 22, 2001 (“the June 22, 2001 Office Action”), the Examiner rejected claim 1 under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the Specification in such a way as to reasonably convey to one skilled in the relevant art that the inventors, at the time the application was filed, had possession of the claimed invention. Ex. 2011, 104–105, 108–109. In particular, the Examiner concluded that “the Applicants do not teach the device necessary to edit an EEPROM nor have they made it clear to the Examiner how their system would be implemented in light of the non-trivial processing required

to write and erase its data." *Id.* at 109. In response to the June 22, 2001 Office Action, in an amendment dated November 16, 2001 (*id.* at 121, 127, 130, "the November 16, 2001 Amendment"), Applicant in the '941 patent then amended claim 1 to include an "agent" to "set up the verification structure in the erasable, non-volatile memory of the BIOS." *See id.* at 130.

After the November 16, 2001 Amendment, in a non-final office action dated January 15, 2002, the Examiner rejected all claims under 35 U.S.C. § 103(a) over Misra (U.S. Patent No. 6,189,146), Goldman (U.S. Patent No. 5,684,951), and Ewertz (5,479,639). Ex. 2011, 139–140, 143–145. In response, in an amendment dated February 5, 2002, Applicant responded that "[t]he cited references . . . do not teach or suggest, among other things, storing a verification structure, such as a software license information, in the BIOS of a computer as is recited in the present claims." *Id.* at 151.

The Examiner then eventually allowed the claims, stating the reason for allowance as

> the closest prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS to verify the program using the verification structure and having a user act on the program according to the verification.

*Id.* at 162. Further, the Examiner stated,

> it is well known to those of ordinary skill [in] the art that a computer BIOS is not setup to manage software license verification structure. The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS.

*Id.*

### ii. Does the Prosecution History Limit the "Agent" to OS-Level?

Based on this complete record, and in particular, the prosecution history of the '941 patent, we are unpersuaded by Patent Owner's contention that, during prosecution of the '941 patent, remarks by the applicant and the examiner "limit the 'agent' to an 'OS-level software program or routine,' by distinguishing references in which *BIOS programs* stored information in the BIOS." PO Resp. 34. Turning to the prosecution history, we refer to Patent Owner's reliance on the Notice of Allowance for forming the meaning of "agent":

> the examiner's reasons for allowance explained that the cited references "do not teach licensed programs running at the OS level *interacting with a program verification structure* stored in the BIOS" and that "a computer BIOS is not set up to *manage* a software license verification structure." . . . The Examiner further stated that "[t]he present invention overcomes this difficulty by *using an agent to set up a verification structure* in the erasable, non-volatile memory of the BIOS." . . . Taken as a whole, the examiner's statement clearly and unmistakably refers to the claimed agent.

PO Sur-Reply 9–10.

But focusing on the Examiner's statement in the Notice of Allowance, we find that the '941 patent's prosecution history does not unambiguously support Patent Owner's "agent" claim construction, i.e., as an "OS-level" software program or routine. We find that, at most, the Examiner's statement says that "licensed programs running at the OS level" interact with a program verification structure stored in the BIOS, wherein the agent is

used to set up the verification structure. Ex. 2011, 162. That is, the Examiner's statement says that "licensed programs" interacting with the verification structure are "running at the OS level," but does not say whether the "agent" setting up the verification structure is also OS-level. *Id.* We agree with Petitioner that "there is nothing clear or unmistakable about the alleged disavowal" of "agent" to the bounds of "OS-level," and that the Examiner's statement distinguishing the prior art references may be directed to "an entity *different from* the agent." Pet. Reply 5.

We find that the prosecution history cited by Patent Owner is, at best, ambiguous and, in any case, lacks a clear and unambiguous "disavowal" that would support Patent Owner's proposed construction calling for the agent to be "OS-level." The Examiner's statement as to the reasons for allowance in the prosecution history was that prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS, wherein an agent is used to set up a verification structure in the erasable, non-volatile memory of the BIOS. *See* Ex. 2011, 162. Thus, to the extent there was a disclaimer, it extends only to licensed programs running at the OS level interacting with the program verification structure stored in the BIOS. Applicant never argued to the Examiner in the '941 patent's prosecution that the agent itself is "OS-level." *Id.*

In sum, for the reasons given, we are not persuaded by Patent Owner's arguments that the claims should be construed as requiring the agent to be "OS level."[3]

As Patent Owner's reliance on disavowal does not support its proposed construction, we determine that the definition of "agent" as recited in claim 1, discussed by the parties as a "software program or routine," more aligns with the plain and ordinary meaning in light of the Specification and the claim language.

iii. Software-only

Based on the complete record, we are also unpersuaded by Patent Owner's contention that the plain meaning of "agent" in the context of the '941 patent excludes hardware. PO Sur-Reply 2. In particular, we are unpersuaded by Patent Owner's contention that "[t]he use of special hardware in the agent would be anathema to the '941 patent, which specifically distinguishes prior art hardware-based products." *Id.* (citing Ex. 1001, 1:27–35; Ex. 2018 ¶ 61 (the '941 patent discloses using existing computer hardware with 'a conventional BIOS module'")). We refer to Patent Owner's reliance on the Specification of the '941 patent for supporting its construction of the "plain meaning" of "agent" as excluding hardware:

---

[3] Petitioner also contends that it is not clear what Patent Owner means by "OS-level" software. Pet. Reply 7–11. However, as discussed above, we agree with Petitioner that the Examiner's statement regarding "OS-level" in the Notice of Allowance may be directed to "an entity different from the agent." *Id.* at 5. Thus, we do not deem it necessary to construe "OS-level" to resolve the controversy.

> Software based products have been developed to validate authorized software usage by writing a license signature onto the computer's volatile memory (e.g. hard disk). These products may be appropriate for restricting honest software users, but they are very vulnerable to attack at the hands of skilled system's programmers (e.g. "hackers"). These license signatures are also subject to the physical instabilities of their volatile memory media.
>
> Hardware based products have also been developed to validate authorized software usage by accessing a dongle that is coupled e.g. to the parallel port of the P.C. These units are expensive, inconvenient, and not particularly suitable for software that may be sold by downloading (e.g. over the internet).
>
> There is accordingly a need in the art to provide for a system and method that substantially reduce[s] or overcome[s] the drawbacks of hitherto known solutions.

Ex. 1001, 1:19–35 ("Background of the Invention").

But focusing on Patent Owner's cited passage in the "Background of the Invention" Section of the '941 patent, we find that the '941 patent's Specification does not unambiguously support Patent Owner's "agent" claim construction, i.e., as "software-only." We find that, at most, the cited passage says that both software-based products and hardware-based products have been developed to validate authorized software, whereby software based products writing a license signature to the computer's volatile memory (e.g. hard disk) are "vulnerable to attach at the hands of skilled system's programmers (e.g. 'hackers')," while hardware-based products accessing a dongle coupled to the parallel port of the personal computer are "expensive,

inconvenient, and not particularly suitable for software that may be sold by downloading (e.g. over the internet)." Ex. 1001, 1:19–32. That is, the cited passage says that both software-based products and hardware-based products have drawbacks, but does not say whether the "agent" should be in software or hardware to overcome the drawbacks. *Id.* We find that there is nothing clear or unmistakable in the cited passage about the alleged disavowal of "agent" to the bounds of "software only," and in fact, the cited passage is silent as to even the term "agent." *Id.*

We find, that the passage in the Specification of the '941 patent cited by Patent Owner is, at best, ambiguous and, in any case, lacks any "disavowal" that would support Patent Owner's proposed construction calling for the agent to exclude hardware. As Petitioner points out, "there generally must be something in the Specification that conveys to a skilled artisan that the inventor intended the exclusion, such as a discussion of disadvantageous or alternatives." Pet. Reply 16 (citing *Novartis Pharmas. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013 (Fed. Circ. 2022)). The cited passage in the Specification of the '941 patent discusses the drawbacks of particular prior art software-based products *and* hardware-based products that had been developed to validate authorized software usage, but disclaims neither. *See* Ex. 1001, 1:19–35.

We are persuaded by Petitioner's contention and supporting evidence that the plain and ordinary meaning of "agent" as "computer program or routine" is not limited to software-only, and that the term "*may be software, hardware, or both*." Pet. Reply 15 (citing Ex. 1038 ("Oxford Dictionary of Computing"), 11). As Petitioner points out, Patent Owner's expert,

Dr. Martin, testified that "a mixed software/hardware entity does have a software component," wherein "it may be possible to analyze the software component without the hardware," depending on the specific circumstance. *Id.* at 16–17 (citing Ex. 1035, 117:7–123:10).

In this case, there is no indication in the claim language, the Specification, or the prosecution history of any intent to only claim the preferred embodiment in which the agent excludes hardware components. *See Retractable Techs., Inc. v. Becton, Dickinson & Co*., 653 F.3d 1296, 1306 (Fed. Cir. 2011) (quoting *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.*, Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the [S]pecification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the [S]pecification, might be considered broad enough to encompass the feature in question."). In sum, for the reasons given, we are not persuaded by Patent Owner's arguments that the claims should be construed as requiring the agent to be "software-only."

As Patent Owner's reliance on the Specification does not support its proposed construction, we determine that the dictionary definition discussed by the parties more closely aligns with the plain and ordinary meaning in light of the Specification and the claim language. In other words, we construe "agent" in claim 1 to mean a "computer program or routine" wherein such computer program or routine does not exclude hardware components.

*B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of non-obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*C. Level of Ordinary Skill in the Art*

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation marks omitted).

Here, Petitioner asserts that a person of ordinary skill in the art ("POSITA") in the context of the '941 patent "would have had been at least a B.S. degree in computer science, computer engineering, or electrical engineering (or equivalent experience)" and "would have had at least two years of experience with computer science and computer engineering,

including information encryption, computer architecture, and firmware programming," citing to the declaration of Dr. Wolfe for support. Pet. 24 (citing Ex. 1003 ¶¶ 21−25).

Patent Owner contends that the POSITA "would be an individual who, as of the 1997/1998 time frame, had earned an accredited Bachelor's degree in electrical engineering, computer engineering, or computer science, or an equivalent education or level of knowledge," and had "two years of industrial experience with computer hardware, software, and operating systems," citing to the declaration of Dr. Martin for support. PO Resp. 29 (citing Ex. 2018 ¶ 51).

The parties propose similar levels of ordinary skill in the art and do not directly challenge the other's proposal. We consider the level of ordinary skill in the art to be reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (holding that absent evidence to the contrary, "the prior art itself [may] reflect[] an appropriate level" of ordinary skill in the art).

In general, we agree with the areas of agreement in the parties' proposals. Petitioner has not explained sufficiently why researching or working particularly with "information encryption" and "firmware programming" is necessary (Pet. 24) and Patent Owner has not explained sufficiently why researching or working particularly with "operating systems" is necessary (PO Resp. 29). Thus, we adopt both parties' proposed general experience of working with "computer architecture," including "computer hardware, software" which comports with the level of ordinary skill in the art reflected in the prior art of record. Accordingly, we determine

that a person of ordinary skill would have a Bachelor's degree in electrical engineering, computer engineering, or computer science, or the equivalent plus two years of experience working with computer science and computer engineering, including computer architecture, hardware and software.

*D. Obviousness Over Hellman, Chou, and Schneck*

Petitioner asserts that claims 1, 2, 11, and 13 are unpatentable under § 103(a) as obvious over Hellman and Chou (Ground 1), and that claims 1−3, 6−14, 16 are unpatentable as obvious over Hellman, Chou, and Schneck (Ground 2), thus Ground 1 is subsumed by Ground 2. Pet. 24–67. For each of the prior art combinations, Petitioner provides detailed explanations as to how the combination teaches or suggests each claim limitation, and articulates reasons to combine the prior art teachings, citing to Dr. Wolfe's Declaration for support. *Id.* at 24−67 (citing Ex. 1003).

Patent Owner counters that the asserted combinations fail to disclose key elements of claim 1 (PO Resp. 48−66), and that the Petition fails to establish a valid motivation for combining Hellman with Chou. *Id.* at 52–57.

We summarize the asserted prior art below.

1. Hellman (Exhibit 1004)

Hellman discloses a method and an apparatus in which use of a software package can be authorized for a particular base unit a specific number of times. Ex. 1004, 4:37−40. It is undisputed that Hellman is prior art. *See generally* PO Resp.

Figure 1 of Hellman is reproduced below:




Figure 1 above illustrates a block diagram of a pay-per-use software control system. Ex. 1004, 5:1–2. Base unit 12 communicates with authorization and billing unit 13 over an insecure communication channel 11, using transmitter-receiver units 14, 16. *Id.* at 5:39–42. The user at base unit 12 obtains software package 17 by purchasing it and requests its use. *Id.* at 5:51–59. Authorization and billing unit 13 receives the user's request, generates authorization A for unit 12 to use software package 17 an additional N times, and sends authorization A to base unit 12. *Id.* at 6:3–8.

Figure 8 of Hellman is reproduced below.




Figure 8 above depicts an implementation of base unit 12 during use of a software package. *Id.* at 10:33–34. Software package 17 (*see* Fig. 1) is

connected to base unit 12 and a signal representing software package 17 is operated on by one-way hash function generator 33 to produce an output signal which represents hash value H. *Id.* at 10:34–38. Signal H is transmitted to update unit 36 to indicate which software package is being used. *Id.* at 10:38–40. Update unit 36 uses value H as an address to non-volatile memory 37, which responds with a signal representing M, the number of uses of software package 17 which are still available. *Id.* at 10:40–43.

If value M is greater than 0, then update unit 36 sends a control signal to switch 41 which activates software player 42, allowing it to use software package 17. *Id.* at 10:44–46. Update unit 36 also decrements M to M−1 and stores this as the new value in address H in non-volatile memory 37. *Id.* at 10:46–49. If M=0, then update unit 36 does not change the contents of non-volatile memory 37, but neither does it send a control signal to activate software player 42. *Id.* at 10:50–53. Thus, the user is prevented from using software package 17 for which he does not have current authorized use. *Id.* at 10:53–54.

2. Chou (Exhibit 1005)

Chou discloses an apparatus and a method for discouraging computer theft. Ex. 1005, code (57). It is undisputed that Chou is prior art. *See generally* PO Resp.

Chou's invention requires that a user enters a unique word or number related to the particular computer each time the computer is powered up. Ex. 1005, 2:11−14. Chou discloses a security routine that is stored in the BIOS memory. *Id.* at 2:14−16. The security routine requires verification of

a password entered by the user, or a verification of a quantity read from an externally connected memory device. *Id.* at 2:16−18.

Chou also discloses that, at the time of its invention, "[r]ecent changes in the computer BIOS memory storage devices permit writing data to the BIOS memory, offering the opportunity to provide password protection within the same memory which stores the BIOS routines." *Id.* at 1:63−66. And, "any attempt to delete the protection will result in the BIOS routine being disabled, disabling the boot up process." *Id.* at 1:66−2:1. "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture." *Id.* at 2:2−4. According to Chou, its "invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *Id.* at 2:4−7.

3. Schneck (Exhibit 1006)

Schneck discloses a technique that "controls access to and use and distribution of data." Ex. 1006, 6:49−50. Schneck's technique can be used to "control how much of the software's functionality is available." *Id.* at 6:53−56. Schneck prevents the authorization to use software on one device from being used on another, unauthorized device, to address the "secondary distribution" problem. *Id.* at 2:40−67, 6:57−62.

It is undisputed that Schneck is prior art. *See generally* PO Resp.

4. Discussion

Petitioner asserts that "Hellman discloses almost all of the features of claim 1, including authorizing a software use through verification data stored

in a non-volatile memory such as EEPROM," and acknowledges that Hellman does not explicitly disclose storing M value (the claimed "license record") in the BIOS memory. Pet. 30.

Petitioner argues that Chou discloses that "embedding sensitive information in the BIOS memory reduced the risk of tampering with that information" because Chou explains that, "by storing sensitive information (passwords in Chou) in the BIOS memory, any attempt to delete or disable the sensitive information would also disable the BIOS program." *Id.* at 33−34 (citing Ex. 1005, 1:63−2:1). Indeed, Chou discloses that "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture," and that "[t]he present invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." Ex. 1005, 1:63−2:1. That is, Chou teaches storing sensitive information in the BIOS EEPROM to reduce the risk of tampering with that information. *Id.* at code (57), 1:54−2:7, 3:52−62.

We agree with Petitioner's assertion that, in light of Chou, a person of ordinary skill in the art would have been motivated to store value M (the claimed "license record") in the BIOS EEPROM memory "in order to achieve Hellman's purpose of discouraging tampering with the license information." Pet. 30−35 (citing Ex. 1004, 4:22−26; Ex. 1003 ¶¶ 112−116). Petitioner explains that it was well-known at the time of the invention that "a computer would have BIOS and that it would be common to store it in EEPROM memory." *Id.* (citing Ex. 1005, 1:54−62, 2:2−7, 3:21−35;

Ex. 1003 ¶¶ 105−111). Indeed, during prosecution of the '941 patent, Applicant admitted that "all computers must have a BIOS." Ex. 2011, 155 (Prosecution History of the '941 patent—Office Action Response, dated February 5, 2002). Dr. Wolfe testifies that a person of ordinary skill in the art "would have been motivated to store BIOS together with the values M in the non-volatile memory 37, in order to discourage users from tampering with the values M." Ex. 1003 ¶ 115 (citing Ex. 1005, 1:63−2:7).

*a. Motivation to combine prior art references*

"[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 U.S. at 417. Here, the evidence in the present record shows that storing sensitive information, such as Hellman's license information, in the BIOS memory is not beyond the skill of a pertinent artisan. As Petitioner points out (Pet. 29−30), Chou discloses that, at the time of its invention, "[r]ecent changes in the computer BIOS memory storage devices permit writing data to the BIOS memory, offering the opportunity to provide password protection within the same memory which stores the BIOS routines." Ex. 1005, 1:63−66. Chou also discloses "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture." *Id.* at 2:2−4. Chou further discloses that its

"invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *Id.* at 2:4−7.

We are unpersuaded by Patent Owner's contention that "[t]he mere presence of BIOS among computers does not establish that Chou's BIOS memory would have been used to store Hellman's value 'M,' in place of Hellman's separately disclosed non-volatile memory 37." PO Resp. 52. Such argument does not address Petitioner's reliance on Chou's disclosure that "embedding sensitive information in the BIOS memory reduced the risk of tampering with that information" because Chou explains that, "by storing sensitive information (passwords in Chou) in the BIOS memory, any attempt to delete or disable the sensitive information would also disable the BIOS program." Pet. 33−34. As discussed above, Chou discloses that "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture," and that "[t]he present invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *See* Ex. 1005, 1:63−2:1.

Although Patent Owner contends that "Chou's disclosure does not discuss tamper-prevention," but rather is directed to anti-theft (PO Resp. 52), as Petitioner explained during oral arguments, Chou prevents theft of a computer by prevent tampering of sensitive data in passwords. Tr. 59:7–23 ("Chou says I want to avoid people tampering with my sensitive data in your passwords. Because if they do, they'll steal my computer."). According to Petitioner, "Chou discloses that storing sensitive information in the BIOS memory means that any attempt to modify or delete the sensitive

information would results in disabling the boot process of the computer," and thus, a POSITA "would have understood that introducing the risk of disabling the entire computer would have discouraged tampering." Pet. Reply 20–21 (citing Ex. 1003 ¶ 115; Ex. 1033 ¶ 56). We find persuasive Dr. Wolfe's testimony that, in light of Chou, one of ordinary skill in the art would have been motivated to store Hellman's license information in the BIOS EEPROM, in order to discourage users from tampering with the license information and to provide extra protection to the sensitive information. Ex. 1003 ¶¶ 112−116.

We are also unpersuaded by Patent Owner's contention that implementing Hellman's system would require adding a switch, wherein "the value of the security functions could reasonably outweigh the cost of an EEPROM chip, eliminating the need for cost savings." PO Resp. 54. As Petitioner points out, requiring an extra switch "does not undermine the fact that a [POSITA] would still have been motivated to reduce the overall cost/size of the implementation." Pet. Reply 21.

Although Patent Owner further contends that Hellman discloses hardware used to store license records in an EEPROM, wherein replacing Hellman's hardware with software would not have been obvious (PO Sur-Reply 12), we do not find such contention persuasive. Such argument is premised on Patent Owner's proposed claim construction requiring that the agent is "software only," which, as discussed above, we decline to adopt. We find persuasive Dr. Wolfe's testimony that a POSITA would have recognized that "the update unit 36 [of Hellman] would have been implemented by software, hardware, or some combination of the two" (*see*

Ex. 1003 ¶¶ 137A–137B), and agree with Petitioner that there would not be any need to replace Hellman's hardware with software when combining the teachings of Hellman and Chou. Pet. Reply 17. In fact, during oral argument, Patent Owner acknowledged that Hellman discloses a "device" using incoming signals to access hardware components that "could" be implemented in hardware and software. Tr. 47:3–13 ("MR GOSSE: So you have signals coming in, and they're being used to access the hardware component . . . JUDGE CHERRY: So you're saying a person of ordinary skill in 1998 couldn't have implemented that in hard- and software? MR GOSSE: It's not that they couldn't, . . . The question is what would have been done"). As Patent Owner also acknowledged during oral arguments, Petitioner further relies on Chou for providing the motivation to implement the storing of license records in software. *Id.* at 48:5–24.

Accordingly, we are persuaded by Petitioner's assertion that, in light of Chou, a person of ordinary skill in the art would have been motivated to store Hellman's value M in the BIOS EEPROM memory. Pet. 30−35 (citing Ex. 1004, 4:22−26; Ex. 1003 ¶¶ 112−116). We determine that Petitioner has set forth reasoning with rational underpinning explaining why it would have been obvious to combine the teachings of Hellman and Chou with a reasonable expectation of success. *See*, e.g., Pet. 30–35. We find that, based upon the complete record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Hellman and Chou in the manner described by Petitioner and the proffered combination of familiar prior art elements according to their established functions would have conveyed a

reasonable expectation of success to a person of ordinary skill at the time of the invention. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Petitioner then relies on Schneck for disclosing that "licensing information is transmitted in encrypted form," and that any information stored on a non-volatile memory "should be stored in encrypted form to prevent an unauthorized use of a licensed software." Pet. 46–47 (citing Ex. 1006, 9:46−59, 25:64−67). Indeed, Schneck discloses that "packaged data 108 may include access rules 116 in encrypted form," and that "[s]ince all storage of data on internal non-volatile memory devices (for example, disks, flash memory, and the like) is encrypted, this ensures that a physical attack on the system will not result in compromise of plaintext." Ex. 1006, 9:46−59, 25:64−67.

We are also persuaded by Petitioner's contention that, in light of Schneck, a person of ordinary skill in the art would have further stored Hellman's value M ("license record") in encrypted form in the BIOS EEPROM memory, because storing value M in encrypted form "would have furthered Hellman's goal of preventing a license authorization from being improperly duplicated." Pet. 45−49 (Ex. 1004, 1:39−2:53, 9:64−10:13, 10:55−65; Ex. 1006, 2:40−67, 17:6−12, 25:64−67, 25:64−67; Ex. 1003 ¶¶ 139−150). As Dr. Wolfe testified, such an artisan would have recognized that storing value M in encrypted form would "prevent the sort of tampering described . . . and warned against by Schneck." Ex. 1003 ¶¶ 145−146 (citing Ex. 1006, 16:64−17:12, 25:64−67).

We find that, based upon the complete record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to further combine the teachings of Schneck with Hellman and Chou in the manner described by Petitioner.

*b. The combinations of Hellman and Chou, and Hellman, Chou, and Schneck in view of claim 1*

Having reviewed Petitioner's arguments and supporting evidence in the complete record, we determine Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 11, and 13 are obvious over Hellman in further view of Chou, notwithstanding Patent Owner's arguments to the contrary. As the combination of Hellman and Chou meets all the limitations of claim 1, we need not address Schneck and determine that claims 1–3, 6–14, and 16 are thus obvious over Hellman and Chou, in further view of Schneck. We address in detail Petitioner's arguments and Patent Owner's responses with respect to the limitations of illustrative claim 1.

*i. The preamble of claim 1*

The preamble of claim 1 recites a "method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area." Ex. 1001, 6:59−62.

Petitioner asserts that, "even if the preamble is considered limiting, Hellman disclosed all aspects of the preamble of claim 1, other than explicit mention of a BIOS and a memory storing the BIOS." Pet. 35, 49. According to Petitioner, "Hellman discloses the required 'method of

restricting software operation within a license' in the form of its method of limiting use of software within authorized uses." *Id.* (citing Ex. 1004, 9:29–10:13, 10:33–54, 10:55–65; Ex. 1003 ¶¶ 98–104). As Petitioner notes, Hellman's base unit 12 has temporary memory 28 (e.g., RAM), and non-volatile memory 37 (e.g., EEPROM). *Id.* at 36 (citing Ex. 1004, 2:24–27, 8:67–68, 10:1–4, Figs. 1, 6; Ex. 1003 ¶¶ 98–104). Further, as Petitioner also points out, Chou discloses a BIOS EEPROM on a computer. *Id.* at 37–38 (citing Ex. 1005, 1:54–2:7, 3:21–35, Figs. 1, 3, 7; Ex. 1003 ¶¶ 104–106). We are persuaded by Petitioner's argument that, in view of Chou, an ordinarily skilled artisan "would have found it obvious to implement Hellman on a computer in which the same erasable, non-volatile memory 37 (e.g., EEPROM) stored both the license information disclosed in Hellman and the BIOS." *Id.* at 38 (citing Ex. 1005, 1:63–2:7, 3:21–35; Ex. 1003 ¶¶ 105–111; Ex. 1002, 51); *see also id.* at 30–35.

As Petitioner explains, Hellman discloses a computer (base unit 12) that includes temporary memory 28 (RAM) and non-volatile memory 37 (EEPROM) and Chou discloses a BIOS EEPROM on a computer. Pet. 36–38 (citing Ex. 1004, 2:24–27, 8:67–68, 10:1–4, Figs. 1, 6; Ex. 1005, 1:54–2:7, 3:21–35, Figs. 1, 3, 7; Ex. 1003 ¶¶ 98–106). We are persuaded by Dr. Wolfe's testimony that a person of ordinary skill in the art "would have been motivated to use non-volatile memory 37 of Hellman to store BIOS because non-volatile memory 37 used a type of memory disclosed by Chou as being advantageous for storing BIOS," noting that Chou discloses that "a transition had occurred to using EEPROM for BIOS, and that the

programmability of EEPROM made that an advantageous medium for storing BIOS." Ex. 1003 ¶¶ 112–115 (citing Ex. 1005, 1:63–2:7).

Patent Owner does not make any specific argument regarding the preamble. *See* generally PO Resp. Regardless of whether the preamble of claim 1 is limiting, based on the complete record presented, Petitioner has demonstrated persuasively that the combination of Hellman and Chou discloses the subject matter recited in the preamble of claim 1.

*ii. "selecting a program residing in the volatile memory"*

As to the limitation "selecting a program residing in the volatile memory," Petitioner argues that Hellman discloses selecting software package 17 (a computer program) residing in temporary RAM memory 28 (volatile memory). Pet. 38–39 (citing Ex. 1004, 5:51–61, 8:67–9:2, 9:15–28, 10:6. In particular, Hellman discloses a user selecting/purchasing software package 17. Ex. 1004, 5:51–53. Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the complete record presented, Petitioner has demonstrated persuasively that Hellman discloses the limitation "selecting a program residing in the volatile memory," as recited in claim 1.

*iii. "using an agent to set up a verification structure in the erasable, non-volatile memory of BIOS"*

Claim 1 recites "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record."

Petitioner asserts that Hellman discloses "using update unit 36 (acting as the required 'agent') to set up a verification structure in non-volatile memory 37 (the required 'erasable, non-volatile memory') as the non-

volatile memory 37 was preferably implemented as EEPROM." Pet. 40 (citing Ex. 1004, 10:1–4; Ex. 1003 ¶¶ 133–138). According to Petitioner, "update unit 36 sets up the required 'verification structure' in the non-volatile memory 37 at least in the form of storing the value M at a specific address H for a software program identified by that hash value H." *Id.* at 41 (citing Ex. 1003 ¶¶ 133–138). Petitioner argues that "value M is the required 'license record,' because it indicates the scope of authorized use—the number of uses, where 'M' is the number—for the specific software package 17 identified by hash value H." *Id.* Petitioner contends that "[s]toring the value M at the address H constitutes setting up a verification structure because it includes storing a license record at a specific license record location that corresponds to the licensed program." *Id.* (citing Ex. 1001, 1:59–62, 6:17–21; Ex. 1003 ¶¶ 133–138).

Patent Owner argues that "the mere use of a common erasable, non-volatile memory to *store* a BIOS and a license record is not adequate to invalidate the challenged claims," because claim 1 "requires 'using an *agent* to set up a verification structure accommodating data that includes at least one license record.'" PO Resp. 56. According to Patent Owner, "the '941 patent's prosecution history establishes that the claimed 'agent' would be understood as an 'OS-level software program or routine,'" and that "[n]either Petitioners nor Dr. Wolfe considered the prosecution history when evaluating whether the art discloses the claimed 'agent.'" *Id.* 56–57 (citing Pet. 23; Ex. 2026, 23:20–24:1).

We are not persuaded by Patent Owner's argument because it relies upon Patent Owner's proposed claim construction, which interprets the

claim term "agent" as "an OS-level software program or routine." *See* PO Resp. 56–57. As discussed above (*see infra* Section II.A.), we decline to adopt Patent Owner's proposed claim construction as it improperly imports extraneous requirements into the claims and relies on a non-existent "disavowal." Therefore, Patent Owner's argument that Hellman does not disclose an "agent" as an "OS-level" software program or routine is unpersuasive.

Patent Owner also argues that there is no motivation to modify "Hellman's hardware-based system." PO Resp. 61. However, as discussed above in section II(D)(4)(a), we agree with Petitioner that there would not be any need to replace Hellman's hardware with software when combining the teachings of Hellman and Chou. *See* Pet. Reply 17. As discussed above, Patent Owner's argument is premised on Patent Owner's proposed claim construction requiring that the agent is "software only," which, as discussed above, we decline to adopt. We find persuasive Dr. Wolfe's testimony that a POSITA would have recognized that "the update unit 36 [of Hellman] would have been implemented by software, hardware, or some combination of the two" (*see* Ex. 1003 ¶¶ 137A–137B), wherein Chou provides the motivation to implement the storing of license records in software. *See also* Tr. 48:5–24 ("JUDGE CHERRY: . . . Doesn't Chou provide us a motivation? . . . MR. GOSSE: Your Honor, Chou is disclosing . . . a theft prevention device [that is] preventing someone from logging onto their computer [wherein] there's effectively a narrow convention that takes what used to be stored on CMOS device, [and] replace that CMOS device with an EEPROM.").

Although Patent Owner further argues that Petitioner improperly cites the same element of Hellman for "memory of the BIOS" and "verification structure" (PO Resp. 62), we find such argument unpersuasive. In particular, as Patent Owner itself points out, Dr. Wolfe testified that "Hellman discloses a 'verification structure' in the form of the *memory structure* of non-volatile memory 37 storing at least one value M at memory addresses defined by at last one hash value H." *Id.* at 63 (citing Pet. 41; Ex. 1003 ¶¶ 133–138). That is, Dr. Wolfe testified that Hellman discloses a verification structure in the form of a memory structure storing at least M value at an address defined by hash value H, wherein the verification structure is set in (i.e., not the same element as) the erasable, non-volatile memory 37. Ex. 1003 ¶¶ 133–138.

We are persuaded by Dr. Wolfe's testimony that that a person of ordinary skill in the art "would additionally have recognized that the authorization and billing unit 13 may cooperate with the update unit 36 to act as the 'agent'" because "authorization and billing unit 13 generates the authorization A that leads to the updating of the authorized use value M in the non-volatile memory 37." Ex. 1003 ¶¶ 138−150. As Petitioner clarified during oral argument, "Updating Unit 36 is managing a data structure in non-volatile memory 37[,] managing these values M at specific, defined locations H." Tr. 14:6–8.

Based on the complete record presented, Petitioner has demonstrated persuasively that Hellman in view of Chou teaches "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS," as recited in claim 1.

*iv. "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS"*

Claim 1 also recites "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS." Petitioner argues that Hellman discloses this limitation because Hellman discloses using value M (the claimed "license record") that is stored in non-volatile memory 37 to verify software package 17. Pet. 42 (citing Ex. 1004, 10:33−54; Ex. 1003 ¶¶ 151−152). In particular, Hellman discloses that when an attempt is made to run software package 17, value H is generated and sent to update unit 36, which uses value H as an address in non-volatile memory to verify if a license exists for software package 17. Ex. 1004, 10:33−54. If a license does exist, update unit 36 retrieves the number of remaining authorized uses value M, and a determination is made as to whether the number of authorized uses is greater than zero. *Id.*

Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the complete record presented, Petitioner has demonstrated persuasively that Hellman discloses the limitation "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS," as recited in claim 1.

*v. "acting on the program according to the verification"*

Lastly, claim 1 recites "acting on the program according to the verification." Petitioner argues that Hellman discloses this limitation because it discloses allowing software package 17 to be used if a license record is found in non-volatile memory 37 and there are authorized uses remaining. Pet. 42 (citing Ex. 1004, 10:40−49; Ex. 1003 ¶¶ 154−155).

Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the complete record presented, Petitioner has demonstrated persuasively that Hellman discloses the limitation "acting on the program according to the verification," as recited in claim 1.

*vi. Conclusion on Claim 1*

For the reasons discussed above, we determine Petitioner has proven, by a preponderance of the evidence that the combination of Hellman and Chou, as well as over the combination of Hellman, Chou, and Schneck account for all of the limitations of claim 1 and that Petitioner has shown an adequate motivation to combine with a reasonable expectation of success. We reserve our final conclusion of obviousness until we consider the Patent Owner's evidence of objective indicia of non-obviousness.

*c. Remaining challenged claims*

Petitioner also similarly accounts for claims 2, 3, 6−14, and 16 as obvious over the asserted prior art. Pet. 51−67. Petitioner provides detailed explanations as to how the asserted prior art combinations teach or suggest these claims and articulates reasons to combine the prior art teachings, citing Dr. Wolfe's testimony for support. *Id.* (citing Ex. 1004; Ex. 1005; Ex. 1003).

As to claims 3, 8, 9, 14, and 15, Patent Owner contends that, since Dr. Wolfe testified that the license record "would have been supplied in a modified version of Hellman's system, in which the authorization A is stored in the non-volatile memory 37," Petitioner's proposed modification "would render Hellman's system inoperative. *See* PO Resp. 64–65 (citing Ex. 1003 ¶¶139–150; Ex. 2018 ¶¶197–205.). In particular, Patent Owner

contends that Petitioner relies on two embodiments, both of which render Hellman's system inoperative. *Id.* For example, in one embodiment in which Petitioner contends that authorization A is an encrypted value, Patent Owner argues that only a certain system would allow the base unit to update the value of authorization A to increment or decrement the number of remaining uses, wherein "only the authorization and billing unit can generate new values of A, making it impossible for the update unit to change the number of remaining uses." *Id.* (citing Ex. 2018 ¶¶ 199–205).

However, Petitioner points out that it observed in the Petition that a POSITA would have found storing A in the EEPROM "especially useful where M was the default value representing 'unlimited number of uses of a software package,' . . . ***given that M would not need to be incremented or decremented***." Pet. Reply 23 (citing Pet. 48; *see* also Ex. 1004, 10:55–65). We are persuaded by Petitioner's contention that it proposed a modification that "would work best in Hellman's scenario where M does not need to be incremented/decremented," and thus, Patent Owner's arguments are obviated by this embodiment. *Id.* at 23–24 (citing Ex. 1033 ¶¶ 62–64).

In its Sur-Reply, Patent Owner does not dispute Petitioner's contentions. *See* PO Sur-Reply 20–21. In fact, Patent Owner acknowledges that Petitioner is relying on an "embodiment that *could be* modified," even though it then contends that Petitioner's arguments are "improper hindsight," wherein Petitioner "cherry-picks the embodiment. *Id.*

We determine that Petitioner has set forth reasoning with rational underpinning explaining why it would have been obvious to combine the teachings of Hellman and Chou and Schneck with a reasonable expectation

of success. Pet. 45–49. We find that, based upon the complete record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Hellman and Chou in the manner described by Petitioner and the proffered combination of familiar prior art elements according to their established functions would have conveyed a reasonable expectation of success to a person of ordinary skill at the time of the invention. *See KSR*, 550 U.S. at 416.

Having reviewed Petitioner's arguments and supporting evidence in the record, we determine Petitioner has proven, by a preponderance of the evidence that Hellman and Chou account for the limitations of claims 2, 11, and 13, and that Hellman, Chou, and Schneck account for the limitations of claims 2, 3, 6−14, and 16.

*E. Objective Indicia of Non-Obviousness*

We next consider Patent Owner's evidence concerning objective indicia of non-obviousness. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc). Objective evidence of non-obviousness "may often be the most probative and cogent evidence in the record" and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (citation omitted). For such evidence to have substantial weight, however, "its proponent must establish a nexus between the evidence and the merits of the claimed invention." *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d

1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013)). The patentee "bears the burden of showing that a nexus exists." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

A rebuttable presumption of nexus arises "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharm. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). Absent a presumption of nexus, the patentee may prove nexus by showing that the objective evidence resulted directly from "the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74; *see In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

Thus, the Board employs a two-step analysis in evaluating whether a patentee has established a nexus between the evidence concerning objective indicia of non-obviousness and the merits of the claimed invention. *See Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 32–33 (PTAB Jan. 24, 2020) (precedential). Initially, the Board considers whether the patentee has demonstrated that the "products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* at 33. Absent a presumption of nexus, the Board

considers whether the patentee has demonstrated "a legally and factually sufficient connection" between the evidence and the claimed invention. *See Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019); *Lectrosonics*, IPR2018-01129, Paper 33 at 33.

1. Industry praise

Patent Owner contends that "a significant player in the BIOS market ["AMI"] directly acknowledged the value in the '941 patented technology." PO Resp. 66. As evidence of this contention, Patent Owner relies on its "joint press release" with AMI, which it contends is "directly praising the technology of the '941 patent," and contends that AMI chose to enter an alliance with Patent Owner "to offer BIOS based security products utilizing [Patent Owner's] Platform Security Anchor™ (PSA) technology (as described in US Patent 6,411,941[)]." *Id.* (citing Ex. 2027 ("February 14, 2005 Joint News Release"), 1).

In its Sur-Reply, Patent Owner contends that both the press release and the Alliance Agreement "explicitly and exclusively reference the '941 patent, making their nexus to the patent clear." PO Sur-Reply 21 (citing Ex. 2027; Ex. 2029 ("Alliance Agreement")). Patent Owner then relies on the testimony of Mr. Mullor, its founder, who testified that "AMI invested in the development of software under the Alliance Agreement, which embodied the '941 patent." *Id.* (citing Ex. 1034 ("the Mullor Declaration"), 92:15–17, 51:22–53:2; 62:13–63:10).

Petitioner responds that Patent Owner authored the press release with AMI, and thus, "[t]he joint press release was not industry praise, so much as it was self-praise." Pet. Reply 24 (citing Ex. 1034 ("Mullor Deposition"),

47:17–49:7). Petitioner points out that Patent Owner "gave AMI a royalty free license to the '941 Patent." *Id.* (citing Ex. 2029 § 8.1(2)). During oral arguments, Petitioner references Mr. Mullor's Declaration in which he acknowledged that the joint press release was a "marketing piece," wherein such press release is "not a third party acknowledging anything about the patent," but rather "two parties working together to try and market a product." Tr. 74: 1–6 (citing Ex. 1034, 48:9–49:1 ("It's a marketing piece. It certainly describes that we're in a relationship, a business relationship, . . . a marketing piece that described what we wanted to tell the world back then about what we're doing.")).

We considered Patent Owner's evidence concerning industry praise (the press release) and agreement to commercialize BIOS-based security products (the Alliance Agreement). *See* Exs. 2027, 2029. However, we find that evidence does not address the nexus between the merits of *the challenged claims* and the evidence offered to show that the '941 patent was the object of industry praise. *See* PO Resp. 66. That is, we see no evidence in the record that the subject matter recited by claim 1 of the '941 patent, itself, was the object of the praise referred to by AMI or the reason for the agreement to commercialize. In fact, the press release and Alliance Agreement refer not to the claims of the '941 patent, but more broadly to the '941 patent itself. *See* Ex. 2027; Ex. 2029. Patent Owner does not explain how the relied-upon praise and agreement relate to the claims of the '941 patent in particular. *See* PO Resp. 66; PO Sur-Reply 21.

As discussed above, for Patent Owner's evidence concerning objective indicia of non-obviousness to be considered, Patent Owner must

establish a nexus between the evidence concerning objective indicia of non-obviousness, i.e., the press release and Alliance Agreement and the merits of the claimed invention. *See Lectrosonics, Inc.*, IPR2018-01129, Paper 33 at 32–33.

Since Patent Owner has not provided evidence that a product embodies the claimed features and is coextensive with the claims, it is not entitled to presumption of nexus. Absent a presumption of nexus, the Board considers whether the patentee has demonstrated "a legally and factually sufficient connection" between the evidence and the claimed invention. *See Henny Penny*, 938 F.3d at 1332. Here, Patent Owner also does not demonstrate any legally and factually sufficient connection of the press release and Alliance Agreement to the claims of the '941 patent. *See generally* PO response; PO Sur-Reply.

Furthermore, even if there were a nexus, we are persuaded by Petitioner's contention that the single joint press release by two parties in a business relationship is insufficient evidence of "industry praise" as opposed to "self-praise." Pet. Reply 24. As Patent Owner acknowledged, AMI and Patent Owner entered an agreement to commercialize BIOS-based security products . PO Resp. 66. But, as Petitioner points out, a joint press release by two parties in business relationship is not by a "third party," but rather "two parties working together to try and market a product." Tr. 74: 1–6. That is, Mr. Mullor acknowledged that the press release is "a marketing piece," and that AMI and Patent Owner are in a "business relationship" to try to market a product. *See* Ex. 1034, 48:9–49:1. Thus, even if there were a

nexus shown, we find this evidence would be entitled to little weight in our analysis.

2. Licensing

Patent Owner contends that several "very significant" companies, [redacted] have taken a license to the '941 patent, wherein each license was for "only the '941 patent" such that "the nexus between the '941 patent and the licensing cannot be questioned." PO Resp. 69. According to Patent Owner, although Patent Owner sued [redacted] licenses in which the licensee paid above the cost of litigation "demonstrate a nexus between the license and patent's strength. *Id.* at 69–70 (citing *Transocean Offshore Deepwater Drilling*, 699 F.3d at 1353).

Patent Owner contends that the Hellman and Chou references, two of the prior art references that are subject of this IPR, were known references before each of these settlements, and, instead of going to trial on this combination "after incurring years of litigation costs," the companies took licenses. PO Resp. 70. In particular, "[redacted] asserted the Hellman/Chou invalidity combination" but "still decided to [redacted]." *Id.*

In its Sur-Reply, Patent Owner adds that [redacted], also entered an agreement with Patent Owner, wherein "[t]he '941 patent was the sole patent at issue, [redacted] was well-aware of the combination of Hellman and Chou" but "[redacted]

[redacted].” PO Sur-Reply 21–22. Although Patent Owner acknowledges that it also entered into settlements with other companies such as TCL and Sony for less than the cost of litigation, it contends that Petitioner does not cite to any caselaw “finding that low-dollar license agreements can *detract* from an otherwise strong showing of objective indicia of non-obviousness.” *Id.* at 22. According to Patent Owner, “[t]he Federal Circuit has repeatedly held that settlements for less than the cost of litigation have no bearing on the obviousness analysis.” *Id.* (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004); *Cole Kepro Int’l, LLC v. VSR Inds., Inc.*, 695 Fed.Appx. 566, 572 (Fed. Circ. 2004).

Petitioner argues that, while Apple apparently was aware of the Hellman and Chou references, “there is no indication Apple contemplated combining those references.” Pet. Reply 25 (citing Ex. 2022 (“Apple Claim Charts”)). Petitioner then argues that, while [redacted]

Petitioner further argues that [redacted]

[redacted] which "objectively demonstrates the *strength* of the Hellman/Chou combination." *Id.* at 26.

We have considered Patent Owner's licenses [redacted] as evidence concerning objective indicia of non-obviousness.[4] *See* Exs. 2031, 2032. However, although Patent Owner relies on these licenses as evidence, Patent Owner does not demonstrate a sufficient nexus between the challenged claims and the evidence offered. *See* PO Resp. 69–70; PO Sur-Reply 21–22. In particular, Patent Owner does not establish whether these licenses resulted directly from the unique characteristics of the claimed subject matter of the '941 patent.

For example, with respect to the [redacted] large portions of the license are redacted. Importantly, Exhibit B [redacted] so it is impossible for us to discern what was

---

[4] We decline to consider Patent Owner's license with [redacted] that was only produced in response to Petitioner's discovery request and was not identified in Patent Owner's Patent Owner Response. Moreover, even if we were to consider this license, it is similar to the [redacted] discussed here, and so would be treated similarly.

licensed and on what terms precisely. *See Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1363–64 (Fed. Cir. 2021) ("Here, given that 188 patents were licensed, the nexus between the license and the validity of any particular claim is rather tenuous to say the least. Thus, the Board was correct to require that Teva show something more than the mere existence of the license.").

Although [redacted] is more complete, we agree with Petitioner that there is little evidence in the record that would give the necessary context to the license in order to give it substantial weight. *See* Pet. Reply 25. [redacted] provides no information about what claims it asserted or how much it was demanding in damages. Without some information about what the potential exposure was, it is difficult to assess whether the license represented a business decision based on the magnitude of the potential risk or an acquiescence to the strength of the '941 patent.

The Federal Circuit has long recognized that licensing programs "are not infallible guides to patentability," and that they "sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits," or "for other reasons unrelated to the unobviousness of the licensed subject matter." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985). The Federal Circuit continues to "specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license.'" *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004); *see* also *ABT Systems,*

*LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015) ("While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention.").

Although Patent Owner cites *Transocean* to support its contention that licenses in which the licensee [redacted] "demonstrate a nexus between the license and the patent's strength" (PO Resp. 69–70 (citing *Transocean*, 699 F.3d at 1353)), in *Transocean*, the Federal Circuit determined that Transocean had presented substantial evidence from which a reasonable jury could find that *each of the seven objective factors*, i.e., commercial success, industry praise, unexpected results, copying, industry skepticism, licensing, and long-felt but unsolved need, supported the non-obviousness of Transocean's claims. *See Transocean*, 699 F.3d at 1349 (emphasis added). As Petitioner argued during oral arguments, in *Transocean*, "the Federal Circuit found that there was evidence supporting non-obviousness that already existed on the technical issues of obviousness." Tr. 84:21–23.

The patentee "bears the burden of showing that a nexus exists." *See WMS Gaming*, 184 F.3d at 1359. However, in this case, Patent Owner relies merely on the existence of the licenses to show a nexus. We do not find such evidence to be sufficient. We are left to speculate as to whether the licensee settled "for other reasons unrelated to the unobviousness of the licensed subject matter." *See EWP*, 755 F.2d at 907–08. The mere existence of the licenses themselves cannot overcome a convincing case of obviousness without showing a clear nexus to the claimed invention. *See ABT*, 797 F.3d

at 1361–62. Thus, we find that Patent Owner has failed to show a sufficient nexus to challenged claims of the '941 patent and the [redacted] license agreements, and even if such a nexus had been shown, we decline to give significant weight to these licenses because there is insufficient evidence to evaluate the contexts of the corresponding settlements.

### *F. Final Conclusion as to Obviousness*

Weighing the evidence of the level of ordinary skill, the disclosure of the references, differences between the references and the claims at issue, the reasoning to combine the references, and the objective indicia of non-obviousness, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 11, and 13 would have been obvious over Hellman and Chou and claims 1–3, 6–14, and 16 would have been obvious over Hellman, Chou, and Schneck. We find that the value that Patent Owner's objective evidence possesses in establishing non-obviousness is weak in comparison to the evidence regarding the prior art under the first three *Graham* factors. *See Graham*, 383 U.S. at 36 (holding that alleged secondary considerations of commercial success and long-felt need did not "tip the scales of patentability" where the invention "rest[ed] upon exceedingly small and quite non-technical mechanical differences in a device which was old in the art").

Accordingly, after weighing all of the evidence we find that Petitioner proves by a preponderance of the evidence that claims 1, 2, 11, and 13

would have been obvious over Hellman and Chou and claims 1–3, 6–14, and 16 would have been obvious over Hellman, Chou, and Schneck.

## III. CONCLUSION

For the foregoing reasons, Petitioner has demonstrated by a preponderance of the evidence, that claims 1−3, 6−14, and 16 of the ’941 patent are unpatentable.[5]

## IV. ORDER

For the foregoing reasons, it is

ORDERED that, based on a preponderance of the evidence, claims 1−3, 6−14, and 16 of U.S. Patent No. 6,411,941 B1 have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[5] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

In summary:

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1−2, 11, 13 | 103(a) | Hellman, Chou | 1−2, 11, 13 | |
| 1−3, 6−14, 16 | 103(a) | Hellman, Chou, Schneck | 1−3, 6−14, 16 | |
| **Overall Outcome** | | | 1–3, 6–14, 16 | |

PETITIONER:

Jerry Riedinger
Kyle Canavera
Tara Kurtis
PERKINS COIE LLP
riedinger-ptab@perkinscoie.com
canavera-ptab@perkinscoie.com
kurtis-ptab@perkinscoie.com

PATENT OWNER:

David Gosse
Nicholas T. Peters
Karen Wang
FITCH, EVEN, TABIN & FLANNERY LLP
dgosse@fitcheven.com
ntpete@fitcheven.com
kwang@fitcheven.com

Trials@uspto.gov
571-272-7822

Paper 50
Entered: February 23, 2023

PUBLIC VERSION

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

ROKU, INC. and VIZIO, INC.,
Petitioner,

v.

ANCORA TECHNOLOGIES, INC.,
Patent Owner.

IPR2021-01406
Patent 6,411,941 B1

Before THU A. DANG, KEVIN W. CHERRY, and RYAN H. FLAX, *Administrative Patent Judges*.

DANG, *Administrative Patent Judge.*

# JUDGMENT
## Final Written Decision
## Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background*

In response to a Petition (Paper 3, "Pet.") filed by Roku, Inc. and VIZIO, Inc. (collectively, "Petitioner"), we instituted *inter partes* review ("IPR") of claims 1−3, 6−14, and 16 ("the challenged claims")[1] of U.S. Patent No. 6,411,941 B1 (Ex. 1001, "the '941 patent"). *See* Paper 10 ("Decision" or "Dec. Inst."). During the trial, Ancora Technologies, Inc. ("Patent Owner") filed a Response (Papers 21, 22, "PO Resp."), to which Petitioner filed a Reply (Papers 32, 33, "Pet. Reply."). In turn, Patent Owner filed a Sur-Reply. Papers 36, 37 ("PO Sur-Reply"). An oral final hearing was held on October 3, 2022. A transcript of the hearing has been entered into the record. Paper 48 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to Patent Owner.[2] *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must prove

[1] Claims 4, 5, 15, and 17–19 are not challenged in this proceeding. Pet. 7.

[2] Although we refer to certain of Patent Owner's arguments in this proceeding as unpersuasive, we do not shift the ultimate burden of proof from Petitioner. Unpersuasiveness here is in the context of the parties' arguments and the evidence of record. *See Essity Prof'l Hygiene N. Am. LLC v. Cascades Canada ULC,* 811 Fed. App'x 643 (Fed. Cir. 2020).

unpatentability by a preponderance of the evidence. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

Based on the record, Petitioner has proven by a preponderance of the evidence that claims 1−3, 6−14, and 16 of the '941 patent are unpatentable.

*B. The '941 patent*

According to the '941 patent, software products have been developed to validate authorized software usage by writing a license signature onto the computer's volatile memory. Ex. 1001, 1:19–21. However, the '941 patent recognizes that these products are vulnerable to attack by "hackers" and the license signatures are "subject to the physical instabilities of their volatile memory media." *Id.* at 1:21–26. The '941 patent also recognizes that hardware-based products developed to validate authorized software usage are "expensive, inconvenient, and not particularly suitable for software that may be sold by downloading." *Id.* at 1:27–32.

Thus, the '941 patent discloses a method of restricting software operation within a license limitation that relies on the use of a key and a record, which have been written into the non-volatile memory of a computer. *Id.* at 1:39–42. In particular, the method is applicable for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area (*see* below discussion of Figure 1). *Id.* at code (57). According to the '941 patent, the method includes the steps of selecting a program residing in the volatile memory, setting up a verification structure in the non-volatile memories, verifying the program using the structure, and acting on the program according to the verification. *Id.*

In a "specific non-limiting example," a conventional computer includes a conventional Basic Input / Output System ("BIOS") module in which a key constituting a unique identification code for the host computer was embedded at the read-only memory ("ROM") section thereof during manufacture, wherein the key is stored in a non-volatile portion of the BIOS where it cannot be removed or modified. *Id.* at 1:44–49. A verification structure is set in the BIOS so as to indicate that the specified program is licensed to run on the specified computer. *Id.* at 1:59–62. The encrypted license record is stored in another (second) non-volatile section of the BIOS, e.g., the electrically erasable programmable read-only memory ("EEPROM") section. *Id.* at 1:62–2:1. Unlike the first non-volatile section, the data in the second non-volatile memory may be erased or modified so as to enable to add, modify or remove licenses. *Id.* at 2:1–5.

Figure 1 of the '941 patent is reproduced below.




Figure 1 above shows a schematic diagram of computer processor 1 and license bureau 7. *Id.* at 5:9−16. Computer processor 1 is associated with input operations 2 and output operations 3. *Id.* Computer processor 1 contains first non-volatile memory area 4 (e.g., the ROM section of the BIOS), second non-volatile memory area 5 (e.g., the EEPROM section of the BIOS), and volatile memory area 6 (e.g., the internal random access memory ("RAM") of the computer). *Id.*

As shown in Figure 1, computer processor 1 is in temporary telecommunications linkage with license bureau 7. *Id.* at 5:17–18. The first non-volatile memory includes pseudo-random identification key 8, which constitutes unique identification of the computer, and which exclusively or

in combination with other information (e.g., user name), is sufficient to uniquely differentiate the first non-volatile memory from all other first non-volatile memories. *Id.* at 5:19–24. The second non-volatile memory includes license-record-area 9, which contains encrypted license records 10–12, and the volatile memory accommodates license program 16 having license record fields 1–15 appended thereto. *Id.* at 5:15–29.

### *C. The Challenged Claims*

Of the challenged claims, only claim 1 is independent. Claims 2, 3, 6−14, and 16 directly or indirectly depend from claim 1. Claim 1 is illustrative:

> 1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
>
> selecting a program residing in the volatile memory,
>
> using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
>
> acting on the program according to the verification.

Ex. 1001, 6:59–7:4.

*D. Prior Art Relied Upon*

Petitioner relies upon the references listed below (Pet. 7−8):

| Reference | Date | Exhibit No. |
|---|---|---|
| Hellman, U.S. Patent No. 4,658,093 | Apr. 14, 1987 | Ex. 1004 |
| Chou, U.S. Patent No. 5,892,906 | July 19, 1996 | Ex. 1005 |
| Schneck, U.S. Patent No. 5,933,498 | November 5, 1997 | Ex. 1006 |

*E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability (Pet. 8):

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 1, 2, 11, 13 | 103(a) | Hellman, Chou |
| 1−3, 6−14, 16 | 103(a) | Hellman, Chou, Schneck |

Petitioner relies on the Declarations of Andrew Wolfe, Ph.D. (Exs. 1003, 1033) in support of its unpatentability contentions. Patent Owner provides the Declarations of Jon B. Weissman, Ph.D. (Ex. 2006), Ian Jestice (Exs. 2004, 2017), and David Martin, Ph.D. (Ex. 2018), as well as the

[3] The ’941 patent was filed on October 1, 1998, and claims priority to a foreign-filed application dated May 21, 1998. Ex. 1001, codes (22), (30). These dates are before the AIA revisions to 35 U.S.C. § 103 took effect on March 16, 2013. 35 U.S.C. § 100 (note). Therefore, pre-AIA § 103(a) applies. Our decision is not impacted by which version of the statute applies.

deposition of Dr. Weissman taken on behalf of Patent Owner (Ex. 2003). Dr. Wolfe was cross-examined by Patent Owner, and a transcript of his deposition was entered into the record. Ex. 2026.

## II. ANALYSIS

### A. *Claim Construction*

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) ("*Phillips*").

Only those terms in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In light of the parties' arguments and supporting evidence, we find that it is necessary to address only the claim term "agent" recited in claim 1.

"agent"

Claim 1 recites "using an *agent* to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record." Ex. 1001,

6:64–67 (emphasis added). The claim term also appears in claims 7, 14, and 18. *Id.* at 7:5–8:64.

Patent Owner proposes that the claim term "agent" requires construction. PO Resp. 30–36. Patent Owner contends that the term "agent" should be understood as "an 'OS-level software program or routine,' in view of file history that firmly establishes that the claimed 'agent' runs separate from the BIOS." *Id.* at 32. Patent Owner further argues that the plain meaning of "agent" as "a software program or routine" excludes hardware in the context of the '941 patent, since the '941 patent "specifically distinguishes prior art hardware-based products." PO Sur-Reply 3 (citing Ex. 1001, 1:27–35; Ex. 2018 ¶ 61 ("the '941 patent discloses using existing computer hardware with 'a conventional BIOS module.'")).

According to Patent Owner, the court in the prior litigation involving the '941 patent held that "the plain and ordinary meaning [of] 'agent' is 'a software program or routine.'" PO Resp. 33 (citing Ex. 1012, 3; Ex. 1013, 36) (alteration in original). Patent Owner contends that construing "agent" as software-only is consistent with its plain meaning and the disclosure of the '941 patent. PO Sur-Reply 2–3.

Although Patent Owner contends that a person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field," Patent Owner also contends that "[t]he prosecution history also plays a role in claim interpretation." PO Resp. 30–31 (citing *Phillips*, 415 F.3d at 1317–18). Patent Owner then argues, "[r]emarks made both by the applicants and the examiner during prosecution of the '941 patent require a narrower interpretation of 'agent.'"

*Id.* at 33 (citing *Rembrandt Wireless Techs. LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017); *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1354 (Fed. Cir. 2020)). Patent Owner contends that, during prosecution of the ’941 patent, “the applicant and the examiner both filed remarks that limit the ‘agent’ to an ‘OS-level software program or routine,’ by distinguishing references in which *BIOS programs* stored information in the BIOS,” and, in view of these remarks, the Examiner allowed the claims. *Id.* at 34. According to Patent Owner, such interpretation of “agent” to be an “OS level software program or routine” is not inconsistent with positions it adopted in related district court cases, wherein, throughout claim construction briefing, it “noted that the claimed ‘agent’ is OS-level.” PO Sur-Reply 4–5.

Patent Owner furthermore argues that “disavowal of claim scope can be shown by the applicant’s actions during prosecution of a patent, particularly when the examiner accedes to the applicant’s position.” PO Sur-Reply 6. Patent Owner refers to the prosecution history of the ’941 patent, wherein “the examiner’s reasons for allowance explained that the cited references ‘do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS’ and that ‘a computer BIOS is not set up to manage a software license verification structure.” *Id.* at 8 (citing Ex. 2011, 162) (emphasis omitted).

Petitioner points out that Patent Owner’s construction for “agent” is “significantly narrower than what Patent Owner has advanced in more than a dozen proceedings involving the ’941 patent over the past decade,” wherein “Patent Owner has all along argued—successfully, no less—that ‘agent’

encompasses *any* type of software." Pet. Reply 1 (citing Ex. 1036, 18; Ex. 1012, 3; Ex. 1013, 36; Ex. 1035, 33:17–36:14, 92:17–93:16). Petitioner contends that, after having consistently and successfully advanced a broad construction of "agent" for infringement, "Patent Owner cannot now advance an entirely new, and much narrower, construction in an attempt to evade Petitioner's obviousness challenge." *Id.* (citing *01 Communique Lab, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 743 (Fed. Cir. 2018) (claims "may not, like a nose of wax, be twisted one way to avoid [invalidity] and another to find infringement")).

Petitioner contends that the plain and ordinary meaning of "agent" is not limited to software let alone OS-level software. Pet. Reply 1–2. According to Petitioner, Patent Owner "resorts to a prosecution history disclaimer theory" to justify its narrow construction even though Patent Owner "does not use the word 'disclaimer,' [in its arguments,] its invitation for the Board to limit 'agent' is obviously premised on a disclaimer theory." *Id.* at 2 (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal"). However, Petitioner contends that "Patent Owner cannot—and has not even tried to—meet the 'exacting' standard to show clear and unmistakable disclaimer," and thus, "'agent's' plain and ordinary meaning should prevail." *Id.* at 2–3.

a. Law of Lexicography and Disavowal (Disclaimer)

As Patent Owner acknowledges, the district courts have held that "the plain and ordinary meaning [of] 'agent' is 'a software program or routine.'"

PO Resp. 33 (alteration in original). In fact, Patent Owner also acknowledges that "[t]he plain meaning of 'agent' requires 'a software program or routine.'" PO Sur-Reply 2; *see also* Tr. 29:9–11 ("JUDGE FLAX: Counsel, if the plain meaning of the agent is . . . what did you say it was? MR GOSSE: Software program or routine").

A claim term is given its "plain and ordinary meaning absent lexicography or disavowal." *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). That is, "[t]here are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the Specification or during prosecution." *See id.*

For lexicography, "[e]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)) (alteration in original). For example, "a patent's repeated and consistent description of a claim term may inform its construction." *Groove Digital, Inc. v. United Bank*, 825 F. App'x 852, 856 (Fed. Cir. 2020) (nonprecedential) (citing *Abbott*, 696 F.3d at 1150).

For disavowal, a patentee disavows the full scope of a claim term either in the specification or during prosecution. *See Thorner*, 669 F.3d at 1365. For disavowal in the specification, "the specification must contain expressions of manifest exclusion or restriction, representing a clear

disavowal of claim scope." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (quotations omitted). For disavowal during prosecution, "[t]he party seeking to invoke prosecution history disclaimer bears the burden of providing the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." *Mass. Inst. Of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). In either scenario the disavowal must be clear.

b. Disavowal

Patent Owner does not cite to any portion of the Specification that may define "agent" explicitly or implicitly. As discussed above, the only mention of "agent" in the '941 patent is in the claims as issued. *See generally* Ex. 1001. Further, the Specification of the '941 patent does not mention "OS-level" or even "operating system." *See id.* Patent Owner's briefing instead relies heavily on the prosecution history of the '941 patent to construe "agent" as "OS level software program or routine." *See* PO Resp. 31–36; PO Sur-Reply 6–10. Thus, we focus our attention there.

i. Prosecution History Overview

As Patent Owner suggests, in order to construe the meaning of the term "agent" in claim 1, we look at the history of the '941 patent as well as claim 1 itself. As shown in the history of the '941 patent, the application as originally filed, including the originally filed claims, does not mention "agent." *See* Ex. 2011, 21–35.

As shown in the prosecution history of the '941 patent, in an office action dated June 22, 2001 ("the June 22, 2001 Office Action"), the Examiner rejected claim 1 under 35 U.S.C. § 112, first paragraph, as

containing subject matter that was not described in the Specification in such a way as to reasonably convey to one skilled in the relevant art that the inventors, at the time the application was filed, had possession of the claimed invention. Ex. 2011, 104–105, 108–109. In particular, the Examiner concluded that "the Applicants do not teach the device necessary to edit an EEPROM nor have they made it clear to the Examiner how their system would be implemented in light of the non-trivial processing required to write and erase its data." *Id.* at 109. In response to the June 22, 2001 Office Action, in an amendment dated November 16, 2001 (*id.* at 121, 127, 130, "the November 16, 2001 Amendment"), Applicant in the '941 patent then amended claim 1 to include an "agent" to "set up the verification structure in the erasable, non-volatile memory of the BIOS." *See id.* at 130.

After the November 16, 2001 Amendment, in a non-final office action dated January 15, 2002, the Examiner rejected all claims under 35 U.S.C. § 103(a) over Misra (U.S. Patent No. 6,189,146), Goldman (U.S. Patent No. 5,684,951), and Ewertz (U.S. Patent No. 5,479,639). Ex. 2011, 139–140, 143–145. In response to this rejection, in an amendment dated February 5, 2002, Applicant stated that "[t]he cited references . . . do not teach or suggest, among other things, storing a verification structure, such as a software license information, in the BIOS of a computer as is recited in the present claims." *Id.* at 151.

The Examiner then eventually allowed the claims, stating the reason for allowance as

> the closest prior art systems, singly or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS to verify the

> program using the verification structure and having a user act on the program according to the verification.

*Id.* at 162. Further, the Examiner stated,

> it is well known to those of ordinary skill [in] the art that a computer BIOS is not setup to manage software license verification structure. The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS.

*Id.*

ii. Does the Prosecution History Limit the "Agent" to OS-Level?

Based on this complete record, and in particular, the prosecution history of the '941 patent, we are unpersuaded by Patent Owner's contention that, during prosecution of the '941 patent, remarks by the applicant and the examiner "limit the 'agent' to an 'OS-level software program or routine,' by distinguishing references in which *BIOS programs* stored information in the BIOS." PO Resp. 34. Turning to the prosecution history, we refer to Patent Owner's reliance on the Notice of Allowance for forming the meaning of "agent":

> the examiner's reasons for allowance explained that the cited references "do not teach licensed programs running at the OS level *interacting with a program verification structure* stored in the BIOS" and that "a computer BIOS is not set up to *manage* a software license verification structure." . . . The Examiner further stated that "[t]he present invention overcomes this difficulty by *using an agent to set up a verification structure* in the erasable, non-volatile memory of the BIOS." . . . Taken as a whole, the examiner's statement clearly and unmistakably refers to the claimed agent.

PO Sur-Reply 8.

But focusing on the Examiner's actual statement in the Notice of Allowance (quoted above), we find that the '941 patent's prosecution history does not unambiguously support Patent Owner's "agent" claim construction, i.e., as an "OS-level" software program or routine. We find that, at most, the Examiner's statement says that "licensed programs running at the OS level" interact with a program verification structure stored in the BIOS, wherein the agent is used to set up the verification structure. Ex. 2011, 162. That is, the Examiner's statement says that "licensed programs" interacting with the verification structure are "running at the OS level," but does not say whether the "agent" setting up the verification structure is also OS-level. *Id.*

We agree with Petitioner that "[t]here is no indication in the file history that 'agent' was added to the claims to require OS-level implementation." Pet. Reply 4. That is, as Petitioner points out, "the Examiner nowhere tied OS-level implementation to the agent," and thus, we agree with Petitioner that "remarks in the examiner's statement of reasons for allowance" are "insufficient to limit claim scope." *Id.* at 6 (citing *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 737 (Fed. Cir. 2014)).

We agree with Petitioner that the prosecution history cited by Patent Owner is, at best, ambiguous and, in any case, lacks a clear and unambiguous disavowal that would support Patent Owner's proposed construction calling for the agent to be "OS-level." Pet. Reply 7. That is, we agree that "the ambiguity here makes the file history unhelpful in informing the meaning of 'agent' even in the absence of disclaimer." *Id.*

(citing *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1277 (Fed. Cir. 2015)).

The Examiner's statement as to the reasons for allowance in the prosecution history was that prior art systems, individually or collectively, do not teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS, where an agent is used to set up a verification structure in the erasable, non-volatile memory of the BIOS. *See* Ex. 2011, 162. Applicant never argued to the Examiner in the '941 patent's prosecution that the agent itself is "OS-level." *Id.*

In sum, for the reasons given, we are not persuaded by Patent Owner's arguments that the claims should be construed as requiring the agent to be "OS level."

As Patent Owner's reliance on disavowal does not support its proposed construction, we determine that the definition of "agent" as recited in claim 1, discussed by the parties as a "software program or routine," more aligns with the plain and ordinary meaning in light of the Specification and the claim language. We further address the related "software" aspect of the disputed limitation below.

iii. Software-only

Based on the record, we are also unpersuaded by Patent Owner's contention that the plain meaning of "agent" in the context of the '941 patent excludes hardware. PO Sur-Reply 2. In particular, we are unpersuaded by Patent Owner's contention that "[t]he use of special hardware in the agent would be anathema to the '941 patent, which specifically distinguishes prior art hardware-based products." *Id.* at 3 (citing Ex. 1001, 1:27–35; Ex. 2018

¶ 61 (the ’941 patent discloses using existing computer hardware with ‘a conventional BIOS module’”)). We refer to Patent Owner’s reliance on the Specification of the ’941 patent for supporting its construction of the “plain meaning” of “agent” as excluding hardware:

> Software based products have been developed to validate authorized software usage by writing a license signature onto the computer's volatile memory (e.g. hard disk). These products may be appropriate for restricting honest software users, but they are very vulnerable to attack at the hands of skilled system's programmers (e.g. “hackers”). These license signatures are also subject to the physical instabilities of their volatile memory media.
>
> Hardware based products have also been developed to validate authorized software usage by accessing a dongle that is coupled e.g. to the parallel port of the P.C. These units are expensive, inconvenient, and not particularly suitable for software that may be sold by downloading (e.g. over the internet).
>
> There is accordingly a need in the art to provide for a system and method that substantially reduce[s] or overcome[s] the drawbacks of hitherto known solutions.

Ex. 1001, 1:19–35 (“Background of the Invention”).

But, focusing on Patent Owner’s cited passage in the “Background of the Invention” Section of the ’941 patent, we find that the ’941 patent’s Specification does not unambiguously support Patent Owner’s “agent” claim construction, i.e., as “software-only.” We find that, at most, the cited passage says that both software-based products and hardware-based products have been developed to validate authorized software, whereby software based products writing a license signature to the computer’s volatile memory

(e.g. hard disk) are "vulnerable to attach at the hands of skilled system's programmers (e.g. 'hackers')," while hardware-based products accessing a dongle coupled to the parallel port of the personal computer are "expensive, inconvenient, and not particularly suitable for software that may be sold by downloading (e.g. over the internet)." Ex. 1001, 1:19–32. That is, the cited passage says that both software-based products and hardware-based products have drawbacks, but does not say whether the "agent" should be in software or hardware to overcome the drawbacks. *Id.* We find that there is nothing clear or unmistakable in the cited passage to amount to a disavowal of the scope of "agent" to limit it to "software only," and in fact, the cited passage is silent as to the term "agent." *Id.*

We find, that the Specification of the '941 patent is, at best, ambiguous and, in any case, lacks any "disavowal" that would support Patent Owner's proposed construction calling for the agent to exclude hardware. *See Novartis Pharmas. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1017–18 (Fed. Circ. 2022) (To exclude an embodiment, there generally must be something in the specification that conveys to a skilled artisan that the inventor intended the exclusion, such as a discussion of disadvantageous or alternatives). The passage in the Specification of the '941 patent cited by Patent Owner merely discusses the drawbacks of particular prior art software-based products *and* hardware-based products that had been developed to validate authorized software usage, but disclaims neither. *See* Ex. 1001, 1:19–35. That is not enough.

We credit Dr. Wolfe's testimony that "agents 'may be software, *hardware*, or both.'" Ex. 1033 ¶ 5 (citing Ex. 1038 ("Oxford Dictionary of

Computing"), 11). Patent Owner acknowledges that Dr. Wolfe relies upon U.S. Patent No. 5,568,552 (Ex. 1039, "Davis") to support his testimony that "agent" can be understood to include hardware. PO Sur-Reply 3. Although Patent Owner contends that "Davis does not disclose a single instance where the unmodified work 'agent' is used to describe a hardware-based agent," Patent Owner acknowledges that Davis does disclose a "hardware agent," using the term "hardware agent" as "shorthand to describe an integrated circuit component." *Id.* (citing Ex. 1039, 8:55–9:12).

During oral arguments, Patent Owner acknowledged that there is no dispute that every computer has hardware. Tr. 31:4–32:12 ("JUDGE CHERRY: Every computer has a wire. . . . You're not disputing that, are you? MR. GOSSE: No, Your Honor. Of course not"). Further, Patent Owner acknowledged that computers have software thereon. *Id.* at 31:21–32:2 ("JUDGE CHERRY: Those examples that you gave all run software, right? . . . You're not disputing that, are you, at 1998? MR. GOSSE: Your Honor, there were a certainly a number of computers that ran software, yes."). Patent Owner's expert, Dr. Martin, testified that "a mixed software/hardware entity does have a software component," wherein "it may be possible to analyze the software component without the hardware," depending on the specific circumstance. Ex. 1035, 123:6–10. In fact, Dr. Martin testified that hardware can be used to set up the verification structure. *Id.* at 131:14–19 ("I don't see anything precluding the use of hardware in setting up the verification structure.").

In this case, there is no indication in the claim language itself, the Specification, or the prosecution history of any intent to limit the scope of

the claim to only a preferred embodiment where an agent excludes hardware components. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (quoting *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."). In sum, for the reasons given, we are not persuaded by Patent Owner's arguments that the claims should be construed as requiring the agent to be "software-only."

As Patent Owner's reliance on the Specification does not support its proposed construction, we determine that the dictionary definition relied on by Dr. Wolfe in his testimony more closely aligns with the plain and ordinary meaning in light of the Specification and the claim language. In other words, we construe "agent" in claim 1 to mean a "computer program or routine" wherein such computer program or routine does not exclude hardware components.

### *B. Principles of Law*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of non-obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *C. Level of Ordinary Skill in the Art*

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation marks omitted).

Here, Petitioner asserts that a person of ordinary skill in the art ("POSITA") in the context of the '941 patent "would have had at least a B.S. degree in computer science, computer engineering, or electrical engineering (or equivalent experience)" and "would have had at least two years of experience with computer science and computer engineering, including information encryption, computer architecture, and firmware programming," citing to the declaration of Dr. Wolfe for support. Pet. 21–22 (citing Ex. 1003 ¶¶ 21–25).

Patent Owner contends that the POSITA "would be an individual who, as of the 1997/1998 time frame, had earned an accredited Bachelor's

degree in electrical engineering, computer engineering, or computer science, or an equivalent education or level of knowledge," and had "two years of industrial experience with computer hardware, software, and operating systems," citing to the declaration of Dr. Martin for support. PO Resp. 29 (citing Ex. 2018 ¶ 51).

The parties propose similar levels of ordinary skill in the art and do not directly challenge the other's proposal. We consider the level of ordinary skill in the art to be reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (holding that absent evidence to the contrary, "the prior art itself [may] reflect[] an appropriate level" of ordinary skill in the art).

In general, we agree with the areas of agreement in the parties' proposals. Petitioner has not explained sufficiently why researching or working particularly with "information encryption" and "firmware programming" is necessary (Pet. 21–22) and Patent Owner has not explained sufficiently why researching or working particularly with "operating systems" is necessary (PO Resp. 29). Thus, we adopt both parties' proposed general experience of working with "computer architecture," including "computer hardware, software" which comports with the level of ordinary skill in the art reflected in the prior art of record. Accordingly, we determine that a person of ordinary skill would have a Bachelor's degree in electrical engineering, computer engineering, or computer science, or the equivalent plus two years of experience working with computer science and computer engineering, including computer architecture, hardware and software. Our

ultimate decision, however, would not change were we to instead adopt outright either party's proposed definition.

*D. Obviousness Over Hellman, Chou, and Schneck*

Petitioner asserts that claims 1, 2, 11, and 13 are unpatentable under § 103(a) as obvious over Hellman and Chou (Ground 1), and that claims 1−3, 6−14, and 16 are unpatentable as obvious over Hellman, Chou, and Schneck (Ground 2), thus Ground 1 is subsumed by Ground 2 and we will discuss them together. Pet. 22–64. For each of the prior art combinations, Petitioner provides detailed explanations as to how the combination teaches or suggests each claim limitation, and articulates reasons to combine the prior art teachings, citing to Dr. Wolfe's Declaration for support. *Id.* (citing Ex. 1003).

Patent Owner counters that the asserted combinations fail to disclose key elements of claim 1 (PO Resp. 48−66), and that the Petition fails to establish a valid motivation for combining Hellman with Chou. *Id.* at 52–56.

We summarize the asserted prior art below.

1. Hellman (Exhibit 1004)

Hellman discloses a method and an apparatus in which use of a software package can be authorized for a particular base unit a specific number of times. Ex. 1004, 4:37−40. It is undisputed that Hellman is prior art. *See generally* PO Resp.

Figure 1 of Hellman is reproduced below:




Figure 1 above illustrates a block diagram of a pay-per-use software control system. Ex. 1004, 5:1–2. Base unit 12 communicates with authorization and billing unit 13 over an insecure communication channel 11, using transmitter-receiver units 14, 16. *Id.* at 5:39–42. The user at base unit 12 obtains software package 17 by purchasing it and requests its use. *Id.* at 5:51–59. Authorization and billing unit 13 receives the user's request, generates authorization A for unit 12 to use software package 17 an additional N times, and sends authorization A to base unit 12. *Id.* at 6:3–8.

Figure 8 of Hellman is reproduced below.




Figure 8 above depicts an implementation of base unit 12 during use of a software package. *Id.* at 10:33–34. Software package 17 (*see* Fig. 1) is

connected to base unit 12 and a signal representing software package 17 is operated on by one-way hash function generator 33 to produce an output signal which represents hash value H. *Id.* at 10:34–38. Signal H is transmitted to update unit 36 to indicate which software package is being used. *Id.* at 10:38–40. Update unit 36 uses value H as an address to non-volatile memory 37, which responds with a signal representing M, the number of uses of software package 17 which are still available. *Id.* at 10:40–43.

If value M is greater than 0, then update unit 36 sends a control signal to switch 41 which activates software player 42, allowing it to use software package 17. *Id.* at 10:44–46. Update unit 36 also decrements M to M−1 and stores this as the new value in address H in non-volatile memory 37. *Id.* at 10:46–49. If M=0, then update unit 36 does not change the contents of non-volatile memory 37, but neither does it send a control signal to activate software player 42. *Id.* at 10:50–53. Thus, the user is prevented from using software package 17 for which he does not have current authorized use. *Id.* at 10:53–54.

2. <u>Chou (Exhibit 1005)</u>

Chou discloses an apparatus and a method for discouraging computer theft. Ex. 1005, code (57). It is undisputed that Chou is prior art. *See generally* PO Resp.

Chou's invention requires that a user enters a unique word or number related to the particular computer each time the computer is powered up. Ex. 1005, 2:11−14. Chou discloses a security routine that is stored in the BIOS memory. *Id.* at 2:14−16. The security routine requires verification of

a password entered by the user, or a verification of a quantity read from an externally connected memory device. *Id.* at 2:16–18.

Chou also discloses that, at the time of its invention, "[r]ecent changes in the computer BIOS memory storage devices permit writing data to the BIOS memory, offering the opportunity to provide password protection within the same memory which stores the BIOS routines." *Id.* at 1:63–66. And, "any attempt to delete the protection will result in the BIOS routine being disabled, disabling the boot up process." *Id.* at 1:66–2:1. "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture." *Id.* at 2:2–4. According to Chou, its "invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *Id.* at 2:4–7.

3. Schneck (Exhibit 1006)

Schneck discloses a technique that "controls access to and use and distribution of data." Ex. 1006, 6:49–50. Schneck's technique can be used to "control how much of the software's functionality is available." *Id.* at 6:53–56. Schneck prevents the authorization to use software on one device from being used on another, unauthorized device, to address the "secondary distribution" problem. *Id.* at 2:40–67, 6:57–62.

It is undisputed that Schneck is prior art. *See generally* PO Resp.

4. Discussion

On the record, we are persuaded by Petitioner's reliance on Hellman for disclosing "almost all of the features of claim 1, including authorizing a

software use through verification data stored in a non-volatile memory such as EEPROM." Pet. 28. Although Petitioner acknowledges that Hellman does not expressly disclose that the computer (base unit 12) has a BIOS and that nonvolatile memory 37 (e.g., EEPROM) would be used to store the BIOS for the computer, we agree with Petitioner that a POSITA "would have found it obvious to provide a BIOS in the computer (base unit 12) and to store the BIOS in the nonvolatile memory 37 (e.g., EEPROM), as disclosed by Chou." *Id.*

*a. Motivation to combine prior art references*

According to Petitioner, Hellman discloses "as early as 1983 that a computer could store a number of licensed uses of software program (the claimed 'license record') in an EEPROM memory." Pet. 29 (citing Ex. 1004, 9:64–10:4; Ex. 1003 ¶¶ 104, 134–137). We are persuaded by Petitioner's contention, despite Patent Owner's arguments to the contrary, that the POSITA would have been motivated to add a BIOS to the computer (base unit 12) of Hellman, "at least because that was the standard—nearly universal—way in which computers operated prior to the priority date of the '941 Patent." *Id.* at 30. That is, the POSITA "would have recognized that one such EEPROM that already existed in the computer would be the EEPROM used to store the BIOS," wherein "other information, like security routines should be stored in the same memory as the BIOS to prevent tampering by the user, as disclosed by Chou." *Id.* (citing Ex. 1005, 3:21–35, 3:52–62; Ex. 1003 ¶¶ 112 –116) (emphasis omitted).

Chou discloses that it was well-known at the time of the invention that a computer would have BIOS and that it would be common to store it in EEPROM memory. *See* Ex. 1005, 1:54−62, 2:2−7, 3:21−35; Ex. 1003 ¶¶ 105−111. Indeed, during prosecution of the '941 patent, Applicant admitted that "all computers must have a BIOS." Ex. 2011, 155 (Prosecution History of the '941 patent—Office Action Response, dated February 5, 2002). We credit Dr. Wolfe's testimony that a person of ordinary skill in the art would have been motivated to store BIOS in the non-volatile memory 37. Ex. 1003 ¶ 115 (citing Ex. 1005, 1:63−2:7).

We are also persuaded by Petitioner's contention that a POSITA would further have been motivated to use the non-volatile memory 37 in Hellman as the BIOS EEPROM of Chou "because that would have been one of a limited number of design choices." Pet. 31 (citing Ex. 1003 ¶ 114). In particular, according to Petitioner, a POSITA "would have recognized that in many computers of the era in the late 1990's, there would be few if any other EEPROM memory modes present on the computer other than the EEPROM storing the BIOS." *Id.* The *KSR* Court explained that the concept of "obvious to try" applies when "there are a finite number of identified, predictable solutions" to a known problem." *See KSR*, 550 U.S. at 421. And, when the path has been identified and "leads to the anticipated success, it is likely the product [was derived] not of innovation but of ordinary skill and common sense." *Id.* Further, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is

obvious unless its actual application is beyond his or her skill." *Id.* at 417. These concepts apply here.

Here, the evidence of record shows that storing sensitive information, such as Hellman's license information, in the BIOS memory was not beyond the skill of a pertinent artisan. In particular, Chou discloses that, at the time of its invention, "[r]ecent changes in the computer BIOS memory storage devices permit writing data to the BIOS memory, offering the opportunity to provide password protection within the same memory which stores the BIOS routines." Ex. 1005, 1:63−66. Chou also discloses "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture." *Id.* at 2:2−4. Chou further discloses that its "invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *Id.* at 2:4−7.

We are persuaded by Petitioner's contention that a POSITA would have been motivated to use the non-volatile memory 27 in Hellman as the BIOS memory of Chou "because Chou disclosed that embedding sensitive information in the BIOS memory reduced the risk of tampering with that information." Pet. 32 (citing Ex. 1003 ¶ 115). According to Petitioner, "Chou explained that, by storing sensitive information (passwords in Chou) in the BIOS memory, any attempt to delete or disable the sensitive information would also disable the BIOS program." *Id.* (citing Ex. 1005, 1:63–2:1; Ex. 1003 ¶ 115).

Indeed, Chou discloses that "EEPROM flash devices may be programmed with BIOS routines," and that "[t]he present invention makes

use of these new BIOS memory devices for effecting security measures which discourage theft." Ex. 1005, 1:63–2:1. That is, Chou teaches storing sensitive information in the BIOS EEPROM to reduce the risk of tampering with that information. *Id.* at code (57), 1:54–2:7, 3:52–62.

Finally, we are persuaded by Petitioner's contention that a POSITA would further have been motivated to use the Hellman non-volatile memory 37 as the BIOS EEPROM of Chou "because that would have provided economic and operational efficiencies." Pet. 32 (Ex. 1003 ¶ 116). According to Petitioner, using an EEPROM module other than non-volatile memory 37 to store the BIOS "would have increased the cost of the computer and increased the space used on the motherboard for the chips." *Id.*

We are unpersuaded by Patent Owner's contention that "[t]he mere presence of BIOS among computers does not establish that Chou's BIOS memory would have been used to store Hellman's value 'M,' in place of Hellman's separately disclosed non-volatile memory 37." PO Resp. 52. As Petitioner points out, such contention ignores the actual proposed combination of "implementing Hellman's *existing* EEPROM as BIOS memory," wherein a POSITA "would have been motivated to use Hellman's existing non-volatile memory 37 . . . 'for storing the BIOS.'" Pet. Reply 16 (citing Pet. 28, 30). As Petitioner explains, the proposed combination "does not rely on the entirety of Chou's memory to teach storing data in BIOS, but rather uses Hellman's EEPROM (which already stores licensed uses) as the BIOS memory." *Id.* at 19–20 (Ex. 1033 ¶¶ 60–61); *see Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381

(Fed. Cir. 2016) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference.").

Further, such argument does not address Petitioner's reliance on Chou's disclosure of embedding sensitive information in the BIOS memory to reduce the risk of tampering with that information because Chou explains that, "by storing sensitive information (passwords in Chou) in the BIOS memory, any attempt to delete or disable the sensitive information would also disable the BIOS program." Pet. 32. As discussed above, Chou discloses that "EEPROM flash devices may be programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture," and that "[t]he present invention makes use of these new BIOS memory devices for effecting security measures which discourage theft." *See* Ex. 1005, 1:63–2:1.

We are also unpersuaded by Patent Owner's contention that "it was known that BIOS routines and configuration data occupied more memory that was available in standard BIOS memory space." PO Resp. 53 (citing Ex. 2015, 2:6–12). As Petitioner contends, with the support of Dr. Wolfe's testimony, "Hellman discloses a few memory modules, including the non-volatile memory 37 (EEPROM), . . . but no other EEPROM modules," wherein, "given the limited number of memory options in Hellman's base unit and explicit teaching of only a single EEPROM, [a POSITA] would have used Hellman's EEPROM to store BIOS." Pet. Reply 18 (citing Ex. 1003 ¶¶ 113, 114; Ex. 1033 ¶ 51).

Although Patent Owner contends that "Chou's disclosure does not discuss tamper-prevention" (PO Resp. 52), as Petitioner points out, "the Petition relied on Chou's use of a BIOS to further *Hellman's* purpose of tamper prevention." Pet. Reply 17 (citing Pet. 30; Ex. 1004, 4:22–26). We find persuasive Dr. Wolfe's testimony that, in light of Chou, one of ordinary skill in the art would have been motivated to store Hellman's license information in the BIOS EEPROM, in order to discourage users from tampering with the license information and to provide extra protection to the sensitive information. Ex. 1003 ¶¶ 112−116.

We are also unpersuaded by Patent Owner's contention that implementing Hellman's system would require adding a switch, wherein "the value of the security functions could reasonably outweigh the cost of an EEPROM chip, eliminating the need for cost savings." PO Resp. 54. We agree with Petitioner that "Patent Owner mischaracterizes Petitioner's motivation to combine as the economic and operational efficiencies of using 'Chou's EEPROM BIOS *in place of* Hellman's non-volatile memory 37.'" Pet. Reply 19. As Petitioner points out, "[w]hat the Petition actually states is that there are efficiencies in using Hellman's non-volatile memory rather than adding any additional EEPROM modules." *Id.* (citing Pet. 32; Ex. 1033 ¶¶ 57–58).

Further, Patent Owner's argument is premised on Patent Owner's proposed claim construction requiring that the agent is "software only," which, as discussed above, we decline to adopt. We credit Dr. Wolfe's testimony that a POSITA would have recognized that "the update unit 36 [of Hellman] would have been implemented by software, hardware, or some

combination of the two" (*see* Ex. 1003 ¶¶ 137A–137B), wherein there would not be any need to replace Hellman's hardware with software when combining the teachings of Hellman and Chou.

Accordingly, we are persuaded by Petitioner's assertion that, in light of Chou's teachings, a person of ordinary skill in the art would have been motivated to use "non-volatile memory 37 (e.g., EEPROM) of Hellman to store the BIOS for Hellman's computer (Base unit 12), in addition to the license information explicitly disclosed in Hellman, in order to achieve Hellman's purpose of discouraging tampering with the license information. Pet. 28−33 (citing Ex. 1004, 4:22−26; Ex. 1003 ¶¶ 112−116). We find that Petitioner has set forth reasoning with rational underpinning explaining why it would have been obvious to combine the teachings of Hellman and Chou with a reasonable expectation of success. *Id.* We find that, based upon the record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Hellman and Chou in the manner described by Petitioner and the proffered combination of familiar prior art elements according to their established functions would have conveyed a reasonable expectation of success to a person of ordinary skill at the time of the invention. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

Petitioner then relies on Schneck for disclosing that "licensing information is transmitted in encrypted form," and that any information stored on a non-volatile memory "should be stored in encrypted form to

prevent an unauthorized use of a licensed software." Pet. 44–45 (citing Ex. 1006, 9:46−59, 25:64−67). Indeed, Schneck discloses that "packaged data 108 may include access rules 116 in encrypted form," and that "[s]ince all storage of data on internal non-volatile memory devices (for example, disks, flash memory, and the like) is encrypted, this ensures that a physical attack on the system will not result in compromise of plaintext." Ex. 1006, 9:46−59, 25:64−67. Patent Owner does not make any specific argument regarding Petitioner's reliance on Schneck for this disclosure. *See generally* PO Resp.

We are persuaded by Petitioner's contention that, based on Schneck's teachings, a POSITA would have stored "the licensing information in non-volatile memory in encrypted form to address Hellman's deficiencies." Pet. 45−46 (citing Ex. 1003 ¶¶ 144−150). As Dr. Wolfe testifies, such an artisan would have recognized that storing licensing information in encrypted form would "prevent the sort of tampering described . . . and warned against by Schneck." Ex. 1003 ¶¶ 145−146 (citing Ex. 1006, 16:64−17:12, 25:64−67).

We find that, based upon the record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to further combine the teachings of Schneck with Hellman and Chou in the manner described by Petitioner.

b. *Independent Claim 1's Obviousness over Hellman and Chou, and Hellman, Chou, and Schneck*

Having reviewed Petitioner's arguments and supporting evidence in the complete record, we determine Petitioner has demonstrated

by a preponderance of the evidence that claims 1, 2, 11, and 13 are obvious over Hellman in further view of Chou, notwithstanding Patent Owner's arguments to the contrary. As the combination of Hellman and Chou meets all the limitations of claim 1, we need not address Schneck and determine that claims 1–3, 6–14, and 16 are thus obvious over Hellman and Chou, in further view of Schneck. We address in detail Petitioner's evidence and Patent Owner's responses with respect to the limitations of illustrative claim 1.

*i. The preamble of claim 1*

The preamble of claim 1 recites a "method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area." Ex. 1001, 6:59−62.

Petitioner asserts that, even if the preamble is considered limiting, the POSITA "would have found the limitations of the preamble obvious based on the combination of Hellman and Chou." Pet. 46–47. According to Petitioner, "Hellman disclosed a computer (base unit 12) with a volatile memory area (temporary memory 28) and a non-volatile memory area (non-volatile memory 38)." *Id.* at 47. Further, Petitioner contends that "Hellman disclosed a method of restricting software operation (software package 17) with a license (authorized uses M)." *Id.*

We are persuaded by Petitioner's argument that a POSITA "would have found it obvious to modify Hellman's system to provide the non-volatile memory area (non-volatile memory 28) as the non-volatile memory storing the BIOS of the computer, a commonly known technique at the

priority date, as exemplified by Chou." Pet. 47; *see also* Ex. 1005, 1:54–2:7, 3:21–35, Figs. 1, 3, 7; Ex. 1003 ¶¶ 104–106.

In particular, Hellman discloses base unit 12 that includes temporary memory 28 (RAM) and non-volatile memory 37 (EEPROM). *See* Ex. 1004, 2:24–27, 8:67–68, 10:1–4, Figs. 1, 6. Chou discloses a BIOS EEPROM on a computer. *See* Ex. 1005, 1:54–2:7, 3:21–35, Figs. 1, 3, 7. We are persuaded by Dr. Wolfe's testimony that a person of ordinary skill in the art "would have been motivated to use non-volatile memory 37 of Hellman to store BIOS because non-volatile memory 37 used a type of memory disclosed by Chou as being advantageous for storing BIOS," noting that Chou discloses that "a transition had occurred to using EEPROM for BIOS, and that the programmability of EEPROM made that an advantageous medium for storing BIOS." Ex. 1003 ¶¶ 112–115 (citing Ex. 1005, 1:63–2:7).

Patent Owner does not make any specific argument regarding the preamble. *See* generally PO Resp. Regardless of whether the preamble of claim 1 is limiting, based on the complete record presented, Petitioner has demonstrated persuasively that the combination of Hellman and Chou discloses the subject matter recited in the preamble of claim 1.

*ii. "selecting a program residing in the volatile memory"*

As to the limitation "selecting a program residing in the volatile memory," we are persuaded by Petitioner's argument that a POSITA would have found it obvious based on the teachings of Hellman to select a software package 17 (the required "program") residing in temporary memory 28 (the required "volatile memory"). Pet. 47–48. In particular, Hellman discloses a

user selecting/purchasing software package 17. *See* Ex. 1004, 5:51–53. According to Petitioner, Schneck demonstrates that a POSITA "would have recognized that a first step to accessing protected information would be to 'request the operating system to read such data into memory." Pet. 47. We are persuaded by Petitioner's contention that, once in memory, "the protected information, such as software package 17 from Hellman, would be selected from the temporary memory 28." *Id.* (citing Ex. 1006, 18:7–10; Ex. 1004, 5:57–61, 9:15–28, 10:33–65; Ex. 1003 ¶¶ 130–132).

Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the record presented, Petitioner has demonstrated by a preponderance of the evidence that Hellman discloses the limitation "selecting a program residing in the volatile memory," as recited in claim 1.

*iii. "using an agent to set up a verification structure in the erasable, non-volatile memory of BIOS, the verification structure accommodating data that includes at least one license record"*

Claim 1 recites "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record." Ex. 1001, 6:64–67.

On this complete record, we are persuaded by Petitioner's assertion that a POSITA would have found it obvious based on the disclosures of Hellman and Chou

> to use an agent (update unit 36) to set up a verification structure (memory location in non-volatile memory 37 as defined by hash value H) in the erasable, non-volatile memory of the BIOS

> (non-volatile memory 37 provided as EEPROM, storing BIOS as taught by Chou), with the verification structure accommodating data that includes at least one license record (authorized uses value M).

Pet. 48.

Patent Owner argues that "the mere use of a common erasable, non-volatile memory to *store* a BIOS and a license record is not adequate to invalidate the challenged claims," because claim 1 "requires 'using an *agent* to set up a verification structure accommodating data that includes at least one license record.'" PO Resp. 56. According to Patent Owner, "the '941 patent's prosecution history establishes that the claimed 'agent' would be understood as an 'OS-level software program or routine,'" and that "[n]either Petitioners nor Dr. Wolfe considered the prosecution history when evaluating whether the art discloses the claimed 'agent.'" *Id.* at 56–57 (citing Pet. 20–21; Ex. 2026, 23:20–24:1).

We are not persuaded by Patent Owner's argument because it relies upon Patent Owner's proposed claim construction, which interprets the claim term "agent" as "an OS-level software program or routine." *See* PO Resp. 56–57. As discussed above (*see supra* Section II.A.), we decline to adopt Patent Owner's proposed claim construction as it improperly imports extraneous requirements into the claims and relies on a non-existent "disavowal." Therefore, Patent Owner's argument that Hellman does not disclose an "agent" as an "OS-level" software program or routine is unpersuasive.

Patent Owner also argues that there is no motivation to modify "Hellman's hardware-based system." PO Resp. 61. However, as discussed

above in section II(D)(4)(a), we find there would not be any need to replace Hellman's hardware with software when combining the teachings of Hellman and Chou. As discussed above, Patent Owner's argument is premised on Patent Owner's proposed claim construction requiring that the agent is "software only," which, as discussed above, we decline to adopt. Further, as Petitioner points out, Patent Owner mischaracterizes Petitioner's combination of Hellman and Chou. Pet. Reply 19. As Petitioner points out, Petitioner is proposing using Hellman's *existing* non-volatile memory rather than adding any additional EEPROM modules. *Id.* (citing Pet. 32; Ex. 1033 ¶¶ 57–58).

Although Patent Owner further argues that Petitioner improperly cites the same element of Hellman for "memory of the BIOS" and "verification structure" (PO Resp. 62–63), we find such argument unpersuasive. In particular, as Patent Owner itself points out, Dr. Wolfe testified that "Hellman discloses a 'verification structure' in the form of the *memory structure* of non-volatile memory 37 storing at least one value M at memory addresses defined by at last one hash value H." *Id.* at 63 (citing Pet. 38–39; Ex. 1003 ¶¶ 133–138). That is, Dr. Wolfe testified that Hellman discloses a verification structure in the form of a memory structure storing at least M value at an address defined by hash value H, wherein the verification structure is set in (i.e., not the same element as) the erasable, non-volatile memory 37. Ex. 1003 ¶¶ 133–138.

We are persuaded by Dr. Wolfe's testimony that that a person of ordinary skill in the art "would additionally have recognized that the authorization and billing unit 13 may cooperate with the update unit 36 to

act as the 'agent'" because "authorization and billing unit 13 generates the authorization A that leads to the updating of the authorized use value M in the non-volatile memory 37." Ex. 1003 ¶¶ 138–150.

Based on the record presented, Petitioner has demonstrated by a preponderance of the evidence that Hellman in view of Chou teaches "using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record," as recited in claim 1.

*iv. "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS"*

Claim 1 also recites "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS." Ex. 1001, 7:1–3. We are persuaded by Petitioner's argument that Hellman discloses this "in the form of verifying the software package 17 (the required 'program') using the value stored in non-volatile memory 37 at the memory address identified by has value H (the required 'verification structure') whenever the software package 17 was used." Pet. 50 (citing Ex. 1004, 10:33–43, 10:55–65; Ex. 1003 ¶¶ 151–152). In particular, Hellman discloses that when an attempt is made to run software package 17, value H is generated and sent to update unit 36, which uses value H as an address in non-volatile memory to verify if a license exists for software package 17. Ex. 1004, 10:33–54. If a license does exist, update unit 36 retrieves the number of remaining authorized uses value M, and a determination is made as to whether the number of authorized uses is greater than zero. *Id.*

Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the record presented, Petitioner has demonstrated persuasively that Hellman discloses the limitation "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS," as recited in claim 1.

*v. "acting on the program according to the verification"*

Lastly, claim 1 recites "acting on the program according to the verification." Ex. 1001, 7:4. Petitioner argues that Hellman discloses this limitation because it discloses "allowing software package 17 (the required 'program') to be used if a license record is found in non-volatile memory 37 and they were authorized uses remaining." Pet. 51 (citing Ex. 1004, 10:40–49; Ex. 1003 ¶¶ 154–155).

Patent Owner does not make any argument regarding this limitation. *See generally* PO Resp. Based on the record presented, Petitioner has demonstrated persuasively that Hellman discloses the limitation "acting on the program according to the verification," as recited in claim 1.

*vi. Conclusion on Claim 1*

For the reasons discussed above, we determine Petitioner has proven, by a preponderance of the evidence that the combination of Hellman and Chou, as well as over the combination of Hellman, Chou, and Schneck account for all of the limitations of claim 1 and that Petitioner has shown an adequate motivation to combine with a reasonable expectation of success. We reserve our final conclusion of obviousness until we consider the Patent Owner's evidence of objective indicia of non-obviousness.

*c. Remaining challenged claims*

Petitioner also similarly accounts for claims 2, 3, 6−14, and 16 as obvious over the asserted prior art. Pet. 51−64. Petitioner provides detailed explanations as to how the asserted prior art combinations teach or suggest these claims and articulates reasons to combine the prior art teachings, citing Dr. Wolfe's testimony for support. *Id.* (citing Ex. 1004; Ex. 1005; Ex. 1003).

As to claims 3, 8, 9, and 14, Patent Owner contends that, because Dr. Wolfe testified that the license record "would have been supplied in a modified version of Hellman's system, in which the authorization A is stored in the non-volatile memory 37," Petitioner's proposed modification "would render Hellman's system inoperative." *See* PO Resp. 64–65 (citing Ex. 1003 ¶¶ 139–150; Ex. 2018 ¶¶ 197–205). In particular, Patent Owner contends that Petitioner relies on two embodiments, both of which render Hellman's system inoperative. *Id.* For example, in one embodiment in which Petitioner contends that authorization A is an encrypted value, Patent Owner argues that only a certain system would allow the base unit to update the value of authorization A to increment or decrement the number of remaining uses, wherein "only the authorization and billing unit can generate new values of A, making it impossible for the update unit to change the number of remaining uses." *Id.* (citing Ex. 2018 ¶¶ 199–205).

However, as Petitioner points out, Patent Owner does not address "Hellman's unlimited-use embodiment and the relationship between Hellman's M, N, and A values." Pet. Reply 21–22 (citing PO Resp. 64–65). We are persuaded by Petitioner's contention that "Hellman makes clear that

software can be licensed for an 'unlimited number of uses,' such that M is a value representing infinity," and thus, as Dr. Martin acknowledged, in that instance "M would not need to be incremented or decremented." *Id.* at 21 (citing Ex. 1004, 10:55–57; Ex. 1035, 157:2–18). Rather, "Hellman's update unit would be configured to recognize this infinite value and not change it after the software has been used." *Id.* (citing Ex. 1004, 10:55–65; Ex. 1033 ¶¶ 62–63).

In its Sur-Reply, Patent Owner does not dispute Petitioner's contentions. *See* PO Sur-Reply 20–21. In fact, Patent Owner acknowledges that Petitioner is relying on an "embodiment that *could be* modified," even though it contends that Petitioner's arguments are "improper hindsight," wherein Petitioner "cherry-pick[s]" the embodiment. *Id.* This last argument is also unpersuasive. "Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure," as Petitioner does here, "such a reconstruction is proper." *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

We determine that Petitioner has set forth reasoning with rational underpinning explaining why it would have been obvious to combine the teachings of Hellman and Chou and Schneck with a reasonable expectation of success. Pet. 28–33. We find that, based upon the complete record, Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the

teachings of Hellman and Chou in the manner described by Petitioner and the proffered combination of familiar prior art elements according to their established functions would have conveyed a reasonable expectation of success to a person of ordinary skill at the time of the invention. *See KSR*, 550 U.S. at 416.

Having reviewed Petitioner's arguments and supporting evidence in the record, we determine Petitioner has proven, by a preponderance of the evidence that Hellman and Chou account for the limitations of claims 2, 11, and 13, and that Hellman, Chou, and Schneck account for the limitations of claims 2, 3, 6–14, and 16.

*d. Objective Indicia of Non-Obviousness*

We have considered Patent Owner's evidence concerning objective indicia of non-obviousness as a part of this decision. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc). Objective evidence of non-obviousness "may often be the most probative and cogent evidence in the record" and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (citation omitted). For such evidence to have substantial weight, however, "its proponent must establish a nexus between the evidence and the merits of the claimed invention." *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (quoting *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257

(Fed. Cir. 2013)). The patentee "bears the burden of showing that a nexus exists." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

A rebuttable presumption of nexus arises "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). Whether a rebuttable presumption of nexus arises "turns on the nature of the claims and the specific facts." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362 (Fed. Cir. 2021). Absent a presumption of nexus, the patentee may prove nexus by showing that the objective evidence resulted directly from "the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74; *see In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

Thus, the Board employs a two-step analysis in evaluating whether a patentee has established a nexus between the evidence concerning objective indicia of non-obviousness and the merits of the claimed invention. *See Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 32–33 (PTAB Jan. 24, 2020) (precedential). Initially, the Board considers whether the patentee has demonstrated that the "products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* at 33. Absent a presumption of nexus, the Board considers whether the patentee has demonstrated "a legally and factually sufficient connection" between the evidence and the claimed invention. *See*

*Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019); *Lectrosonics*, IPR2018-01129, Paper 33 at 33.

*i. Industry praise*

Patent Owner contends that "a significant player in the BIOS market ["AMI"] directly acknowledged the value in the '941 patented technology." PO Resp. 66. As evidence of this contention, Patent Owner relies on its "joint press release" with AMI, which it contends is "directly praising the technology of the '941 patent," and contends that AMI chose to enter an alliance with Patent Owner "to offer BIOS based security products utilizing [Patent Owner's] Platform Security Anchor™ (PSA) technology (as described in US Patent 6,411,941[)]." *Id.* at 66–67 (citing Ex. 2027 ("February 14, 2005 Joint News Release"), 1).

In its Sur-Reply, Patent Owner contends that both the press release and the Alliance Agreement "explicitly and exclusively reference the '941 patent, making their nexus to the patent clear." PO Sur-Reply 21 (citing Ex. 2027; Ex. 2029 ("Alliance Agreement"), 1). Patent Owner then relies on the testimony of Mr. Mullor, its founder, who testified that "AMI invested in the development of software under the Alliance Agreement, which embodied the '941 patent." *Id.* (citing Ex. 1034 ("the Mullor Deposition"), 92:15–17, 51:22–53:2; 62:13–63:10).

Petitioner responds that the joint press release was not industry praise, but rather "[i]n the name inventor's own words, . . . nothing more than a 'marking piece' describing a 'business relationship' between Patent Owner's predecessor and AMI to garner publicity." Pet. Reply 23 (citing Ex. 1034, 48:13). In particular, according to Petitioner, "the inventor testified that he

had a part in authoring the press release," wherein '[t]he self-serving nature of such puffery . . . makes it non-probative of industry praise." *Id.* (citing Ex. 1034, 49:2–4).

We have considered Patent Owner's evidence concerning industry praise (the press release) and the agreement to commercialize BIOS-based security products (the Alliance Agreement). *See* Exs. 2027, 2029. However, we find the evidence does not address a nexus between the merits of *the challenged claims* and the evidence offered to show that the '941 patent was the object of industry praise. *See* PO Resp. 66. That is, we see no evidence in the record that the subject matter recited by claim 1 of the '941 patent, itself, was the object of the alleged AMI praise or the reason for the agreement to commercialize. In fact, the press release and Alliance Agreement refer not to the claims of the '941 patent or the invention, but only broadly to the '941 patent itself. *See* Ex. 2027; Ex. 2029. We agree with Petitioner that, although the press release "obliquely refers to security enhancements related to encryption keys and BIOS," Patent Owner "has made no attempt to prove that these statements are objectively true, let alone that AMI entered into the agreement as a 'direct result of the unique characteristics of the *claimed* invention.'" Pet. Reply. 24 (citing *Fox Factory*, 944 F.3d at 1373–74). That is, Patent Owner does not explain how the relied-upon praise and agreement relate to the claims of the '941 patent in particular. *See* PO Resp. 66; PO Sur-Reply 21.

As discussed above, for Patent Owner's evidence concerning objective indicia of non-obviousness to be given any weight, Patent Owner must establish a nexus between the evidence concerning objective indicia of

non-obviousness, i.e., the press release and Alliance Agreement and the merits of the claimed invention. *See Lectrosonics, Inc.*, IPR2018-01129, Paper 33 at 32–33.

Since Patent Owner has not provided evidence that a product embodies the claimed features and is coextensive with the claims, it is not entitled to presumption of nexus. Absent a presumption of nexus, the Board considers whether the patentee has demonstrated "a legally and factually sufficient connection" between the evidence and the claimed invention. *See Henny Penny*, 938 F.3d at 1332. Here, Patent Owner also does not demonstrate any legally and factually sufficient connection of the press release and Alliance Agreement to the claims of the '941 patent. *See generally* PO response; PO Sur-Reply.

Furthermore, even if there were a nexus (which there is not), we are persuaded by Petitioner's contention that the single joint press release by two parties in a business relationship is insufficient evidence of "industry praise," as opposed to mere "self-serving statements." Pet. Reply 23. As Patent Owner acknowledged, AMI and Patent Owner entered an agreement to commercialize BIOS-based security products. PO Resp. 66. But, a joint press release by two parties in business relationship is not a statement by a third party, but rather by two parties working together to market a product or the relationship itself. That is, Mr. Mullor acknowledged that the press release is "a marketing piece," and that AMI and Patent Owner are in a "business relationship" to try to market a product. *See* Ex. 1034, 48:9–49:1. Thus, even were a nexus shown, we find this evidence would be entitled to little weight in our obviousness analysis.

*ii. Licensing*

Patent Owner contends that several "very significant" companies, [redacted], have taken a license to the '941 patent, wherein each license was for "only the '941 patent" such that "the nexus between the '941 patent and the licensing cannot be questioned." PO Resp. 69. According to Patent Owner, although Patent Owner sued [redacted] licenses in which the licensee paid above the cost of litigation "demonstrate a nexus between the license and patent's strength. *Id.* at 69–70 (citing *Transocean*, 699 F.3d at 1353).

Patent Owner contends that the Hellman and Chou references, two of the prior art references that are subject of this IPR, were known references before each of these settlements, and, instead of going to trial on this combination "after incurring years of litigation costs," the companies took licenses. PO Resp. 70. In particular, "[redacted] asserted the Hellman/Chou invalidity combination" but "still decided [redacted]." *Id.*

In its Sur-Reply, Patent Owner adds that [redacted], also entered an agreement with Patent Owner, wherein "[t]he '941 patent was the sole patent at issue, [redacted] was well-aware of the combination of Hellman and Chou" but "[redacted]." PO Sur-Reply 21–22. Although Patent Owner acknowledges that it also entered into settlements with other companies such

as TCL and Sony for less than the cost of litigation, it contends that Petitioner does not cite to any caselaw "finding that low-dollar license agreements can *detract* from an otherwise strong showing of objective indicia of non-obviousness." *Id.* at 22–23. According to Patent Owner, "[t]he Federal Circuit has repeatedly held that settlements for less than the cost of litigation have no bearing on the obviousness analysis." *Id.* (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004); *Cole Kepro Int'l, LLC v. VSR Inds., Inc.*, 695 Fed. App'x 566, 572 (Fed. Circ. 2004).

Petitioner argues that "Patent Owner's licensing activity is, at best, inconclusive as evidence of non-obviousness." Pet. Reply 25. In particular, Petitioner contends that "Patent Owner relies on [redacted]," but "fails to take into account *five additional* license agreements that were subsequently produced in response to Petitioner's motion" for discovery. *Id.* (citing Exs. 1050–1054). According to Petitioner, "in two of the proceedings in which Hellman and Chou were used to prove invalidity, and where an IPR trial was instituted, the settlement amounts were [redacted] *Id.* at 26 (citing Exs. 1051, 1052). According to Petitioner, "the presence of the low-value [redacted] licenses suggests that the [redacted] licenses were not based on the merits of the claimed invention, and instead were based on some other economic reasons specific to each licensee." *Id.*

We have considered Patent Owner's licenses with [redacted] among others, as evidence concerning objective indicia of non-

obviousness.[4] *See* Exs. 2031, 2032. However, although Patent Owner relies on these licenses as evidence, Patent Owner does not demonstrate a sufficient nexus between the challenged claims and the evidence offered. *See* PO Resp. 69–70; PO Sur-Reply 21–22. In particular, Patent Owner does not establish whether these licenses resulted directly from the unique characteristics of the claimed subject matter of the '941 patent.

For example, with respect to the [redacted] large portions of the submitted license are redacted. Importantly, Exhibit B [redacted] so it is impossible for us to discern what was licensed and on what terms precisely and how the challenged '941 patent fits in. *See Teva Pharms.*, 8 F.4th at 1363–64 ("Here, given that 188 patents were licensed, the nexus between the license and the validity of any particular claim is rather tenuous to say the least. Thus, the Board was correct to require that Teva show something more than the mere existence of the license.").

Although [redacted] is more complete, there is little evidence in the record that would give the necessary context to the license in order to give it substantial weight. [redacted]

---

[4] We decline to consider Patent Owner's license with [redacted] that was only produced in response to Petitioner's discovery request and was not identified in Patent Owner's Patent Owner Response. Moreover, even if we were to consider this license, it is similar to the [redacted] discussed here, and so would be treated similarly.

[redacted] but Patent Owner provides no information about what claims it asserted or how much it was demanding in damages. Without some information about what the potential exposure was, it is difficult to assess whether the license represented a business decision based on the magnitude of the potential risk or an acquiescence to the strength of the '941 patent.

The Federal Circuit has long recognized that licensing programs "are not infallible guides to patentability," and that they "sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits," or "for other reasons unrelated to the unobviousness of the licensed subject matter." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985). The Federal Circuit continues to "specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license.'" *Iron Grip*, 392 F.3d at 1324; *see* also *ABT Systems, LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015) ("While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention.").

Although Patent Owner cites *Transocean* to support its contention that licenses in which the licensee [redacted] "demonstrate a nexus between the license and the patent's strength" (PO Resp. 69–70 (citing *Transocean*, 699 F.3d at 1353)), in *Transocean*, the Federal Circuit determined that Transocean had presented substantial evidence from which a reasonable jury could find that *each of the seven objective factors*, i.e., commercial success, industry praise, unexpected results, copying, industry

skepticism, licensing, and long-felt but unsolved need, supported the non-obviousness of Transocean's claims. *See Transocean*, 699 F.3d at 1349 (emphasis added).

The patentee "bears the burden of showing that a nexus exists." *See WMS Gaming*, 184 F.3d at 1359. However, in this case, Patent Owner relies merely on the existence of the licenses to show a nexus. We do not find such evidence to be sufficient. We are left to speculate as to whether the licensee settled "for other reasons unrelated to the unobviousness of the licensed subject matter." *See EWP*, 755 F.2d at 907–08. The mere existence of the licenses themselves cannot overcome a convincing case of obviousness without showing a clear nexus to the claimed invention. *See ABT*, 797 F.3d at 1361–62. Thus, we find that Patent Owner has failed to show a sufficient nexus to challenged claims of the '941 patent and the [redacted] license agreements, and even if such a nexus had been shown, we decline to give significant weight to these licenses because there is insufficient evidence to evaluate the contexts of the corresponding settlements.

*E. Final Conclusion as to Obviousness*

Weighing the evidence of the level of ordinary skill, the disclosure of the references, differences between the references and the claims at issue, the reasoning to combine the references, and the evidence of objective indicia of non-obviousness, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 11, and 13 would have been obvious over Hellman and Chou and claims 1–3, 6–14, and 16 would have

been obvious over Hellman, Chou, and Schneck. We find that Patent Owner's objective evidence of non-obviousness is weak in comparison to the evidence regarding the prior art under the first three *Graham* factors. *See Graham*, 383 U.S. at 36 (holding that alleged secondary considerations of commercial success and long-felt need did not "tip the scales of patentability" where the invention "rest[ed] upon exceedingly small and quite non-technical mechanical differences in a device which was old in the art").

Accordingly, after weighing all of the evidence we find that Petitioner proves by a preponderance of the evidence that claims 1, 2, 11, and 13 would have been obvious over Hellman and Chou and claims 1–3, 6–14, and 16 would have been obvious over Hellman, Chou, and Schneck.

## III. CONCLUSION

For the foregoing reasons, Petitioner has demonstrated by a preponderance of the evidence, that claims 1−3, 6−14, and 16 of the '941 patent are unpatentable.[5]

---

[5] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

For the foregoing reasons, it is

ORDERED that, based on a preponderance of the evidence, claims 1−3, 6−14, and 16 of U.S. Patent No. 6,411,941 B1 have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

| **Claims** | **35 U.S.C. §** | **Reference(s) /Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1−2, 11, 13 | 103(a) | Hellman, Chou | 1−2, 11, 13 | |
| 1−3, 6−14, 16 | 103(a) | Hellman, Chou, Schneck | 1−3, 6−14, 16 | |
| **Overall Outcome** | | | 1–3, 6–14, 16 | |

For PETITIONER:

Jon Wright
Lestin Kenton
Dohm Chankong
Richard Crudo
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
jwright-ptab@sternekessler.com
lkenton-ptab@sternekessler.com
dchankong-ptab@sternekessler.com
rcrudo-ptab@sternekessler.com

For PATENT OWNER:

David Gosse
Nicholas T. Peters
Karen Wang
FITCH, EVEN, TABIN & FLANNERY LLP
dgosse@fitcheven.com
ntpete@fitcheven.com
kwang@fitcheven.com

US006411941B1

(12) **United States Patent**
**Mullor et al.**

(10) **Patent No.: US 6,411,941 B1**
(45) **Date of Patent: Jun. 25, 2002**

(54) **METHOD OF RESTRICTING SOFTWARE OPERATION WITHIN A LICENSE LIMITATION**

(75) Inventors: **Miki Mullor**; **Julian Valiko**, both of Ramat Hasharon (IL)

(73) Assignee: **Beeble, Inc.**, Newport Beach, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/164,777**

(22) Filed: **Oct. 1, 1998**

(30) **Foreign Application Priority Data**

May 21, 1998 (IL) ................................................ 124571

(51) **Int. Cl.**[7] ................................................ **G06F 17/60**
(52) **U.S. Cl.** ............................ **705/59**; 705/50; 705/51; 705/53; 705/57
(58) **Field of Search** .............................. 705/51, 54, 56, 705/57, 58, 59, 1, 50, 52, 53; 713/187, 189, 200

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,866,769 | A | | 9/1989 | Karp | |
| 4,903,296 | A | | 2/1990 | Chandra et al. | |
| 4,924,378 | A | | 5/1990 | Hershey et al. | |
| 5,386,369 | A | | 1/1995 | Christiano | |
| 5,390,297 | A | | 2/1995 | Barber et al. | |
| 5,479,639 | A | * | 12/1995 | Ewertz et al. | 395/430 |
| 5,490,216 | A | * | 2/1996 | Richadson, III | 380/4 |
| 5,671,412 | A | | 9/1997 | Christiano | |
| 5,684,951 | A | * | 11/1997 | Goodman et al. | 395/188.01 |
| 5,754,763 | A | | 5/1998 | Bereiter | |
| 5,758,068 | A | | 5/1998 | Brandt et al. | |
| 5,758,069 | A | | 5/1998 | Olsen | |
| 5,790,664 | A | | 8/1998 | Coley et al. | |
| 5,826,011 | A | | 10/1998 | Chou et al. | |
| 5,892,900 | A | * | 4/1999 | Ginter et al. | 395/186 |
| 5,905,860 | A | | 5/1999 | Olsen et al. | |
| 6,000,030 | A | * | 12/1999 | Steinberg et al. | 713/200 |
| 6,006,190 | A | | 12/1999 | Baena-Arnaiz et al. | |
| 6,021,438 | A | | 2/2000 | Duvvoori et al. | |
| 6,023,763 | A | | 2/2000 | Grumpstrup et al. | |
| 6,052,600 | A | * | 4/2000 | Fette et al. | 455/509 |
| 6,055,503 | A | | 4/2000 | Horstmann | |
| 6,067,582 | A | * | 5/2000 | Smith et al. | 710/5 |
| 6,073,256 | A | | 6/2000 | Sesma | |
| 6,078,909 | A | | 6/2000 | Knutson | |
| 6,128,741 | A | | 10/2000 | Goetz et al. | |
| 6,173,446 | B1 | | 1/2001 | Khan et al. | |
| 6,189,146 | B1 | * | 2/2001 | Misra et al. | 717/11 |
| 6,192,475 | B1 | | 2/2001 | Wallance | |
| 6,198,875 | B1 | * | 3/2001 | Edenson et al. | 386/94 |
| 6,226,747 | B1 | | 5/2001 | Larsson et al. | |
| 6,233,567 | B1 | | 5/2001 | Cohen | |
| 6,243,468 | B1 | | 6/2001 | Pearce et al. | |
| 6,272,636 | B1 | | 8/2001 | Neville et al. | |
| 6,298,138 | B1 | | 10/2001 | Gotoh et al. | |

FOREIGN PATENT DOCUMENTS

JP 408286906 A * 11/1996 ............. G06F/9/06

OTHER PUBLICATIONS

Dornbusch et al., Destop management software: no need to adjust your set., Infoworld, v17, n37, p60.*

* cited by examiner

*Primary Examiner*—Hyung-Sub Sough
*Assistant Examiner*—Calvin L Hewitt
(74) *Attorney, Agent, or Firm*—Venable; Robert Kinberg; Jeffri A. Kaminski

(57) **ABSTRACT**

A method of restricting software operation within a license limitation that is applicable for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area. The method includes the steps of selecting a program residing in the volatile memory, setting up a verification structure in the non-volatile memories, verifying the program using the structure, and acting on the program according to the verification.

**19 Claims, 2 Drawing Sheets**




1
1st NON-VOLATILE MEMORY
(4)
2nd NON-VOLATILE MEMORY
(5)
9
KEY (8)
LICENCE RECORDS (10) (11) (12)
VOLATILE MEMORY (6)
16
LICENSE PROGRAM
13
14
15
I (2)
O (3)
LICENSE BUREAU (7)

FIG. 1




FIG.2

# METHOD OF RESTRICTING SOFTWARE OPERATION WITHIN A LICENSE LIMITATION

## FIELD OF THE INVENTION

This invention relates to a method and system of identifying and restricting an unauthorized software program's operation.

## BACKGROUND OF THE INVENTION

Numerous methods have been devised for the identifying and restricting of an unauthorized software program's operation. These methods have been primarily motivated by the grand proliferation of illegally copied software, which is engulfing the marketplace. This illegal copying represents billions of dollars in lost profits to commercial software developers.

Software based products have been developed to validate authorized software usage by writing a license signature onto the computer's volatile memory (e.g. hard disk). These products may be appropriate for restricting honest software users, but they are very vulnerable to attack at the hands of skilled system's programmers (e.g. "hackers"). These license signatures are also subject to the physical instabilities of their volatile memory media.

Hardware based products have also been developed to validate authorized software usage by accessing a dongle that is coupled e.g. to the parallel port of the P.C. These units are expensive, inconvenient, and not particularly suitable for software that may be sold by downloading (e.g. over the internet).

There is accordingly a need in the art to provide for a system and method that substantially reduce or overcome the drawbacks of hitherto known solutions.

## SUMMARY OF THE INVENTION

The present invention relates to a method of restricting software operation within a license limitation. This method strongly relies on the use of a key and of a record, which have been written into the non-volatile memory of a computer.

For a better understanding of the underlying concept of the invention, there follows a specific non-limiting example. Thus, consider a conventional computer having a conventional BIOS module in which a key was embedded at the ROM section thereof, during manufacture. The key constitutes, effectively, a unique identification code for the host computer. It is important to note that the key is stored in a non-volatile portion of the BIOS, i.e. it cannot be removed or modified.

Further, according to the invention, each application program that is to be licensed to run on the specified computer, is associated with a license record; that consists of author name, program name and number of licensed users (for network). The license record may be held in either encrypted or explicit form.

Now, there commences an initial license establishment procedure, where a verification structure is set in the BIOS so as to indicate that the specified program is licensed to run on the specified computer. This is implemented by encrypting the license record (or portion thereof) using said key (or portion thereof) exclusively or in conjunction with other identification information) as an encryption key. The resulting encrypted license record is stored in another (second) non-volatile section of the BIOS, e.g. $E^2$PROM (or the



ROM). It should be noted that unlike the first non-volatile section, the data in the second non-volatile memory may optionally be erased or modified (using $E^2$PROM manipulation commands), so as to enable to add, modify or remove licenses. The actual format of the license may include a string of terms that correspond to a license registration entry (e.g. lookup table entry or entries) at a license registration bureau (which will be further described as part of the preferred embodiment of the present invention).

Having placed the encrypted license record in the second non-volatile memory (e.g. the $E^2$PROM), the process of verifying a license may be o commenced. Thus, when a program is loaded into the memory of the computer, a so called license verifier application, that is a priori running in the computer, accesses the program under question, retrieves therefrom the license record, encrypts the record utilizing the specified unique key (as retrieved from the ROM section of the BIOS) and compares the so encrypted record to the encrypted records that reside in the $E^2$PROM. In the case of match, the program is verified to run on the computer. If on the other hand the sought encrypted data record is not found in the $E^2$PROM database, this means that the program under question is not properly licensed and appropriate application define action is invoked (e.g. informing to the user on the unlicensed status, halting the operation of the program under question etc.)

Those versed in the art will readily appreciate that any attempt to run a program at an unlicensed site will be immediately detected. Consider, for example, that a given application, say Lotus 123, is verified to run on a given computer having a first identification code (k**1**) stored in the ROM portion of the BIOS thereof. This obviously requires that the license record (LR) of the application after having been encrypted using k**1** giving rise to $(LR)_{k1}$ is stored in the $E^2$PROM of the first computer.

Suppose now that a hacker attempts to run the specified application in a second computer having a second identification code (k**2**) stored in the ROM portion of the BIOS thereof. All or a portion the database contents (including of course $(LR)_{k1}$ ) that reside in the $E^2$PROM portion in the first computer may be copied in a known per se means to the second computer. It is important to note that the hacker is unable to modify the key in the ROM of the second computer to K**1**, since, as recalled, the contents of the ROM is established during manufacture and is practically invariable.

Now, when the application under question is executed in the second computer, the license verifier retrieves said LR from the application and, as explained above, encrypts it using the key as retrieved from the ROM of the second computer, i.e k**2** giving rise to encrypted license record $(LR)_{k2}$. Obviously, the value $(LR)_{k2}$ does not reside in the $E^2$PROM database section of the second computer (since it was not legitimately licensed) and therefore the specified application is invalidated. It goes without saying that the data copied from the first (legitimate) computer is rendered useless, since comparing $(LR)_{k2}$ with the copied value $(LR)_{k1}$ results, of course, in mismatch.

The example above is given for clarity of explanation only and is by no means binding.

In its broadest aspect, the invention provides for a method of restricting software operation within a license limitation including; for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area; the steps of: selecting a program residing in the volatile memory, setting up a verification structure in the

non-volatile memories, verifying the program using the structure, and acting on the program according to the verification.

An important advantage in utilizing non-volatile memory such as that residing in the BIOS is that the required level of system programming expertise that is necessary to intercept or modify commands, interacting with the BIOS, is substantially higher than those needed for tampering with data residing in volatile memory such as hard disk. Furthermore, there is a much higher cost to the programmer, if his tampering is unsuccessful, i.e. if data residing in the BIOS (which is necessary for the computer's operability) is inadvertently changed by the hacker. This is too high of a risk for the ordinary software hacker to pay. Note that various recognized means for hindering the professional-like hacker may also be utilized (e.g. anti-debuggers, etc.) in conjunction with the present invention.

In the context of the present invention, a "computer" relates to a digital data processor. These processors are found in personal computers, or on one or more processing cards in multi-processor machines. Today, a processor normally includes a first non-volatile memory, a second non-volatile memory, and data linkage access to a volatile memory. There are also processors having only one non-volatile memory or having more than two non-volatile memories; all of which should be considered logically as relating to having a first and a second non-volatile memory areas. There are also computational environments where the volatile memory is distributed into numerous physical components, using a bus, LAN, etc.; all of which should logically be considered as being a volatile memory area.

According to the preferred embodiment of the present invention, there is further provided a license authentication bureau which can participate in either or both of:

(i) establishing the license record in the second non-volatile memory; and

(ii) verifying if the key and license record in the non-volatile memory(s) is compatible with the license record information as extracted from the application under question.

The bureau is a telecommunications accessible processor where functions such as formatting, encrypting, and verifying may be performed. Performing these or other functions at the bureau helps to limit the understanding of potential software hackers; since they can not observe how these functions are constructed. Additional security may also be achieved by forcing users of the bureau to register, collecting costs for connection to the bureau, logging transactions at the bureau, etc.

According to one example of using the bureau, setting up a verification structure further includes the steps of: establishing, between the computer and the bureau, a two-way data-communications linkage; transferring, from the computer to the bureau, a request-for-license including an identification of the .computer and the license-record's contents from the selected program; forming an encrypted license-record at the bureau by encrypting parts of the request-for-license using part of the identification as the encryption key; and transferring, from the bureau to the computer, the encrypted license-record.

According to another example of using the bureau, verifying the program further includes the steps of: establishing, between the computer and the bureau, a two-way data-communications linkage; transferring, from the computer to the bureau, a request-for-license-verification including an identification of the computer, the encrypted license-record for the selected program from the second non-volatile memory, and the licensed-software-program's license-record contents; enabling the comparing at the bureau; and transferring, from the bureau to the computer, the result of the comparing.

The actual key that serves for identifying the computer may be composed of the pseudo-unique key exclusively, or, if desired, in combination with information, e.g. information related to the registration of the user such as e.g. place, telephone number, user name, license number, etc. In the context of the present invention, a "pseudo-unique" key may relate to a bit string which uniquely identifies each first non-volatile memory. Alternately the "pseudo-unique" key may relate to a random bit string (or to an assigned bit string) of sufficient length such that: there is an acceptably low probability of a successful unauthorized transfer of licensed software between two computers, where the first volatile memories of these two computers have the same key.

It should be noted that the license bureau might maintain a registry of keys and of licensed programs that have been registered at the bureau in association with these keys. This registry may be used to help facilitate the formalization of procedures for the transfer of ownership of licensed software from use on one computer to use on another computer.

Constructing the key in the manner specified may hinder the hacker in cracking the proposed encryption scheme of the invention, in particular when the establishment of the license record or the verification thereof is performed in the bureau. Those versed in the art will readily appreciate that the invention is by no means bound by the data, the algorithms, or the manner of operation of the bureau. It should be noted that the tasks of establishing and/or verifying a license record may be shared between the bureau and the computer, done exclusively at the computer, or done exclusively at the bureau. The pseudo-unique key length needs to be long enough to hinder encryption attack schemes. The establishing of the key may be done at any time from the non-volatile memory's manufacture until an attempted use of an established license-record in the non-volatile memory. The key is used for encryption or decryption operations associated with license-records. In principle, the manufacturer of the licensed-software-program may specify the license-record format and therefore different formats may, if desired, be used for respective applications.

According to the preferred embodiment of the present invention, the pseudo-unique key is a unique-identification bit string that is written onto the first non-volatile memory by the manufacturer of the is memory media.

According to one, non-limiting, preferred embodiment of the present invention, the first non-volatile memory area is a ROM section of a BIOS; the second non-volatile memory area is a $E^2$PROM section of a BIOS; and the volatile memory is a RAM e.g. hard disk and/or internal memory of the computer.

The present invention also relates to a non-volatile memory media used as a BIOS of a computer, for restricting software operation within a license limitation, wherein a pseudo-unique key is established.

According to the preferred embodiment of the non-volatile memory media of the present invention, the pseudo-unique key is established in a ROM section of the BIOS.

## BRIEF DESCRIPTION OF THE DRAWINGS

In order to understand the invention and to see how it may be carried out in practice, a preferred embodiment will now be described, by way of non-limiting example only, with reference to the accompanying drawings, in which:

FIG. **1** is a schematic diagram of a computer and a license bureau; and

FIG. **2** is a generalized flow chart of the sequence of operations performed according to one embodiment of the invention.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

A schematic diagram of a computer and a license bureau is shown in FIG. **1**. Thus, a computer processor (**1**) is associated with input operations (**2**) and with output operations (**3**). This computer (processor) internally contains a first non-volatile memory area (**4**) (e.g. the ROM section of the BIOS), a second non-volatile memory area (**5**) (e.g. the $E^2$PROM section of the BIOS), and a volatile memory area (**6**) (e.g. the internal RAM memory of the computer).

The computer processor is in temporary telecommunications linkage with a license bureau (**7**).

The first non-volatile memory includes a pseudo-random identification key (**8**), which exclusively or in combination with other information (e.g. user name), is sufficient to uniquely differentiate this first non-volatile memory from all other first non-volatile memories. As specified before, said key constitutes unique identification of the computer.

The second non-volatile memory includes a license-record-area (**9**) e.g. which contains at least one encrypted license-record (e.g. three records **10–12**). The volatile memory accommodates a license program (**16**) having license record fields (**13–15**) appended thereto. By way of example said fields stand for Application names (e.g. Lotus 123), Vendor name (Lotus inc.), and number of licensed copies (1 for stand alone usage, >1 for number of licensed users for a network application).

Those versed in the art will readily appreciate that the license record is not necessarily bound to continuous fields. In fact, the various license content components of the data record may be embedded in various locations in the application. Any component may, if desired, be encrypted.

Each one of the encrypted license records (**10–12**) is obtained by encrypting the corresponding license record as extracted from program **16**, utilizing for encryption the identification key (**8**).

In a typical, yet not exclusive, sequence of operation, a transaction/request is sent, by the computer to the bureau. This transaction includes the key (**8**), the encrypted license-records (**10–12**), contents from the license program used in forming a license record (e.g. fields **13–15**), and other items of information as desired.

The bureau forms the proposed license-record from the contents, encrypts (utilizing predetermined encryption algorithm) the so formed license-record using the key (**8**), and compares the so formed encrypted license-record with the license-record (**10–12**). The bureau generates an overlay according to the result of the comparison indicating successful comparison, non-critical failure comparison and the critical failure comparison.

The bureau returns the overlay which will direct the computer in subsequent operation. Thus, a success overlay will allow the license program to operate. A non-critical failure overlay will ask for additional user interactions. A critical failure overlay will cause permanent disruption to the computer's BIOS operations. Thus, software operation of the program is methodologically according to a license limitation restriction.

Those versed in the art will readily appreciate that the implementation as described with reference to FIG. **1** is by



no means binding. Thus, by way of non-limiting example, the bureau, instead of being external entity may form part of the computer.

Attention is now directed to FIG. **2**, showing a generalized flow chart of the sequence of operations performed according to one embodiment of the invention.

Thus, selecting (**17**) a program includes the step of: establishing a licensed-software-program in the volatile memory of the computer wherein the licensed-software-program includes contents used to form a license-record. These contents, be they centralize or decentralized, may include terms, identifications, specifications, or limitations related to the manufacturer of a software product, the distributor of a software product, the purchaser of a software product, a licensor, a licensee, items of computer hardware or components thereof, or to other terms and conditions related to the aforesaid.

Setting up (**18**) the verification structure includes the steps of: establishing or certifying the existence of a pseudo-unique key in the first non-volatile memory area; and establishing at least one license-record location in the first or the second nonvolatile memory area.

Establishing a license-record includes the steps of: forming a license-record by encrypting of the contents used to form a license-record with other predetermined data contents, using the key; and establishing the encrypted license-record in one of the at least one established license-record locations (e.g. **10–12** in FIG. **1**).

Verifying (**19**) the program includes the steps of: encrypting the licensed-software-program's license-record contents from the volatile memory area or decrypting the license-record in the first or the second non-volatile memory area, using the key; and comparing the encrypted licensed-software-program's license-record contents with the encrypted license-record in the first or the second non-volatile memory area, or comparing the licensed-software-program's license-record contents with the decrypted license-record in the first or the second non-volatile memory area.

Acting (**20**) on the program includes the step of: restricting the program's operation with predetermined limitations if the comparing yields non-unity or insufficiency. In this context "non-unity" relates to being unequal with respect to a specific equation (e.g. A=B+1); and "insufficiency" relates to being outside of a relational bound (e.g. A>B+1). "Restricting the program's operation with predetermined limitations" may include actions such as erasing the software in volatile memory, warning the license applicant/user, placing a fine on the applicant/user through the billing service charges collected at the license bureau (if applicable), or scrambling sections of the BIOS of the computer (or of functions interacting therewith).

The present invention has been described with a certain degree of particularity but it should be understood that various modifications and alterations may be made without departing from the scope or spirit of the invention as defined by the following claims.

What is claimed is:

**1**. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:

selecting a program residing in the volatile memory,

using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,

verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and

acting on the program according to the verification.

**2**. A method according to claim **1**, further comprising the steps of:

establishing a license authentication bureau.

**3**. A method according to claim **2**, wherein setting up a verification structure further comprising the steps of: establishing, between the computer and the bureau, a two-way data-communications linkage; transferring, from the computer to the bureau, a request-for-license including an identification of the computer and the license-record's contents from the selected program; forming an encrypted license-record at the bureau by encrypting parts of the request-for-license using part of the identification as an encryption key; transferring, from the bureau to the computer, the encrypted license-record; and storing the encrypted license record in the erasable non-volatile memory area of the BIOS.

**4**. A method according to claim **2**, wherein verifying the program further comprises the steps of: establishing, between the computer and the bureau, a two-way data-communications linkage; transferring, from the computer to the bureau, a request-for-license verification including an identification of the computer, an encrypted license-record for the selected program from the erasable, non-volatile memory area of the BIOS, and the program's license-record; enabling the comparing at the bureau; and transferring, from the bureau to the computer, the result of the comparing.

**5**. A method according to claim **3** wherein the identification of the computer includes the unique key.

**6**. A method according to claim **1** wherein selecting a program includes the steps of: establishing a licensed-software-program in the volatile memory of the computer wherein said licensed-software-program includes contents used to form the license-record.

**7**. A method according to claim **6** wherein using an agent to set up the verification structure includes the steps of: establishing or certifying the existence of a pseudo-unique key in a first non-volatile memory area of the computer; and establishing at least one license-record location in the first nonvolatile memory area or in the erasable, non-volatile memory area of the BIOS.

**8**. A method according to claim **6** wherein establishing a license-record includes the steps of: forming a license-record by encrypting of the contents used to form a license-record with other predetermined data contents, using the key; and establishing the encrypted license-record in one of the at least one established license-record locations.

**9**. A method according to claim **7** wherein verifying the program includes the steps of: encrypting the licensed-software-program's license-record contents from the volatile memory area or decrypting the license-record in the erasable, non-volatile memory area of the BIOS, using the pseudo-unique key; and comparing the encrypted licenses-software-program's license-record contents with the encrypted license-record in the erasable, non-volatile memory area of the BIOS, or comparing the license-software-program's license-record contents with the decrypted license-record in erasable non-volatile memory area of the BIOS.

**10**. A method according to claim **9** wherein acting on the program includes the step: restricting the program's operation with predetermined limitations if the comparing yields non-unity or insufficiency.

**11**. A method according to claim **1** wherein the volatile memory is a RAM.

**12**. The method of claim **1**, wherein a pseudo-unique key is stored in the non-volatile memory of the BIOS.

**13**. The method of claim **1**, wherein a unique key is stored in a first non-volatile memory area of the computer.

**14**. The method according claim **13**, wherein the step of using the agent to set up the verification record, including the license record, includes encrypting a license record data in the program using at least the unique key.

**15**. The method according to claim **14**, wherein the verification comprises:

extracting the license record from the software program;

encrypting the license record using the unique key stored in the first non-volatile memory area of the computer to form second encrypted license information; and

comparing the encrypted license information stored in the erasable, non-volatile memory area of the BIOS of the computer with the second encrypted license information.

**16**. The method according to claim **13**, wherein the step of verifying the program includes a decrypting the license record data accommodated in the erasable second non-volatile memory area of the BIOS using at least the unique key.

**17**. The method according to claim **13**, wherein the step of verifying the program includes encrypting the license record that is accommodated in the program using at least the unique key.

**18**. A method for accessing an application software program using a pseudo-unique key stored in a first non-erasable non-volatile memory area of a computer, the first non-volatile memory area being unable to be programmatically changed, the method, comprising:

loading the application software program residing in a non-volatile memory area of the computer;

using an agent to perform the following steps:

extracting license information from software program;

encrypting license information using the pseudo-unique key stored in the first non-volatile memory area;

storing the encrypting license information in a second erasable, writable, non-volatile memory area of the BIOS of the computer;

subsequently verifying the application software program based on the encrypted license information stored in the second erasable, writable, non-volatile memory area of the BIOS; and

acting on the application software program based on the verification.

**19**. The method of claim **18**, wherein the verification comprises:

extracting the license information from the software program;

encrypting the license information using the pseudo-unique key stored in the first non-volatile memory area of the computer to form second encrypted license information; and

comparing the encrypted license information stored in the second erasable, writable, non-volatile memory area of the BIOS of the computer with the second encrypted license information.

* * * * *

US006411941C1

# (12) EX PARTE REEXAMINATION CERTIFICATE (7545th)

# United States Patent

(10) Number: US 6,411,941 C1
(45) Certificate Issued: Jun. 1, 2010

Mullor et al.

(54) **METHOD OF RESTRICTING SOFTWARE OPERATION WITHIN A LICENSE LIMITATION**

(75) Inventors: **Miki Mullor**, Ramat Hasharon (IL); **Julian Valiko**, Ramat Hasharon (IL)

(73) Assignee: **Ancora Technologies Inc.**, Irvine, CA (US)

**Reexamination Request:**
No. 90/010,560, May 29, 2009

**Reexamination Certificate for:**
Patent No.: **6,411,941**
Issued: **Jun. 25, 2002**
Appl. No.: **09/164,777**
Filed: **Oct. 1, 1998**

(30) **Foreign Application Priority Data**

May 21, 1998 (IL) ........................................ 124571

(51) **Int. Cl.**
*G06F 21/22* (2006.01)

(52) **U.S. Cl.** .............................. **705/59**; 705/50; 705/51; 705/53; 705/57

(58) **Field of Classification Search** ..................... 705/59
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,734,819 A * 3/1998 Lewis .......................... 726/29
6,153,835 A * 11/2000 Schwartz et al. ......... 177/25.13

OTHER PUBLICATIONS

Microsoft Computer Dictionary, 5th Edition, 2002, p. 60.*

* cited by examiner

*Primary Examiner*—Matthew Heneghan

(57) **ABSTRACT**

A method of restricting software operation within a license limitation that is applicable for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area. The method includes the steps of selecting a program residing in the volatile memory, setting up a verification structure in the non-volatile memories, verifying the program using the structure, and acting on the program according to the verification.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT



AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-19** is confirmed.

* * * * *

US006411941C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (7545th)

**United States Patent** (10) **Number: US 6,411,941 C1**

**Mullor et al.** (45) **Certificate Issued: Jun. 1, 2010**

(54) **METHOD OF RESTRICTING SOFTWARE OPERATION WITHIN A LICENSE LIMITATION**

(75) Inventors: **Miki Mullor**, Ramat Hasharon (IL); **Julian Valiko**, Ramat Hasharon (IL)

(73) Assignee: **Ancora Technologies Inc.**, Irvine, CA (US)

**Reexamination Request:**
No. 90/010,560, May 29, 2009

**Reexamination Certificate for:**
Patent No.: **6,411,941**
Issued: **Jun. 25, 2002**
Appl. No.: **09/164,777**
Filed: **Oct. 1, 1998**

(30) **Foreign Application Priority Data**

May 21, 1998 (IL) ................................................ 124571

(51) **Int. Cl.**
*G06F 21/22* (2006.01)

(52) **U.S. Cl.** .............................. **705/59**; 705/50; 705/51; 705/53; 705/57

(58) **Field of Classification Search** ..................... 705/59
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,734,819 A * 3/1998 Lewis .......................... 726/29
6,153,835 A * 11/2000 Schwartz et al. ......... 177/25.13

OTHER PUBLICATIONS

Microsoft Computer Dictionary, 5th Edition, 2002, p. 60.*

* cited by examiner

*Primary Examiner*—Matthew Heneghan

(57) **ABSTRACT**

A method of restricting software operation within a license limitation that is applicable for a computer having a first non-volatile memory area, a second non-volatile memory area, and a volatile memory area. The method includes the steps of selecting a program residing in the volatile memory, setting up a verification structure in the non-volatile memories, verifying the program using the structure, and acting on the program according to the verification.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT



AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-19** is confirmed.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1674, -1701

**Short Case Caption:** Ancora Technologies, Inc. v. Roku, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,996 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 07/10/2023

Signature: /s/ Andres C. Healy

Name: Andres C. Healy

Save for Filing

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 23-1674, -1701

**Short Case Caption:** Ancora Technologies, Inc. v. Roku, Inc.

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 15 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/10/2023

Signature: /s/ Andres C. Healy

Name: Andres C. Healy