No. 2023-1674, 2023-1701

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ANCORA TECHNOLOGIES, INC.,

*Appellant*

v.

ROKU, INC., VIZIO, INC. NINTENDO CO., LTD.,
NINTENDO OF AMERICA INC.,

*Appellees*

Appeal from United States Patent and Trademark Office, Patent Trial and Appeal Board in Case Nos. IPR2021-01406 and IPR2021-01338

## APPELLEES' NON-CONFIDENTIAL RESPONSE BRIEF

Jerry A. Riedinger
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: 206.359.8664
E-mail: JRiedinger@perkinscoie.com

Kyle R. Canavera
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, California 92130-2080
Phone: 858.720.5782
E-mail: KCanavera@perkinscoie.com

Andrew T. Dufresne
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095
Phone: 608.663.7460
E-mail: ADufresne@perkinscoie.com

Jon E. Wright
Richard A. Crudo
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street NW, 10th Floor
Washington, DC 20005
Phone: 202.371.2600
E-mail: JWright@sternekessler.com
E-mail: RCrudo@sternekessler.com

*Counsel for Appellees Roku, Inc., VIZIO, Inc., Nintendo Co., Ltd. and Nintendo of America Inc.*

October 18, 2023

## CLAIM 1 OF THE '941 PATENT

1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:

selecting a program residing in the volatile memory,

using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,

verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and

acting on the program according to the verification.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1701, -1674

**Short Case Caption** Ancora Technologies, Inc. v. Nintendo Co., Ltd.

**Filing Party/Entity** Nintendo Co., Ltd. and Nintendo of America Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/18/2023

Signature: /s/ Jerry A. Riedinger

Name: Jerry A. Riedinger

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Nintendo Co., Ltd. | | None/Not Applicable for Nintendo Co., Ltd. |
| Nintendo of America Inc. | | Nintendo Co., Ltd is the parent company of Nintendo of America Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Jose Villarreal,<br>Perkins Coie LLP **no longer with firm | | |
| Theresa H. Nguyen,<br>Perkins Coie LLP | | |
| Tara Kurtis,<br>Perkins Coie LLP | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1674, -1701

**Short Case Caption** Ancora Technologies, Inc. v. Roku, Inc.

**Filing Party/Entity** Roku, Inc. and VIZIO, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/18/2023

Signature: /s/ Jon E. Wright

Name: Jon E. Wright

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Roku, Inc. | | |
| VIZIO, Inc. | | VIZIO Holding Corp. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Sterne, Kessler, Goldstein & Fox | Lestin L. Kenton | Dohm Chankong |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PAGE

Certificates of Interest

Table of Authorities ..... v

Table of Abbreviations and Conventions ..... ix

Related Cases ..... x

Introduction ..... 1

Statement of Issues ..... 2

Statement of the Case ..... 3

A. The ’941 patent used known tools to address a known problem ..... 3

1. Technology background ..... 3

2. The ’941 patent’s disclosure and claims ..... 4

3. The prosecution history ..... 6

B. Litigation history of the ’941 patent ..... 8

1. Ancora’s repeated construction of “agent” without limitation to “OS-level” software ..... 8

2. Prior appeals before this Court ..... 9

C. The prior art ..... 11

1. Hellman ..... 11

2. Chou ..... 13

D. IPRs targeting the ’941 patent ..... 14

1. TCL and Sony Petitions ..... 14

2. Nintendo and Roku/VIZIO Petitions .......... 14

3. Obviousness grounds combining Hellman and Chou .......... 15

4. The Board's final written decision .......... 16

Summary of Argument .......... 18

Argument .......... 20

I. Standards of review .......... 20

II. The Board correctly concluded that the claimed "agent" is not limited to "OS-level" or software-only .......... 21

A. There is no basis for the "OS-level" disclaimer Ancora seeks .......... 21

1. The acknowledged, ordinary meaning of "agent" is not limited to OS-level software .......... 21

2. Ancora has not identified any departure from ordinary meaning in the intrinsic record or any prior ruling, and it consistently misrepresents the record on appeal .......... 22

(a) The specification mentions neither an agent nor an operating system .......... 22

(b) There was no unequivocal disclaimer in the prosecution history, which did not even mention an "agent" in the passages Ancora cites .......... 24

(c) Ancora's reliance on selective citations contorts the record .......... 27

(d) This Court has not taken up the construction of "agent," much less decided it in Ancora's favor .......... 30

3. The Board was entitled to consider Ancora's previously asserted constructions ........................................31

B. There is no basis to exclude hardware from the scope of "agent" ........................................32

1. The plain meaning of "agent" does not exclude hardware ........................................33

2. Ancora's specification-based disclaimer argument is unsupported ........................................35

3. Even if the "agent" were software-only, Hellman taught that feature ........................................36

C. The file history does not support Ancora's narrow construction under any theory ........................................36

III. Substantial evidence supports the Board's obviousness findings ........................................38

A. Substantial evidence supports the Board's finding of a motivation to combine ........................................39

1. Ancora's inoperability argument is forfeited and, in any event, contradicted by Appellees' expert testimony ........................................40

2. Ancora's redundancy argument is also forfeited and rests on a misunderstanding of Appellees' prior-art combination ........................................43

B. By storing license records in BIOS EEPROM, Hellman's update unit "sets up" the claimed "verification structure" ........................................45

1. Substantial evidence supports the Board's finding that Hellman taught the "verification structure" limitation ........................................45

2. Ancora's contrary arguments focus on the "verification structure" standing alone, without considering the method step as a whole ........................................47

IV. The Board correctly concluded that Ancora's proffered evidence of nonobviousness did not outweigh Appellees' strong obviousness case....................50

A. Substantial evidence supports the Board's findings on the asserted secondary considerations....................52

1. Ancora cited self-serving AMI marketing materials with no nexus to the claims....................52

2. Even if Ancora had shown a nexus, substantial evidence supported the Board's finding that the AMI evidence was entitled to little weight....................56

3. Ancora's licensing evidence lacked the requisite specificity and was undermined by low-value licenses....................58

B. The Board properly weighed the record evidence and found Ancora's evidence did not outweigh Appellees' obviousness case....................64

Conclusion....................65

**Confidential Material Omitted**

The material omitted from pages 18 and 57-62 relates to confidential license agreements between Ancora and certain third parties. Specifically, the information omitted from pages 18 and 57-62 includes the names of the third-party licensees, and the information omitted from pages 57 and 62 additionally contains confidential payment terms.

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*ABT Sys., LLC v. Emerson Elec. Co.*,
797 F.3d 1350 (Fed. Cir. 2015) ....................57, 61

*Ancora Techs., Inc. v. Apple Inc.*,
744 F.3d 732 (Fed. Cir. 2014) .................... 10, 11, 25, 26, 30, 31

*Ancora Techs., Inc. v. HTC Am. Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ....................10, 11, 30

*Antor Media Corp., In re*,
689 F.3d 1282 (Fed. Cir. 2012) ....................58

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................53

*Canopy Growth Corp. v. GW Pharma Ltd.*,
No. 22-1603, 2023 WL 3048243 (Fed. Cir. 2023) ....................38

*Cole Kepro Int'l, LLC v. VSR Indus., Inc.*,
695 F. App'x 566 (Fed. Cir. 2017) ....................63

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ....................24

*Couvaras, In re*,
70 F.4th 1374 (Fed. Cir. 2023) ....................21

*Cree, Inc., In re*,
818 F.3d 694 (Fed. Cir. 2016) ....................56

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................55

*Epstein, In re*,
32 F.3d 1559 (Fed. Cir. 1994) ....................43

*Enova Tech. Corp. v. Seagate Tech. (US) Holdings Inc.*,
706 F. App'x 987 (Fed. Cir. 2017) ....................53, 54, 58

*Fox Factory, Inc. v. SRAM, LLC*,
944 F.3d 1366 (Fed. Cir. 2019) ....................................................................50, 55

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) ..........................................................................21

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ..........................................................................64

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ..................................................50, 60, 61, 62, 63

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) ..........................................................................38

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ..........................................................................23

*LiquidPower Specialty Prods. Inc. v. Hughes*,
749 F. App'x 965 (Fed. Cir. 2018) ......................................................................53

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*,
839 F.3d 1111 (Fed. Cir. 2016) ....................................................................21, 30

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ............................................................................21

*Paice LLC v. Ford Motor Co.*,
881 F.3d 894 (Fed. Cir. 2018) ............................................................................43

*Parus Holdings, Inc. v. Google LLC*,
70 F.4th 1365 (Fed. Cir. 2023) ....................................................................33, 41

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ..........................................................................37

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................36, 37

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ..........................................................................53

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016) ....................................................................53

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394 (Fed. Cir. 2008) ..................................................................37

*Shire Dev., LLC v. Watson Pharms., Inc.*,
787 F.3d 1359 (Fed. Cir. 2015) ..................................................................37

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
962 F.3d 1362 (Fed. Cir. 2020) ...........................................46, 50, 52, 56

*SIBIA Neuroscis., Inc. v. Cadus Pharm. Corp.*,
225 F.3d 1349 (Fed. Cir. 2000) ..................................................................60

*Siemens Mobility, Inc. v. Iancu*,
825 F. App'x 867 (Fed. Cir. 2020) ....................................53, 58, 59, 63

*Soverain Software LLC v. Newegg Inc.*,
705 F.3d 1333 (Fed. Cir. 2013) ..................................................................57

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..................................................................22

*Transocean Offshore Drilling, Inc. v. Maersk Drilling, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ..................................................................64

*Univ. of Mass. v. L'Oréal S.A.*,
36 F.4th 1374 (Fed. Cir. 2022) ..................................................................38

*Volvo Penta of the Ams., LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) ..................................................................53

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
626 F.3d 1361 (Fed. Cir. 2010) ..........................................................51, 65

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ..................................................................64

**STATUTES AND REGULATIONS** **PAGE(S)**

35 U.S.C. § 101 .......... 10

35 U.S.C. § 112 .......... 7, 24

37 C.F.R. § 42.23(b) .......... 59

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Appellees | appellees Nintendo Co., Ltd., Nintendo of American Inc., Roku, Inc. and VIZIO, Inc., collectively |
| Ancora | appellant Ancora Technologies, Inc. |
| Appx____ | appendix page(s) ____ |
| BlueBr___ | page(s) ___ of Ancora's principal brief |
| Board | Patent Trial and Appeal Board |
| EEPROM or $E^2$PROM | electrically erasable programmable read-only memory |
| IPR | *inter partes* review |
| Nintendo | appellees Nintendo Co., Ltd., and Nintendo of America Inc., collectively |
| OS | operating system |
| Roku/VIZIO | appellees Roku, Inc. and VIZIO, Inc., collectively |
| '941 patent | U.S. Patent 6,411,941 |

## RELATED CASES

This appeal arises from two final decisions of the Patent Trial and Appeal Board, in which the Board invalidated for obviousness claims 1-3, 6-14, and 16 of U.S. Patent No. 6,411,941. The two cases consolidated in this appeal, *Ancora Technologies, Inc. v. Nintendo Co., Ltd.*, No. 2023-1701 (Fed. Cir.), and *Ancora Technologies, Inc. v. Roku, Inc.*, No. 2023-1674 (Fed. Cir.), are the only cases from the same proceedings that are before this or any other appellate court.

The following proceedings are currently stayed pending the outcome of this appeal:

- *Ancora Techs., Inc. v. HTC America, Inc.*, No. 2:16-cv-01919 (W.D. Wash.)
- *Ancora Techs., Inc. v. Nintendo Co., Ltd.*, No. 6:21-cv-00738 (W.D. Tex.)
- *Ancora Techs., Inc. v. VIZIO, Inc.*, No. 2:21-cv-08534 (C.D. Cal.)
- *Ancora Techs., Inc. v. Roku, Inc.*, No. 6:21-cv-00737 (W.D. Tex.)
- *Ancora Techs., Inc. v. Google, LLC*, No. 6:21-cv-00735 (W.D. Tex.)
- Ex Parte Control No. 90/014,865

## INTRODUCTION

Ancora argues that the term "agent" should be limited to "OS-level" software. Ancora never proposed that narrow construction before these IPRs, despite spending more than a decade asserting the '941 patent in litigation that included five separate claim construction proceedings. When pursuing that divergent construction before the Board, Ancora admitted that the ordinary meaning of "agent" does not require "OS-level" functionality. Ancora relied instead on a never-before-raised prosecution-history disclaimer theory. But the file history does not say what Ancora alleges, much less clearly and unmistakably so. For example, Ancora repeatedly cites a reference to "software license management applications"—not the claimed "agent"—as "OS level." The applicant never characterized the *agent* as "OS level," and the Board correctly rejected Ancora's construction.

Ancora's nonobviousness positions are similarly unfounded. Its inoperability and redundancy arguments were never presented to the Board and thus are forfeited. And Ancora's straw-man criticism about Hellman's "verification structure" ignores the Board's actual findings, which have ample support in the record. Finally, the Board applied the correct standards for assessing objective indicia, considered the evidence Ancora presented, and reasonably found both that Ancora failed to meet its burden to establish a nexus and that the evidence was entitled to little weight. Tellingly, none of Ancora's evidence mentions the claimed "agent," let alone an OS-

level and software-only agent, which Ancora now alleges is the core innovative feature of its invention. The Board reasonably concluded that Ancora's weak evidence of objective indicia did not outweigh Appellees' strong obviousness case. This Court should affirm.

## STATEMENT OF ISSUES

1. Did the Board correctly construe "agent" as not limited to "OS-level" software, where the intrinsic record never clearly and unmistakably defined that term as limited to "OS-level" software?

2. Does substantial evidence support the Board's findings that the prior art taught the claimed verification structure?

3. Did Ancora forfeit its inoperability and redundancy arguments by failing to present them to the Board below?

4. Regarding objective indicia, does substantial evidence support the Board's findings that Ancora failed to establish the required nexus and that the cited licenses and evidence of alleged industry praise were entitled to little weight and failed to overcome Appellees' strong obviousness showing?

## STATEMENT OF THE CASE

### A. The '941 patent used known tools to address a known problem

#### 1. Technology background

By the '941 patent's 1998 priority date, skilled artisans had long-since developed various strategies to prevent unauthorized "secondary distribution" of licensed software. Appx1073-1074(¶¶31-32). Secondary distribution occurs when a user receives a valid license for a program but then duplicates the program and/or the license for additional, unauthorized uses. *Id.* (¶32). While many solutions were developed, a common theme was using encryption to reduce unauthorized secondary distribution of the software program. Appx1074(¶33).

The computer BIOS field was similarly established by 1998. Appx1075(¶36). BIOS programs are used to start up a device. Early computers tended to store BIOS programs in separate, true ROM (read only memory) modules, i.e., memory that *could not* be rewritten in the field. Appx1075-1076(¶37). By the early 1990s, it had become more common to store BIOS programs in "ROM" that could be rewritten in some form. Appx1076(¶38). By 1998, electrically erasable programmable read-only memory (EEPROM) was widely used for BIOS memory. Appx1076(¶¶38-39). EEPROM chips could be rewritten via software without removing the chip from the computer. *Id.* EEPROM thus allowed device manufacturers to provide updates to BIOS while the devices were in the field.

### 2. The '941 patent's disclosure and claims

The '941 patent proposed providing copy protection using "a key" and "a record" stored in "the non-volatile memory of a computer." Appx115(1:38-43). The key is stored "during manufacture" in a "ROM section" of a "BIOS module" to provide "a unique identification code for the host computer." *Id.* (1:44-52). The "license record" is stored in "another (second) non-volatile section of the BIOS, e.g. $E^2$PROM (or the ROM)." *Id.* (1:59-2:1). Using the key to encrypt the license record created a locally stored, device-specific license record for the licensed program. *Id.* (1:59-2:26). The '941 patent distinguishes between storage locations for the key and license record: "[U]nlike the first non-volatile section, the data in the second non-volatile memory may optionally be erased or modified (using $E^2$PROM manipulation commands), so as to enable to add, modify or remove licenses." *Id.* (2:1-5).

Figure 1 depicts that approach. The first non-volatile memory ("the ROM section of the BIOS," Appx117(5:12-14)), stores a key. The second non-volatile memory ("the $E^2$PROM section of the BIOS," Appx117(5:14-15)) stores license records. The volatile memory ("the internal RAM memory of the computer," Appx117(5:15-16)) stores a license program.




Appx113 (annotated).

The ’941 patent also described using those structures for license verification. A selecting step includes establishing “a licensed-software-program in the volatile memory.” Appx117(6:7-16). Next, setting up the verification structure includes establishing or confirming a “pseudo-unique key” in the first non-volatile memory. *Id.* (6:18-21). Further, the key is used to form an “encrypted license-record” in the first or the second non-volatile memory area. *Id.* (6:21-27). At the verifying step, the license record is compared to a result of using the key to encrypt information from the licensed program. *Id.* (6:28-39). And at the acting step, an action, such as “restricting the program’s operation,” occurs in response to the verifying step. *Id.* (6:40-

52). Thus, the alleged invention is providing a license record unique to a specific computer stored in a harder-to-modify memory, such as BIOS EEPROM.

Claim 1 of the ’941 patent is reproduced below:

> 1. A method of restricting software operation within a license for use with a computer including an erasable, non-volatile memory area of a BIOS of the computer, and a volatile memory area; the method comprising the steps of:
>
> (1) selecting a program residing in the volatile memory,
>
> (2) using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS, the verification structure accommodating data that includes at least one license record,
>
> (3) verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS, and
>
> (4) acting on the program according to the verification.

Appx117-118(6:59-7:4) (numbering added). Step (2) requires using an “agent” to set up data in the BIOS memory, but the specification never mentions an “agent.”

### 3. The prosecution history

None of the original claims recited an “agent.” Appx2858-2860. The examiner rejected the claims as not enabled, under the mistaken assumption that EEPROM could be rewritten only with a special device at the factory:

> The applicant refers to secondary non-volatile storage as EEPROM …. The Applicants do not teach the device necessary to edit an EEPROM nor have they made it clear to the Examiner how their system would be implemented in

> light of the non-trivial processing required to write and erase its data.

Appx2934-2935.

After an examiner interview, Appx2945, the applicant introduced the "BIOS" and "agent" terms into claim 1. Appx2947-2960. The applicant noted that the amendments were made "as agreed upon during the interview" to overcome § 112 rejections. Appx2953. In the next office action, the examiner again rejected the claims as obvious, but withdrew the rejection under § 112. Appx2965-2974.

The applicant responded on February 5, 2002. Appx2975-2983. The applicant did not amend claim 1, Appx2983, but made various arguments to distinguish the prior art, Appx2976-2981. While admitting that "all computers must have a BIOS,"[1] Appx2981, the applicant argued that a POSA "would not consider the BIOS as a storage medium to preserve application data" because there was "no OS support whatsoever to write data to the system BIOS" and "[n]o file system is associated with the BIOS." Appx2980. The applicant also asserted that

> Software license management applications, such as the one of the present invention, are operating system (OS) level programs. Therefore, BIOS programs and software licensing management applications do not ordinarily interact or communicate because when BIOS is running, the

[1] While correct as of the 1998 priority date, this is no longer true because many computers transitioned from BIOS to UEFI.

> computer is in a configuration mode, hence OS is not running. Thus, BIOS and OS level programs are normally mutually exclusive.

Appx2979. The applicant did not mention an "agent." Appx2976-2981.

The examiner then allowed the claims, citing distinctions over the prior art. Appx2985-2991. First, the examiner stated that "the closest prior art systems, singly or collectively, do not teach *licensed programs* running at the OS level interacting with a program verification structure stored in the BIOS to verify the program." Appx2988 (emphasis added). Second, the examiner stated that skilled artisans knew "a computer BIOS is not setup to manage a software license verification structure. The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS." *Id.* Thus, while the examiner mentioned the "agent," the examiner did not connect that claim element to the "OS level" descriptor.

## B. Litigation history of the '941 patent

### 1. Ancora's repeated construction of "agent" without limitation to "OS-level" software

The '941 patent has been through claim construction in five district court cases. Ancora never proposed restricting the "agent" to "OS-level" software in those proceedings.

In cases against Apple and TCL, Ancora did not seek to construe "agent" at all. Appx1396-1416; Appx1417; Appx1332-1352.

Against HTC, Ancora interpreted "agent" according to what it identified as that term's ordinary meaning: a "Software Program or Routine." Appx2286; *see also* Appx2311; Appx2727. In another case against Samsung and LG, Ancora likewise proposed a plain-meaning construction of "agent" as "a software program or routine." Appx2196-2197; *see also* Appx2218-2219 ("As used in the '941 patent, the term 'agent' was well understood to refer to 'a software program or routine.'"). While Ancora referenced the February 5, 2002, office action response in its arguments, Appx2197, Ancora did not contend that "OS-level" software was required, Appx2197-2200; Appx2218-2225; Appx2260-2263. The district court agreed with Ancora and construed "agent" as "software program or routine." Appx1355; Appx1385-1393.

When litigating against Nintendo and Roku, Ancora likewise asserted that "agent" meant "software program or routine." Appx2321. In those cases, Ancora took that position after *already* requesting the narrower "OS-level" construction in the parallel IPRs at issue here. Appx2319-2327; Appx263-337, Appx290.

**2. Prior appeals before this Court**

This Court has heard two previous appeals concerning the '941 patent. Neither addressed what "agent" means.

The first addressed a *Markman* issue in Ancora's case against Apple. *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732 (Fed. Cir. 2014). The district court had construed the licensed "program" as limited to an "*application* program," excluding OS programs. *Id.* at 734. On appeal, the Court agreed with Ancora that there had been no disclaimer, so the ordinary meaning of "program" should apply. *Id.* at 734-37. The Court explained that the "to-be-verified program" was different from software that "performs the claimed verification steps" in claim 1. *Id.* at 735. The Court noted that Ancora's February 5, 2002, office action response addressed the verifying software, not the "program" itself. *Id.* at 735-36. The Court also held the examiner's comments referring to "OS-level" in the notice of allowance legally insufficient to establish a disclaimer. *Id.* at 736-37. The Court did not address the claimed "agent" or its construction.

Ancora appealed from another district court order holding the '941 claims ineligible under § 101. *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343 (Fed. Cir. 2018). This Court reversed because claim 1 was directed to a patent-eligible "solution to a computer-functionality problem." *Id.* at 1349. The Court focused on using "a modifiable part of the BIOS memory—not other computer memory" to store license-verification information. *Id.* at 1345. In other words, the Court recognized that the "asserted innovation of the patent relates to *where* the license record is stored in

the computer." *Id*. (emphasis added). As in *Apple*, the *HTC* opinion did not analyze the claimed agent or its meaning.

### C. The prior art

#### 1. Hellman

Hellman taught a technique for using "base unit specific" software authorizations to limit use within parameters defined by the distributor. Appx1257(Abstract). Hellman described a system including a base unit, software, and an authorization/billing unit. Appx1264(5:39-50). The base unit could be a user's computer. Appx1262(2:24-27).

After purchasing and obtaining a desired software package, the base unit sent the authorization/billing unit a "user originated request for software use." Appx1264(5:57-59). The request included the following information: the software name, a unique identifier of the base unit, the number of uses requested, a "random number," and billing information. *Id.* (5:57-6:2).

After receiving such a request, the authorization/billing unit sent back an authorization. Appx1264(6:3-8). First, the authorization/billing unit used the base unit's unique identifier to look up a shared secret key for the base unit. Appx1264(6:17-21). Next, the authorization/billing unit used the software name to obtain a software package—a duplicate of the software package purchased at the

base unit. Appx1264(6:21-30). The authorization/billing unit then generated a cryptographic hash based on the duplicate software package. *Id.* (6:31-61). Finally, the authorization/billing unit ran the secret key, the cryptographic hash, the number of purchased uses, and the random number through another cryptographic function to generate an authorization sent back to the base unit. Appx1264-Appx1265(6:3-8, 6:62-7:2). The resulting authorization was unique to the licensed software package, the base unit, and the random number. Appx1089-1090(¶68).

The base unit then proceeded through a corresponding verification process. The base unit generated the same cryptographic hash as the authorization/billing unit based on its local copy of the software package. Appx1266(9:23-26). The base unit then retrieved the secret key from its permanent memory and ran the cryptographic hash, secret key, number of requested uses, and previously generated random number through a cryptographic function, comparing the result to the received authorization. Appx1266(9:29-40, 9:50-63). If the result and authorization matched, the authorization was valid for the software package, base unit, and specified number of uses. *Id.* (10:14-26); Appx1091(¶72). In that case, the base unit would update the authorized-use count in a *non-volatile* memory. Appx1266(9:64-10:13). The non-volatile memory could be, for example, "an EEPROM or a CMOS memory with battery backup." *Id.* (10:1-4).

### 2. Chou

Chou described methods for discouraging computer theft. Appx1269(Abstract). Specifically, Chou described modifying a personal computer to render the computer inoperable unless a password stored in BIOS memory was entered by the user or provided by an attached hardware device. Appx1275(1:5-8). Chou's method was implemented through a routine likewise stored in the BIOS memory. Appx1275(2:10-32). Chou taught that the password stored in the BIOS memory could be updated using the security routine stored in the BIOS memory. Appx1278-1279(7:14-35, 8:42-9:50).

Chou included an important observation, noting that "[m]any computer manufacturers have implemented password protection in the computer BIOS (Basic Input/Output System) which is integral to the operation of a personal computer." Appx1275(1:54-57). But when BIOS was stored in CMOS RAM, a type of battery-powered memory that would lose its contents if the battery were depleted, the security functions could be bypassed by removing power to the CMOS RAM. *Id.* (1:57-62). To remedy that problem, Chou noted that newer BIOS memory devices "permit[ted] writing data to the BIOS memory, offering the opportunity to provide password protection within the same memory which stores the BIOS routines. Thus, any attempt to delete the protection will result in the BIOS routine being disabled, disabling the boot up process." Appx1275(1:63-2:1). Chou specifically cited EEPROM

flash devices that could be "programmed with BIOS routines which permit the user to enter data without requiring the computer to be returned to the manufacture[r]." Appx1275(2:2-7).

### D. IPRs targeting the '941 patent

#### 1. TCL and Sony Petitions

TCL's first IPR petition challenged the '941 patent based primarily on obviousness over Hellman and Chou. *TCT Mobile (US) Inc. v. Ancora Techs., Inc.*, No. IPR2020-01609 (PTAB Sept. 10, 2020). The Board instituted, but Ancora and TCL settled soon after, and the IPR was terminated. Meanwhile, Sony filed another petition asserting the same grounds. *Sony Mobile Commc'ns AB v. Ancora Techs., Inc.*, No. IPR2021-00663 (PTAB Mar. 15, 2021). Ancora again settled shortly after institution, and the Sony IPR was terminated.

#### 2. Nintendo and Roku/VIZIO Petitions

On the same day the Sony IPR was terminated, Ancora sued Nintendo, Roku, and VIZIO alleging infringement of the '941 patent. *See, e.g.*, *Ancora Techs., Inc. v. Roku, Inc.*, No. 6:21-cv-00737 (W.D. Tex.); *Ancora Techs., Inc. v. Nintendo Co.*, No. 6:21-cv-00738 (W.D. Tex.); *Ancora Techs., Inc. v. VIZIO, Inc.*, No. 6:21-cv-00739 (W.D. Tex.). Nintendo and Roku/VIZIO filed two IPR petitions substantially

similar to the original TCL petition, including obviousness grounds based primarily on Hellman and Chou. *See* Appx163-168; Appx4575-4580.[2]

### 3. Obviousness grounds combining Hellman and Chou

The Nintendo and Roku/VIZIO petitions relied on Hellman for nearly all features of claim 1. Appx200. While Hellman did not explicitly say that the user's computer had a BIOS or that nonvolatile memory 37 (e.g., EEPROM) would be used to store BIOS commands, the petition explained that a POSA would have found it obvious to include a BIOS in nonvolatile memory, as described by Chou. *Id.* The combination is illustrated below, alongside the '941 patent's disclosure.




'941 Patent, Fig. 1
(Annotated by Petitioner)




Hellman, Fig. 6
(Annotated by Petitioner)

[2] Ancora does not address any issues specific to grounds involving the additional Schneck reference, Appx165-168; Appx4577-4579.

The petitions presented four distinct motivations to combine Hellman and Chou. First, while Hellman did not explicitly disclose a BIOS, all computers had BIOS by the priority date, consistent with Ancora's arguments during prosecution. Appx201-202. And when determining where to store the BIOS in Hellman's system, Chou's use of EEPROM for that purpose would have motivated a POSA to store BIOS in Hellman's non-volatile memory 37, which Hellman taught could be EEPROM. *Id.* Second, using Hellman's non-volatile memory would have been one of a limited number of design choices, given that computers at the time had a small number of EEPROM modules. Appx203. Third, Chou taught skilled artisans to store sensitive information (like Hellman's license information) in the same memory as BIOS to discourage tampering. Appx203-204. And fourth, using the same EEPROM for license information and BIOS would have created design efficiencies in space usage and cost. Appx204.

The Nintendo and Roku/VIZIO IPRs proceeded separately and have separate records. Appellees generally cite the Nintendo proceeding here except when necessary to cite the Roku/VIZIO proceeding specifically.

#### 4. The Board's final written decision

In parallel final written decisions, the Board found challenged claims 1-3, 6-14, and 16 unpatentable as obvious. Appx1-54; Appx55-111.

The Board rejected Ancora's proposed construction of "agent" as "OS-level software program or routine." Appx7-19. It concluded the plain and ordinary meaning of "agent" was "software program or routine." Appx10. The Board considered Ancora's argument that a disclaimer during prosecution limited "agent" to "OS-level." Appx14-16. But the Board found the prosecution history ambiguous at best and not sufficient to show a clear disclaimer. *Id.* In particular, the Board noted that the "Applicant never argued to the Examiner in the '941 patent's prosecution that the agent itself is 'OS-level.'" Appx15. The Board also considered Ancora's argument that the specification limited "agent" to exclude hardware. Appx16-19. Ancora relied almost entirely on a background paragraph criticizing prior-art hardware solutions. Appx16-17. The Board noted that apart from not addressing the "agent" at all, the specification's background criticized prior-art hardware *and* software solutions, so it provided no basis for selectively excluding hardware. Appx17-18.

Moving to obviousness, the Board addressed Ancora's argument that Hellman lacked a "verification structure." Appx37. But the Board found that Hellman included the claimed verification structure as "the *memory structure* of non-volatile memory 37." Appx37. The Board also considered Ancora's evidence of objective indicia. Appx41-52. Regarding alleged industry praise, the Board found that Ancora failed to show a nexus and that even if there were a nexus, Ancora's evidence consisted of Ancora's own "marketing piece." Appx45. Regarding Ancora's licensing

evidence, the Board found that Ancora failed to show a nexus for the [redacted] and [redacted] licenses, and "even if such a nexus had been shown," the Board "decline[d] to give significant weight to these licenses because there is insufficient evidence to evaluate the contexts of the corresponding settlements." Appx51. The Board noted that Ancora provided no evidence of how much it was demanding in damages from the licensed parties, thus depriving the raw settlement figures of important context. Appx49-50. The Board additionally rejected the [redacted] license because it was improperly withheld and only produced based on petitioners' motions to compel. Appx46-48.

The Board therefore held all challenged claims unpatentable over the cited prior art.

## SUMMARY OF ARGUMENT

The Board agreed with Ancora that the plain and ordinary meaning of "agent" was "software program or routine." Ancora identified no basis to limit the claimed "agent" to "OS-level" functions. Ancora did not rely on the specification for its disclaimer argument, which does not even mention an "agent." Ancora instead relied on arguments made during prosecution and subsequent comments by the examiner. But in both instances, Ancora contorts the actual record of prosecution. The applicant's arguments did not rely on, or even mention, the "agent." The examiner's subsequent comments also did not describe the "agent" as "OS-level." In both instances,

the "OS-level" phrase, where used, applied to entities other than the "agent." The Board correctly found that Ancora failed to show a clear and unmistakable disclaimer of the claim term "agent" based on this prosecution history.

The Board also correctly rejected Ancora's argument that the specification limited the "agent" to exclude all hardware. Ancora relied on the specification's critique of prior-art hardware and software solutions, but that did not support selectively excluding hardware. Further, the specification's critique was not related to any "agent," and additional evidence showed that the ordinary meaning includes software, hardware, and mixed software/hardware entities. In any case, Ancora does not challenge on appeal the Board's finding that the prior art disclosed or rendered obvious a software-only agent, and this Court can affirm for that reason alone.

Substantial evidence supports the Board's finding of a motivation to combine. Ancora argues here that the combination of Hellman and Chou would be inoperable, and that the combination would have a redundant second BIOS. The Board did not address either of those arguments because Ancora did not present them in its briefing. Regardless, the Board correctly relied on Appellees' ample evidence of a motivation to combine. Substantial evidence likewise supports the Board's finding that Hellman included a "verification structure." The Board found that Hellman's update unit set up a "verification structure" by storing one or more license values at specific

memory locations determined by an addressing algorithm. Ancora neither addresses the Board's analysis nor identifies any shortcoming in the underlying evidence.

The Board correctly concluded that Ancora's evidence of nonobviousness did not outweigh Appellee's strong obviousness case, and additionally that it lacked nexus. The Board considered the evidence Ancora presented, and in both instances the Board properly found that the evidence was entitled to little weight. For the supposed industry praise, the Board found that the evidence was not impartial industry praise, but rather Ancora's own self-interested joint press release. For the licensing evidence, the Board found that the litigation-driven licenses lacked sufficient context to demonstrate whether the settlement amounts were significant, e.g., in comparison to damages risk that the licensees were avoiding. Further, the Board found that the higher-value licenses were offset by low-value and no-value licenses, with the latter licenses having a closer nexus to the claims. For both types of objective indicia, the Board correctly found that the evidence lacked nexus to the claimed invention.

## ARGUMENT

### I. Standards of review

"The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016).

Obviousness is a legal question based on underlying findings of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Those findings include, among others, the scope and content of the prior art, the differences between the prior art and the claims, and objective evidence of nonobviousness. *Id.* at 1319. "The Board's findings regarding objective indicia involve questions of fact that [the Court] review[s] for substantial evidence." *In re Couvaras*, 70 F.4th 1374, 1380 (Fed. Cir. 2023). This includes nexus findings, *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015), and weighing objective indicia, *Couvaras*, 70 F.4th at 1380.

## II. The Board correctly concluded that the claimed "agent" is not limited to "OS-level" or software-only

Ancora's proposed construction of "agent" as "OS-level software program or routine" would impose two separate restrictions on the term's ordinary meaning. The Board correctly rejected both attempts to narrow "agent."

### A. There is no basis for the "OS-level" disclaimer Ancora seeks

#### 1. The acknowledged, ordinary meaning of "agent" is not limited to OS-level software

All parties agree that the ordinary meaning of "agent" is not limited to "OS-level" functions. As Ancora confirmed, the "[p]lain meaning of 'agent' is 'software program or routine.'" Appx4493 (citing Appx504-505; Appx649-652). The Board agreed. Appx10.

Because Ancora's asserted OS-level restriction falls outside of the acknowledged ordinary meaning for "agent," the term cannot be so limited absent lexicography or disavowal. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Ancora never alleged lexicography or any other theory to support a narrowing construction; it relied entirely on prosecution disavowal. Appx505 (arguing that remarks "during prosecution of the '941 patent require a narrower interpretation of 'agent'"); Appx654 (citing disavowal standard and precedent); Appx4493 (alleging "OS-level clearly and unmistakably required by prosecution history").

**2. Ancora has not identified any departure from ordinary meaning in the intrinsic record or any prior ruling, and it consistently misrepresents the record on appeal**

Ancora suggests that "agent" was characterized as "OS level" in the prosecution history. BlueBr16-28. However, when examined more closely, Ancora's cited file-history passages do not address the "agent" at all. Ancora relies on selective and misleading quotations to construct a disclaimer that simply did not occur.

**(a) The specification mentions neither an agent nor an operating system**

The '941 patent itself cannot support an "OS-level" disclaimer because the specification never mentions operating systems or agents. The term "agent" was first introduced during prosecution, and thus appears only in the issued claims. Appx11.

Furthermore, Ancora agreed at the oral hearing that the '941 patent does not mention an operating system. Appx12 (citing Appx739-740).

Ancora cites one passage in the specification as supporting its position: the phrase "using $E^2$PROM manipulation commands." BlueBr23, BlueBr27 (citing Appx115(2:3-4)). But Ancora stops short of saying that described an agent, instead alleging that it indicates "OS level activity." BlueBr27 (citing Appx6599). Ancora's expert did not allege that EEPROM manipulation commands were an agent, Appx6598(137:3-14), or even that the cited passage described OS-level activity *directly*, Appx6599(138:7-17). Rather, he said the specification's reference to EEPROM manipulation commands "perhaps has [fore]shadowing that aspect of the agent's operation." *Id.* In any case, even if referencing EEPROM manipulation commands foreshadowed or even described an OS-level agent, that would at most present an exemplary embodiment that would not limit the scope of the claims. *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").[3]

[3] Ancora alleges that Appellees' expert agreed that "$E^2$PROM manipulation commands" in the specification constituted "OS-level" activity. BlueBr27 (citing Appx1502(¶36)). In its fuller context, Dr. Wolfe instead said that, if "$E^2$PROM manipulation commands" constituted "OS-level" activity, then Hellman likewise disclosed that functionality because it also used EEPROM manipulation commands. Appx1502-1503(¶¶35-38).

**(b) There was no unequivocal disclaimer in the prosecution history, which did not even mention an "agent" in the passages Ancora cites**

To establish a disclaimer, Ancora points to one office-action response and the notice of allowance. But the response never mentioned an "agent" at all, and the notice of allowance did not describe the "agent" as being "OS level."

The "agent" limitation was not added during prosecution to overcome any prior art. Instead, the examiner rejected the claims as not enabled for failing to show *how* a verification structure was set up in BIOS memory; the examiner believed that EEPROM could not be rewritten without a special device at the factory. Appx2934-2935. In response, the applicant amended claim 1 to include "using an agent" to claim 1, expressly to overcome the § 112 rejection. Appx2953, Appx2956. "Agent" was not added to distinguish prior art, whether as "OS level" or otherwise. *Cf. Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798-799 (Fed. Cir. 2019) (finding that prosecution remarks to overcome indefiniteness and written description rejections did not constitute disclaimer; "But clearly describing a particular claim term to overcome an indefiniteness or written description rejection is not the same as clearly disavowing claim scope.").

Ancora here relies primarily on an entirely different office action response dated February 5, 2002. The arguments in the February 5, 2002, response never once mentioned an agent. Appx2976-2981. In particular, the applicant's reference to

"operating system (OS) level programs" was not discussing an "agent." Appx2979. Rather, the applicant addressed "[s]oftware license management applications"—that is, an application that *uses* an "agent" capable of setting up a verification structure in BIOS memory, Appx117(6:64-67)—not the agent *itself*. Those statements did not discuss an "agent" at all, and they certainly did not rise to the level of a clear and unmistakable disclaimer regarding the scope of that term. The analysis in *Apple* is consistent with that view. In *Apple*, the Court concluded that the cited comment about OS-level programs "referred to the verifying software" that interacts with the previously established verification structure to perform, for instance, the "verifying" step of claim 1. *Apple*, 744 F.3d at 736-37. That is not the separate "agent" used to *set up* the verification structure.

Ancora further argues that the applicants "relied on the stated scope of the 'agent' term (*i.e.*, that it was limited to being an OS-level program) when explaining how the invention 'proceeds against conventional wisdom in the art.'" BlueBr22 (quoting Appx2980). But those passages too lack any reference to an "agent." Appx2980. The applicant characterized features of operating systems at the time, but without even mentioning an agent, those arguments did not indicate whether the "agent" had to be an OS-level program, was used by an "OS level" program (such as the OS itself), or had any other specific characteristics. Appx2980.

Ancora also cites the notice of allowance. As a preliminary matter, the notice of allowance was "not the applicants' statement," but the examiner's, and thus cannot by itself constitute an unmistakable disclaimer. *Apple*, 744 F.3d at 727. Even if it could as a matter of law, it does not here because it does not describe the "agent" as "OS-level." Appx2988. The examiner said the prior art did not "teach licensed programs running at the OS level interacting with a program verification structure stored in the BIOS to verify the program using the verification structure and having a user act on the program according to the verification." Appx2988. The examiner thus referred to *licensed programs* running at the OS level; that comment said nothing about the "agent."

The examiner did mention the "agent" elsewhere, but for a very different purpose. After the statement above referencing "OS level" programs, the examiner noted:

> *Further*, it is well known to those of ordinary skill of the art that a computer BIOS is not setup to manage a software license verification structure. The present invention overcomes *this difficulty* by using an agent to set up a verification structure in the erasable, non-volatile memory of the BIOS.

Appx2988 (emphases added). In other words, after addressing OS-level licensed programs, the examiner moved to a separate issue: prior art systems did not have a file system in BIOS to store license records. "Using an agent" overcame *this difficulty*, i.e., the ability to store data in BIOS (i.e., EEPROM). That reference to "using

an agent" concerned a different issue than the preceding comment about OS-level licensed programs, and it provides no support for the disclaimer Ancora alleges.

Ancora also briefly invokes a white paper submitted during prosecution about the applicants' "Beeble" product concept, arguing that document demonstrates "what the applicants stated the term 'agent' meant." BlueBr23 (citing Appx3004-3011). Ancora's use of the Beeble paper to support its disclaimer argument presents numerous problems. First, the Beeble paper never mentioned an "agent" or otherwise characterized one as "OS level." Appx3004-3011. Second, the Beeble paper at most described an embodiment, so it could not define the claims' outer bounds. BlueBr23 (paper described the "Beeble embodiment"); Appx2955 (submitting the Beeble paper as "a description of a specific embodiment of the invention"). Finally, the Beeble paper contains post-priority technical disclosures found nowhere in the patent's specification. If the Beeble paper were the basis for an unstated OS-level limitation, then the claims would be invalid for lack of written description.

In short, neither the applicant nor the examiner characterized the "agent" as "OS-level," or even *mentioned* an agent when making any reference to OS-level software.

#### (c) Ancora's reliance on selective citations contorts the record

Ancora asserts that the applicants "expressly defined 'agent' as an '(OS) level program'" when adding that limitation during prosecution. BlueBr20 (quoting

Appx2979) (cleaned up). There are two problems with that characterization. First, the "agent" was *not* added with the cited reference to an OS-level program; the agent had already been added to the claims to overcome an enablement rejection in a prior office action response. Appx2953, Appx2956. Second, the applicant came nowhere close to *expressly defining* "agent" with the cited comment about "(OS) level programs." The applicant *did not even mention* an "agent" in those comments. Appx2979. Ancora nonetheless maintains the purported disclaimer was "stated unequivocally," but it backs up that assertion with no more than a misleading patchwork of cherry-picked clauses from disconnected sentences in the record. *See* BlueBr21 ("[T]he applicants stated unequivocally that, when storing 'the verification structure or license information … in the BIOS as is required by the present claims' (i.e., the 'agent' limitation at issue), the 'present invention' is an 'operating system (OS) level program."). And even that assertion required it to impute an unfounded and incorrect equivalence between the claimed "verification structure" and "agent." *See id.* (quoting discussion of the "verification structure" on Appx2979 before parenthetically appending "(i.e., the 'agent' limitation at issue)").

Ancora similarly selectively emphasizes portions of the notice of allowance, which shows just how Ancora arrives at the incorrect conclusion that the examiner described the "agent" as "OS level."

> More specifically, *the closest prior art systems, singly or collectively, do not teach licensed programs running at the*

> *OS level interacting with a program verification structure stored in the BIOS* [1] to verify the program using the verification structure and having a user act on the program according to the verification. [2] Further, it is well known to those of ordinary skill of the art that a computer BIOS is not setup to manage a software license verification structure. [3] *The present invention overcomes this difficulty by using an agent to set up a verification structure in the erasable, nonvolatile memory of the BIOS.*

BlueBr24 (quoting Appx2988) (emphasis original, enumeration added). By italicizing the first and last clauses, Ancora implies equivalence between the first clause's "licensed programs running at the OS level" and the final clause's "agent to set up a verification structure." *Id.*; *see also* BlueBr10.

But the intervening clauses above show that the "programs running at the OS level" did not concern the "agent." First, clause [1] refers to claimed steps that did not involve an agent. The "using an agent" limitation appears in the second step of claim 1. Appx117(6:64-67). But clause [1] refers to "verify[ing] the program using the verification structure" and "having a user act on the program according to the verification," the third and fourth steps of claim 1. Appx118(7:1-4). The examiner thus referenced OS-level functions only with respect to steps not involving the "agent." Second, as discussed above, *supra* pp.28-29, clause [2] identifies a different issue unrelated to OS-level operation that was then referenced in clause [3]. Ancora's argument depends on connecting two unconnected thoughts expressed in the

notice of allowance. To the extent there is any ambiguity in the examiner's comments in this paragraph, that prevents application of prosecution disclaimer. *Mass. Inst. of Tech.*, 839 F.3d at 1119 ("Where the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer.'" (quotation marks removed)).

**(d) This Court has not taken up the construction of "agent," much less decided it in Ancora's favor**

Ancora repeatedly casts this Court's decisions in *Apple* and *HTC* as having effectively decided the meaning of "agent" in Ancora's favor. That is incorrect.

*Apple* and *HTC* dealt with other issues, and the Court was not asked to decide the meaning of "agent." Beyond a block quote from claim 1, *Apple* did not even mention the claimed "agent." *Apple*, 744 F.3d at 733-40. *HTC* similarly mentioned the "agent" only when quoting claim 1 and in a single parenthetical. *HTC*, 1343 F.3d at 1344-50.

Despite the Court not addressing the "agent" substantively in either decision, Ancora alleges that the Court "recognized that the claimed agent '*r[an] through an operating system.*'" BlueBr24 (quoting *Apple*, 744 F.3d at 735-36) (emphasis in original). The quoted portion of *Apple* did not discuss the "agent," but rather what the Court referred to as "verifying software" that "performs the claimed verification steps." *Apple*, 744 F.3d at 735-36. Similarly, when discussing the notice of allowance, the Court noted that the examiner's reference to programs running at the OS

level concerned "verifying software," and the Court made no mention of the "agent." Far from recognizing any disclaimer, the Court—like the examiner—focused on OS-level functionality for features like the third step of claim 1, "verifying the program using at least the verification structure from the erasable non-volatile memory of the BIOS." Appx118(7:1-3). Those statements did not recognize any limitations on the claimed "agent." If anything, they show that Ancora's cited file-history passages did not address the claimed "agent" at all.

#### 3. The Board was entitled to consider Ancora's previously asserted constructions

Further undermining Ancora's claim construction arguments, the Board noted Ancora's history of repeatedly seeking to construe "agent" without limiting its scope to OS-level software, until it was faced with the combination of Hellman and Chou. Appx10. Even after alleging in these IPRs that the claimed "agent" was limited to OS-level operation, Ancora sought to construe "agent" *without* that limitation in parallel litigation against Nintendo and Roku. Appx290, Appx2321. Similarly, in its infringement allegations against Nintendo and Roku, Ancora alleged the "agent" was met by servers, Appx2342, Appx2359, which of course contain hardware and non-OS-level software. The Board was rightly skeptical when faced with Ancora's

selective reliance on a contrary construction that Ancora had not once sought in over a decade of district court litigation.[4]

* * *

For the foregoing reasons, the Court should reject Ancora's unfounded disclaimer and affirm the Board's construction of "agent." But if the Court concludes that "agent" is limited to "OS-level" operation, the case should be remanded for the Board to determine whether that feature would have been obvious under that construction. Appellees presented evidence that Hellman taught an OS-level agent, based in part on Hellman's disclosure of EEPROM manipulation similar to the '941 patent. Appx601-604; Appx4969-4975. The Board did not address those arguments because it rejected Ancora's construction. Appx34-37.

### B. There is no basis to exclude hardware from the scope of "agent"

Ancora further seeks to limit the claimed "agent" to exclude hardware. That negative limitation is not warranted under the ordinary meaning or the specification-based disclaimer that Ancora urges.

---

[4] Ancora suggests that its *Markman* briefs in litigation against Samsung/LG "describe[d] the claimed agent as 'OS-level software.'" BlueBr34-35. Ancora fails to point out that while those briefs may have *described* the "agent" as OS-level in some instances, the construction it sought *and received* was not so limited. Appx2196, Appx2218-2219, Appx2196-2197, Appx1355; Appx1385-1393.

**1. The plain meaning of "agent" does not exclude hardware**

The Board identified the ordinary meaning of "agent" in the '941 claims as "software program or routine" or "computer program or routine." Appx10, Appx19. The former mirrored Ancora's own proposal (minus the OS-level restriction). Appx504. Because that stated plain meaning says nothing about *excluding* hardware, Ancora has no basis to read such a negative limitation into the claims.

Ancora's own briefing below supports the conclusion that "software program or routine" does not exclude hardware. When arguing its "software program or routine" construction in the patent owner response, Ancora did not refer to hardware or any hardware exclusion. Appx504-508 (claim construction argument failing to identify hardware exclusion); Appx529-531 (arguing Hellman failed to disclose "OS-level software program or routine" without referencing hardware exclusion). The notion that "software program or routine" contained within it an unstated negative limitation excluding hardware first appeared in Ancora's sur-reply. Appx649-652; *see also* Appx16 (citing only the sur-reply for the hardware exclusion argument). Even now the argument continues to morph, with Ancora characterizing the construction as excluding "additional" hardware. BlueBr30-32.[5]

[5] To the extent that Ancora now urges that "agent" excludes "additional" hardware, that argument is forfeited and should not be considered. In its patent owner response, Ancora acknowledged that the construction in its preliminary response included the "additional" hardware argument. Appx508. Ancora expressly declined to maintain that argument in its patent owner response. *Id.*; *Parus Holdings, Inc. v.*

The Board correctly rejected Ancora's negative limitation. For example, the Board credited a dictionary definition demonstrating that agents "may be software, hardware, or both." Appx18 (citing Appx1691).[6] And as the Board noted, Appx18-19, Ancora's expert admitted that software in a "mixed software/hardware entity" can be analyzed without the hardware, Appx1600(122:12-123:10), meaning that the hardware exclusion is an arbitrary line-drawing exercise. Moreover, Ancora's expert acknowledged that the claims do not "preclud[e] the use of hardware in setting up the verification structure." Appx1602(131:14-19); *see also* Appx1600(122:12-123:10), Appx1602(129:9-130:22); Appx1489-1490(¶15). And Ancora's infringement allegations for the "agent" during district court proceedings pointed to servers operated by Nintendo and Roku, which are mixed hardware/software systems. Appx2342, Appx2359.

---

*Google LLC*, 70 F.4th 1365, 1373 (Fed. Cir. 2023).

[6] Ancora alleges this dictionary definition "states that the hardware agents it refers to are 'robot[s],' which the dictionary contrasts with '[s]oftware agents [that] operate in symbolic environments.'" BlueBr36 (quoting Appx1691). That is incorrect. The dictionary cited a robot as "an example of an agent that perceives its physical environment through sensors and acts through effectors." Appx1691. That did not characterize the robot *example* as the full extent of "hardware" agents.

### 2. Ancora's specification-based disclaimer argument is unsupported

Ancora asserts that the '941 patent's disclosure excludes hardware from the "agent." Ancora relies almost entirely on a single paragraph in the background section. BlueBr29-30 (citing Appx115(1:27-35)). In that passage, the specification notes disadvantages of prior-art "dongle" solutions that relied on a hardware device plugged into the computer to provide license verification. Appx115(1:27-35).

But as the Board pointed out, if Ancora were right that the specification thereby disclaimed hardware agents, it would have disclaimed software agents too. Appx18. The paragraph immediately preceding the one Ancora cites similarly criticized prior-art *software* solutions. Appx115(1:19-26). More fundamentally, that general commentary on the prior art in the background section of the '941 specification has nothing to do with the "agent" that would later show up in the claims. And even if the cited parts of the specification could disclaim any kind of "agent," that could extend only to hardware "dongles" that the '941 patent criticized as "expensive, inconvenient, and not particularly suited for software that may be sold by downloading." Appx115(1:30-31). Hellman did not describe using dongles, and it did teach using its copy protection scheme with downloaded software. Appx1264(5:51-53) (teaching that users obtain licensed software "by purchasing it at a store, *over telephone line*, or in some similar manner" (emphasis added)).

### 3. Even if the "agent" were software-only, Hellman taught that feature

While Ancora spends considerable effort arguing for its software-only construction, Ancora stops short of explaining why Hellman failed to disclose or render obvious a software-only "agent." In fact, the Board found that Hellman disclosed or at least rendered obvious a software-only agent. Appx29-30, Appx36; *see also* Appx1125-1128 (Appellees' expert explaining disclosure and obviousness of software-only version of update unit 36).

Ancora simply ignores that finding. BlueBr36-38. Ancora says that the Board rejected its software-only argument against Hellman—that is correct. BlueBr38. But Ancora also says that "[t]he Board thus did not conclude—because it could not—that Hellman would disclose an 'agent' if that term were construed to exclude hardware." BlueBr38. That is *not* correct. As noted, the Board made findings that Hellman on its own taught a software-only agent and that Hellman and Chou would have rendered a software-only agent obvious. Appx29-30, Appx36. Because Ancora failed to challenge that finding, the judgment should be affirmed even if "agent" were construed as software-only.

## C. The file history does not support Ancora's narrow construction under any theory

Ancora asserts that the Board improperly focused on disclaimer without considering the file history under *Phillips*. BlueBr16-18. But Ancora *itself* focused on

disclaimer—the Board cannot be faulted for addressing the argument Ancora presented.

In any event, Ancora is wrong that the Board limited its analysis to disclaimer. The Board concluded that the file history's ambiguity rendered it "unhelpful in informing the meaning of 'agent' *even in the absence of disclaimer*." Appx70 (emphasis added). Thus, the Board performed the very analysis Ancora now says was missing.

The Board's conclusion is well supported. Neither the applicant nor the examiner ever described the claimed "agent" in a way that suggested narrow meaning, let alone the specific restrictions that Ancora urges here. The prosecution history thus "lack[ed] the clarity" needed to be "useful." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1401-02 (Fed. Cir. 2008) (file history's ambiguity rendered it "not particularly helpful to either party's claim construction position").

Ancora's cited cases are thus inapposite, as each involved clear and consistent statements and/or amendments that supported a construction consistent with other intrinsic evidence. *See Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1345 (Fed. Cir. 2020) (applicant's "repeated and consistent remarks during prosecution" supported narrow meaning of term with "no plain or ordinary meaning"); *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir.

2015) (construing term narrowly where "[t]he prosecution history, the structure of the claim itself, the ordinary meaning of the claim terms, … and the patent's description of the invention" all supported the construction); *Univ. of Mass. v. L'Oréal S.A.*, 36 F.4th 1374, 1382-83 (Fed. Cir. 2022) (applicant's "amendments and comments clearly convey[ed]" narrow reading); *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003) (language added after "repeatedly unsuccessful attempts to gain allowance of claims without those phrases"); *Canopy Growth Corp. v. GW Pharma Ltd.*, No. 22-1603, 2023 WL 3048243, at *4-5 (Fed. Cir. 2023) (applicant "sequentially deleted" conditions from the claims during prosecution, thus supporting a construction that omitted those conditions).

The Board correctly concluded the file history did not support Ancora's narrow constructions—under a disclaimer theory or otherwise.

## III. Substantial evidence supports the Board's obviousness findings

Ancora makes three arguments as to why the Board's obviousness determination lacked substantial evidence. The first two challenge the asserted prior-art combination as "inoperable" and "redundant." BlueBr42-45. The third challenges the Board's finding that Hellman satisfied the "verification structure" limitation. *Id.* at 46-48. All fail.

Ancora's first two arguments are forfeited, as Ancora never presented them below. They also lack merit—Ancora's inoperability argument runs contrary to expert testimony and Ancora's own patent disclosure, while its redundancy argument misapprehends the Board's findings and seeks to leverage a single (inartful) sentence appearing in only one of the two final written decisions. Ancora's "verification structure" argument likewise fails, as it mischaracterizes the Board's findings and, in any event, ignores that Hellman's verification structure falls squarely within an embodiment described in the '941 patent.

### A. Substantial evidence supports the Board's finding of a motivation to combine

Substantial evidence supports the Board's finding that a skilled artisan would have been motivated by Chou to store BIOS in Hellman's non-volatile EEPROM memory. Appx27-32; Appx82-89.

As Appellees and Dr. Wolfe explained, although Hellman did not expressly disclose that BIOS was stored in its EEPROM, a skilled artisan would have understood that Hellman's computer—like all computers during that period—had BIOS, and that Chou would have motivated a skilled artisan to store the BIOS in Hellman's EEPROM to prevent tampering with the license records also stored there. Appx4610-4618; Appx5634-5647(¶¶98-120F); Appx6328-6334(¶¶48-61). Storing BIOS in Hellman's EEPROM, as taught by Chou, would have made Hellman's EEPROM the BIOS memory, as required by the claims.

Dr. Wolfe provided several rationales for why a skilled artisan would have stored BIOS in Hellman's EEPROM, including because Chou taught that storing sensitive information (such as Hellman's license records) in the same memory as BIOS provided extra protection because "any attempt to delete the protection will result in the BIOS routine being disabled, disabling the boot up process" altogether. Appx5642(¶115) (quoting Appx1275(1:63-2:7)); *see also* Appx5640-5642(¶¶113-116). The Board evaluated those rationales and found "persuasive Dr. Wolfe's testimony that, in light of Chou, one of ordinary skill in the art would have been motivated to store Hellman's license information in the BIOS EEPROM, in order to discourage users from tampering with the license information and to provide extra protection to the sensitive information." Appx29 (citing Appx1111-1114(¶¶112-116)). Thus, substantial evidence supports the Board's finding, which Ancora does not challenge on appeal.

Ancora instead makes two new arguments. One asserts that the prior-art combination is inoperable, and the other asserts that the combination is redundant. Both are forfeited and both lack merit.

#### 1. Ancora's inoperability argument is forfeited and, in any event, contradicted by Appellees' expert testimony

Ancora first argues that Appellees' prior-art combination is inoperable because, according to Ancora, it creates a "critical failure" where BIOS data stored in

Hellman's EEPROM could be "inadvertently changed." BlueBr43-44. In Ancora's telling, the Board "ignored" this argument. But, in fact, Ancora never presented it.

Before the Board, Ancora's motivation-to-combine arguments were narrow. It argued first that there would have been no reason to store BIOS in Hellman's EEPROM, and second that Appellees improperly assumed "that the entirety of Chou's EEPROM chip constitutes 'memory of the BIOS,' such that storing data in EEPROM is the same as storing it in BIOS memory." Appx4879-4882.[7] Not once did Ancora argue that the Hellman-Chou combination is inoperable. On appeal, Ancora cites two paragraphs of expert testimony that it contends support its new inoperability argument. *See* BlueBr44 (citing Appx3428-3429(¶¶189-190)). But even if that testimony could support such an argument, Ancora *never cited it* in any substantive paper, and the Board was not required to hunt for it. *See Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1371-1372 (Fed. Cir. 2023). As the Board reminds every patentee at the start of trial: "any arguments not raised in the response may be deemed waived." Appx382; Appx4760.

In any event, Ancora's argument lacks merit. Appellees' expert acknowledged that "there would have been some risk introduced by storing non-BIOS information" (e.g., Hellman's license records) in BIOS memory, but he concluded that risk "is

[7] Ancora does not maintain either of these arguments on appeal.

what Chou observed as the benefit of doing so in the first place: preventing tampering with the sensitive information without also impacting the BIOS data and thus disabling the entire device." Appx1115-1116(¶120B) (citing Appx1275(1:63-2:7)). He also explained that a skilled artisan would have known how to avoid this problem, for example by implementing Hellman's one-way hash function to map to a specific range of memory values. Appx1117-1118(¶120E). That way, Hellman's license records could be "stored amidst the BIOS data in non-volatile memory 37, but without risk of the license data overwriting the BIOS data." *Id.* Thus, Dr. Wolfe explained why the risk that Ancora now says rendered the combination inoperable does not in fact "negate[]" the undisputed affirmative rationales for combining the references. Appx1116(¶120C); *see generally* Appx1106-1132(¶¶98-150).

Ancora's argument here is also belied by its own patent, which does not teach how to avoid the purported overwrite problem. The '941 patent simply describes "establishing at least one license-record location in the first or the second non-volatile memory," without explaining how to avoid the purported problem of inadvertently impacting BIOS operations. Appx117(6:19-21). Thus, as with its "verification structure arguments," Ancora errs by requiring more of the prior art than from its own patent. *See Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 902 (Fed. Cir. 2018) (agreeing that a patent owner cannot hold a prior art reference "to a different standard than it holds the claimed invention" (cleaned up)); *see also In re Epstein*, 32 F.3d

1559, 1568 (Fed. Cir. 1994) ("that [an] appellant did not provide the type of detail in his specification that he now argues is necessary in prior art references supports" a finding that "one skilled in the art would have known how to implement the features").

**2. Ancora's redundancy argument is also forfeited and rests on a misunderstanding of Appellees' prior-art combination**

Ancora next argues that the asserted combination is "redundant" because Hellman already has BIOS, so, adding Chou's BIOS to Hellman's EEPROM was "logically untenable." BlueBr44. Ancora does not cite any of its IPR papers or expert testimony in support because Ancora never presented this argument to the Board. It too is forfeited.

Ancora's argument suffers from other problems as well. To start, it is based on an incorrect understanding of Appellees' prior-art combination. Appellees never suggested that a skilled artisan would add *a second BIOS* to Hellman's EEPROM. Rather, as the Board recognized, Appellees argued that a skilled artisan would have appreciated that Hellman already had a BIOS, and that Chou would have motivated a skilled artisan to store that BIOS in Hellman's EEPROM. *Supra* pp.39-40. And in any event, Hellman's lack of an express BIOS disclosure was cured by Chou, which *did* expressly disclose BIOS. Appx1109-1110(¶106). The proposed combination, then, was not to add a second BIOS to Hellman, but rather to leverage Chou's disclosure of storing sensitive data in BIOS memory to show that Hellman's license

records would have been stored in BIOS EEPROM memory. Appx29. Under the asserted prior-art combination, there is no redundancy problem.

Ancora points to a single sentence in the Roku/VIZIO final written decision in which the Board said a skilled artisan would have been motivated "to add a BIOS to the computer … of Hellman." BlueBr45 (citing Appx82). According to Ancora, this stray statement proves that the Board found a skilled artisan would have added "a second, redundant BIOS to Hellman." BlueBr45. Ancora makes too much of this statement. It is clear from the rest of the Board's analysis that it correctly understood the combination actually proposed in the petitions. Appx83 (citing Dr. Wolfe's testimony); Appx85 (correctly stating the actual combination); Appx88 (correctly describing the combination). At most, then, the Board's isolated statement to that effect was harmless error. Further, that statement appears *only* in the Roku/VIZIO final written decision. *Compare* Appx82, *with* Appx27 (Nintendo decision stating that "the evidence in the present record shows that storing sensitive information, such as Hellman's license information, in the BIOS memory is not beyond the skill of a pertinent artisan"). Ancora does not explain why an alleged error that appears in one opinion is fatal to both. It is not. The Court should affirm.

### B. By storing license records in BIOS EEPROM, Hellman's update unit "sets up" the claimed "verification structure"

#### 1. Substantial evidence supports the Board's finding that Hellman taught the "verification structure" limitation

Ancora's argument as to the "verification structure" limitation also fails. That limitation requires "using an agent to set up a verification structure … accommodating data that includes at least one license record" in the portion of non-volatile memory containing BIOS. Appx117-118(6:64-7:3). For each authorized software program, Hellman's "update unit" 36 (the claimed agent) set up a license record within Hellman's non-volatile BIOS memory (EEPROM 37) at a memory location corresponding to the program's hash value (H):




FIG_6

Appx1260 (annotated); Appx1266(10:1-13, 10:34-41); Appx1123-1132(¶¶133-150); Appx1505-1506(¶¶42-47). Each license record included the user's total number of authorized uses (M) for each program. Thus, as Appellees' expert explained, when there were multiple authorized programs, the license records took the form of a table of M values:

| Memory Address | M Value |
|---|---|
| Address Defined by (H1) | M1 |
| Address Defined by (H2) | M2 |
| Address Defined by (H3) | M3 |

Appx1489(¶14); Appx1505-1506(¶44); Appx4084(30:1-22). When there was just a single authorized program, the table consisted of a single row.

Thus, by storing license records (M) for software programs at memory addresses represented by hash values (H) for those programs—such that the records could later be retrieved to permit or restrict access to the programs—Hellman's update unit "set up" a "verification structure," just as the '941 claims require. Appx1123-1128(¶¶133-138).

The Board credited Dr. Wolfe's testimony on this point, finding that "Hellman discloses a verification structure in the form of a memory structure storing at least M value at an address defined by hash value H, wherein the verification structure is set in (i.e., not the same as) the erasable, non-volatile memory 37." Appx37 (citing Appx1123-1128(¶¶133-138)). The Board's finding is thus supported by substantial evidence. *See Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d

1362, 1371 (Fed. Cir. 2020) ("It is not for us to second-guess the Board's assessment of the evidence. Rather, the only question before us is whether the conclusion adopted by the Board is supported by substantial evidence." (cleaned up)).

**2. Ancora's contrary arguments focus on the "verification structure" standing alone, without considering the method step as a whole**

Ancora asserts that the Board erred in holding that the "verification structure" limitation "is taught by Hellman's memory 'address H'" because, according to Ancora, "a bare memory address *is not a structure*" at all. BlueBr47. And, while Ancora acknowledges that Hellman's non-volatile memory has a "memory structure," BlueBr48, Ancora asserts that this structure is not set up by the agent. These arguments fail for several reasons.

To start, Ancora is simply wrong that the Board pointed to Hellman's "address H" or some "unidentified, pre-existing structure" as the claimed verification structure. Rather, as explained above, the Board found that "[s]toring the value M at the address H constitutes setting up a verification structure because it includes storing a license record at a specific license record location that corresponds to the licensed program." Appx35 (citing petition at Appx211 and other supporting evidence); Appx37. Thus, Hellman's verification structure was, for example, a table of license records (M values) in EEPROM, not a bare memory address H. And *that* structure did not exist *until* the update unit stored the license records in EEPROM.

Ancora further errs in suggesting that Hellman only disclosed a memory address and not a "verification *structure*." BlueBr48. The '941 claims do not place any restrictions on the type of structure that can qualify. And, notably, the patent indicates that a "database" is a type of verification structure. Appx115(2:19-26). Indeed, Ancora acknowledged as much in the IPRs. *See* Appx302 (stating that "[t]he verification structure is a *data structure or database* that must be able to store" the license records (emphasis added)). Hellman's memory structure, e.g., a table of M values stored in memory, was indisputably a data structure and effectively an EEPROM database. Appx1505-1506(¶¶44-46). Accordingly, the Board correctly rejected Ancora's argument, and this Court should too.

Ancora is also wrong that Hellman's update unit did not "set up" the memory structure. As explained above, Hellman's update unit stored license records in its BIOS EEPROM, and the act of allocating memory and storing the license records constituted "setting up" the claimed verification structure. *See* Appx1124-1125(¶¶135-136); Appx1505-1506(¶¶44). To the extent Ancora contends that "setting up" requires something more, it does not say what more is required. And, in any event, such a contention contradicts Ancora's own patent, which describes "setting up" the verification structure as "establishing at least one license-record location" in non-volatile memory (i.e., choosing a memory address), and then "establishing the … license-record in one of the at least one established licensed record locations" by

"stor[ing]" the record at the appropriate memory address. Appx115(1:65-67); Appx117(6:17-27); *see also* Appx115(2:10-11) (describing setting up the verification structure by "plac[ing] the encrypted license record in the second non-volatile memory"). That is *exactly* what Hellman's update unit did. *See* Appx1499-1502(¶¶31-35).

Finally, Ancora's argument (at BlueBr49) that the Board relied on "conclusory" expert testimony is unfounded. Citing only a portion of Dr. Wolfe's testimony, Ancora asserts that he simply concluded, without more, that "Hellman discloses a 'verification structure' in the form of the memory structure of non-volatile memory 37." BlueBr49 (citing Appx37; Appx1124-1125). But Dr. Wolfe's full testimony, which the Board quoted in its entirety, was that "Hellman discloses a 'verification structure' in the form of the memory structure of non-volatile memory 37 *storing at least one value M at memory addresses defined by at last [sic] one hash value H.*" Appx37 (citing Appx1123-1128(¶¶133-138)) (portion truncated by Ancora emphasized). Again, Dr. Wolfe's full quote is consistent with what the Board found and what the '941 patent discloses. And, contrary to Ancora's argument, Dr. Wolfe *did* say what the verification structure was (a table of M values in Hellman's EEPROM) *and* what set up that table (Hellman's "update unit"). *See* Appx1124-1125(¶136); Appx1489(¶14); Appx1505-1506(¶44); Appx4084(30:1-22).

The Board's findings are supported by substantial evidence and should be affirmed.

## IV. The Board correctly concluded that Ancora's proffered evidence of nonobviousness did not outweigh Appellees' strong obviousness case

As the patentee, Ancora bore the burden of production to show a nexus "between the merits of the claimed invention" and the objective evidence offered "*before* that evidence may become relevant to the issue of obviousness." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) (cleaned up) (emphasis added). It is not enough for Ancora to have shown that its proffered evidence has *some* relationship to the patent—rather, Ancora was required to show a nexus to the "unique characteristics of the *claimed* invention." *Fox Factory*, 944 F.3d at 1373-1374 (emphasis added).[8]

Even when sufficient nexus has been shown, moreover, objective evidence of nonobviousness is insufficient to defeat a strong obviousness case where the probative value of the evidence is weak. *See Firebug*, 962 F.3d at 1372 ("[W]e need not determine whether the Board erred in determining that Firebug had not established

---

[8] Ancora suggests in passing that a nexus presumption might apply. BlueBr54. But such a presumption applies only when a commercial product practices the claimed invention, *Fox Factory*, 644 F.3d at 1373, which Ancora has never alleged, Appx45; Appx103. Indeed, Ancora's attempts to commercialize a product embodying the claimed invention failed. Appx1528(37:8-38:10); Appx1530(45:3-13, 46:18-47:5).

nexus because the Board alternatively found that, even if nexus is presumed, Fire-bug's evidence of secondary considerations is weak, and that conclusion is supported by substantial evidence."); *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010) ("[W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness.").

Here, the Board found that Ancora failed to establish a nexus between its evidence and the claimed invention and that, "even if there were a nexus," Ancora's evidence would be entitled to little weight. Appx43-51. Then, weighing all of the record evidence—including "objective indicia of nonobviousness"—the Board determined that Ancora's evidence was "weak in comparison to the evidence regarding the prior art." Appx51.

On appeal, Ancora asserts at least eight separate errors in the Board's analysis of the AMI evidence (BlueBr52-55) and a dozen others in its analysis of the licensing evidence (BlueBr56-63). At bottom, though, Ancora focuses almost entirely on the Board's nexus finding, which, according to Ancora, led the Board to improperly "disregard[]" the evidence altogether. BlueBr49-50; *see also id.* at 3, 14-15, 49-63. But the Board did not "disregard" the evidence—rather, as Ancora elsewhere acknowledges (BlueBr54), the Board considered the evidence for its probative value

but determined that it is "entitled to little weight." Appx46; Appx49; Appx51. Ancora largely ignores that finding, but it alone provides a basis for affirmance. *See Firebug*, 962 F.3d at 1372.

In any event, both the Board's nexus and probative value findings are based on a legally correct analysis and supported by substantial evidence. The Board also appropriately weighed that evidence against Appellees' strong obviousness case and correctly found the challenged claims unpatentable.

### A. Substantial evidence supports the Board's findings on the asserted secondary considerations

#### 1. Ancora cited self-serving AMI marketing materials with no nexus to the claims

Substantial evidence supports the Board's finding that Ancora failed to show a nexus between its AMI evidence and the claimed invention. The cited press release described Ancora's "alliance" with BIOS manufacturer AMI to develop certain technology, Appx4120-4121, as well as a license agreement that allegedly undergirded the alliance, Appx4125-4135. Ancora asserts that the evidence establishes industry praise for the claimed invention. But, as the Board correctly noted, Appx44, Ancora did not tie that evidence to the *claims* of the '941 patent.

The press release and agreement include vague references to contemplated BIOS-based products. Appx4120-4121; Appx4125. But such products were never commercialized, Appx1528(37:8-38:10); Appx1530(45:3-13, 46:18-47:5), and the

references are little more than generic descriptors of generic technology. Such evidence that addresses products only "at a high level" does not establish the requisite nexus. *See Enova Tech. Corp. v. Seagate Tech. (US) Holdings Inc.*, 706 F. App'x 987, 994-95 (Fed. Cir. 2017).

Ancora emphasizes that the press release parenthetically states that certain BIOS-based security products are allegedly "described in" the '941 patent, and it argues that praise directed to "the entire '941 patent" is sufficient to establish praise toward claim 1 itself. BlueBr50, BlueBr52. This is wrong. An oblique reference to a patent's disclosure is not the same as a reference to the *claimed invention*. *See Siemens Mobility, Inc. v. Iancu*, 825 F. App'x 867, 874 (Fed. Cir. 2020) (affirming no-nexus finding where patentee's evidence "referred to a 'horn sequencing patent'" but did not provide "any connection to the language of the claims"). Ancora's cited cases are not to the contrary, as all involved evidence that was linked to a *particular claim feature*.[9] Ancora provided no such evidence here.

---

[9] *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1054 (Fed. Cir. 2016) (en banc) (patentee proffered expert testimony); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 746-747 (Fed. Cir. 2016) (patentee "presented multiple declarations" that tied "commercial embodiments" to features "recited in the claims"); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013) ("[v]arious witnesses testified to the overwhelming success of the patented products"); *LiquidPower Specialty Prods. Inc. v. Hughes*, 749 F. App'x 965, 969 (Fed. Cir. 2018) (patentee tied "the evidence to [its] commercial products that are designed and marketed to" perform the claimed features); *see also Volvo Penta of the Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202,

Nor could it have. Ancora's single cited passage from the press release says nothing about storing license records in BIOS, or any other feature recited in claim 1 (the only challenged independent claim). Instead, it refers to "embed[ding] encryption keys in the core of the PC," which allegedly "achieves a higher level of reliability and security" than other security solutions. Appx4120. While embedding encryption keys is recited in other, *unchallenged* claims (e.g., independent claim 18), it appears nowhere in challenged claim 1.[10] *Compare* Appx117-118(6:59-7:4), *with* Appx118(8:31-52). Thus, the quoted passage cannot possibly constitute industry praise for the purported invention of claim 1. *See Enova*, 706 F. App'x at 994 (rejecting nexus argument where the document on which patentee relied referred to benefits "unrelated to the claimed invention's" features).

Next, Ancora misleadingly asserts that the Board erred in "requiring" Ancora to show "proof of a 'product [that] embodies the claimed features and is coextensive with the claims.'" BlueBr53 (quoting Appx45). But the Board did no such thing. Rather, the Board said that *because* Ancora had not provided such evidence, "*it is not entitled to presumption of nexus*." Appx45 (emphasis added); *supra* n.8. The Board then *went on* to consider whether Ancora had "demonstrated 'a legally and

---

1212 (Fed. Cir. 2023) (patentee proffered similar linking evidence).

[10] For this reason, Ancora's argument (at BlueBr52) that claim 1 is "incorporated into every claim of the patent" is simply wrong. Other claims clearly recite features missing from claim 1.

factually sufficient connection' between the evidence and the claimed invention" in the absence of such a presumption. Appx45. This is exactly the analysis the Board was required to perform. *See Fox Factory*, 944 F.3d at 1373-74.

Ancora's remaining arguments are all aimed at skirting its nexus burden. For example, Ancora argues that Roku/VIZIO allegedly relied on only "conclusory attorney argument" to challenge nexus, and that Nintendo did not challenge nexus at all. BlueBr54. In a similar vein, Ancora asserts that "patentees are not required" to prove a negative. *Id.* at 53 (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988)). Ancora puts the cart before the horse. *Demaco* says that *once a patentee has already established* a nexus to "the patented invention itself," the patentee need not *also* prove that commercial success is not due to factors other than the patented invention. *Id.* at 1394. But *Demaco* reaffirmed the well-established principle that the burden of proof to establish nexus in the first place "*resides with the patentee*." *Id.* at 1392 (emphasis added). Accordingly, Appellees need not have proffered *any* evidence to the contrary. Nevertheless, Appellees *did* proffer evidence to rebut Ancora's nexus arguments, including the AMI evidence itself as well as deposition testimony from Ancora's declarant, Mr. Mullor. Appx42-44 (summarizing argument and evidence).

### 2. Even if Ancora had shown a nexus, substantial evidence supported the Board's finding that the AMI evidence was entitled to little weight

Even if Ancora had satisfied its burden to show a nexus (it did not), substantial evidence supports the Board's additional finding that Ancora's evidence is "entitled to little weight." Appx45-46. Ancora relied on the AMI press release as purported "industry praise." But that press release is better described as "self praise." In his own words, Ancora's CEO and named inventor confirmed that the document is nothing more than a "marketing piece" describing a "business relationship" between Ancora and AMI to garner publicity. Appx1530-1531(47:17-49:7). He further testified that he had a part in authoring the press release, Appx1531(49:2-4), and Ancora now admits that "both parties" had to approve the document's content before it could be released, BlueBr51.

Thus, as the Board noted, the press release "is not a statement by a third party, but rather by two parties working together to market a product or the relationship itself." Appx45. Such puffery does not demonstrate bona fide industry praise. *See In re Cree, Inc.*, 818 F.3d 694, 702 (Fed. Cir. 2016) (affirming Board's finding that "self-serving statements from researchers about their own work do not have the same reliability" as third-party industry praise); *cf. Firebug*, 962 F.3d 1362, at 1372-1373 (affirming decision giving "little weight" to declaration from patentee's CEO and

named inventor); *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361 (discounting similar "advertisements and press releases" for the inventor's products).

Ancora insists that the press release is not in fact self-praise because the AMI agreement did not legally create a "joint venture or partnership" between Ancora and AMI. BlueBr54. Ancora misses the point. Regardless of whether the parties' relationship formally qualified as a joint venture or partnership, the fact remains that Ancora helped author the press release and thus had a significant say in its contents.

Finally, despite Ancora's misleading statement to the contrary (at BlueBr50), the AMI agreement did not *require* AMI to pay Ancora terms for a license to the '941 patent. Appx4130(¶8.1(2)). Rather, the agreement required *both sides to* terms [redacted] an terms of terms *only* if terms. Appx4127(¶4.2(1)-(2)); Appx4130(¶8.1(1)). But because neither party *actually* terms covered by the agreement, the parties never saw terms from their collaboration. Appx1528(37:8-38:10); Appx1530(45:3-13, 46:18-47:5). Such evidence is hardly probative of nonobviousness. *See Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1346-47 (Fed. Cir. 2013) (reversing JMOL of nonobviousness where the fact that the "software was abandoned by almost all of its initial licensees" undermined patentee's nonobviousness argument).

### 3. Ancora's licensing evidence lacked the requisite specificity and was undermined by low-value licenses

Ancora's licensing evidence fares no better. "Successful licensing is not an 'infallible guide to patentability.'" *Siemens*, 825 F. App'x at 873 (quoting *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985)). Indeed, parties "may enter into licenses because of business judgments, to avoid litigation, and for other reasons unrelated to obviousness, so the evidentiary value of licenses must be 'carefully appraised.'" *Id.* Thus, to demonstrate nexus, a patentee must show that a licensing program was successful "because of the merits of the claimed invention" and not "because they were entered into as business decisions to avoid litigation, because of prior business relationships, or for other economic reasons." *In re Antor Media Corp.*, 689 F.3d 1282, 1294 (Fed. Cir. 2012).

Substantial evidence supports the Board's finding that Ancora failed to make such a showing. To start, Ancora's licenses shed no light on the reasons they were accepted. For example, "large portions" of the [redacted] license were redacted, making it "impossible" for the Board to "discern what was licensed and on what terms." Appx48-49. The opaque nature of the license alone undermines Ancora's nexus claim. *See Enova*, 706 F. App'x at 996 (affirming Board's finding that patentee failed to show a nexus where "the redaction of [the] licenses makes it difficult to determine the reason that they were agreed to").

The [redacted] license likewise omitted context as to which claims were at issue in the underlying litigation[11] and how much was at stake, making it "difficult to assess whether the license represented a business decision based on the magnitude of the potential risk or an acquiescence to the strength of the '941 patent." Appx49. And, while the Board (correctly) refused to consider Ancora's [redacted] license,[12] Appx48 n.4, the Board observed that "even if we were to consider the license, it is similar to the [redacted] license agreement discussed here, and so would be treated similarly." Appx48.

Accordingly, Ancora's preferred licenses failed to provide enough context to allow the Board to determine whether they bore the requisite nexus to the challenged claims. *See Siemens*, 825 F. App'x at 874 (affirming no-nexus finding where license agreement had "royalty information redacted" and a license request "may have been

---

11 Ancora cites its claim construction briefing in the [redacted] case to suggest that the same claims at issue here were asserted there. BlueBr61 (citing Appx2182). That may have been true at the time of claim construction, but nothing in the record shows which claims remained at issue when [redacted] settled.

12 Ancora asserts (BlueBr62-63) that the Board abused its discretion in refusing to consider the [redacted] license. But Ancora did not produce or cite the [redacted] license in its responses. Rather, it produced the license only after Appellees' discovery requests. Appx560-570; Appx577-582. Ancora then tried to rely on the license in its sur-replies only *after* Appellees cited Ancora's low-value licenses in their replies. Appx668-669. The Board was well within its discretion in declining to consider Ancora's belated evidence. *See* 37 C.F.R. § 42.23(b).

sought for other reasons, including to avoid the cost of an already-pending patent infringement suit").

Ancora's CEO and named inventor also could not provide the requisite context. During his deposition, he testified that he could not remember details regarding the terms of the licenses, how much in damages Ancora was seeking in each case,[13] or which products were accused. Appx1522-1523(14:20-20:5). Without such details, the Board appropriately concluded that Ancora "relies merely on the existence of the licenses to show a nexus." Appx50. But that is insufficient. *See SIBIA Neuroscis., Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he mere existence of these licenses is insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify [other prior art].").

This Court's decision in *Iron Grip* is instructive. There, "the only evidence of marketplace success" was the fact that three of the patentee's six competitors took a license to the patent at issue. 392 F.3d at 1324. But the patentee did not explain the circumstances under which the licenses were granted beyond the fact that two of

---

[13] Ancora asserts that the amount in damages it was seeking in the [redacted] [redacted] [redacted], and [redacted] cases "has no probative value." BlueBr62. This is wrong. As the Board noted, without knowing the litigation risk to [redacted] [redacted] and [redacted] "it is difficult to assess whether the license represented a business decision based on the magnitude of the potential risk or an acquiescence to the strength of the '941 patent." Appx49.

them "were taken in settlement of litigation." *Id.* That was not enough. "Without a showing of nexus, the mere existence of ... licenses is insufficient to overcome the conclusion of obviousness when there is a strong prima facie case of obviousness." *Id.* (cleaned up); *see also ABT Sys.*, 797 F.3d at 1361-1362 (reversing denial of JMOL of invalidity where patentee "point[ed] to no evidence that the licenses it cites were taken based on the merits of the invention claimed in the '017 patent").

So too, here. By failing to provide details regarding the circumstances under which the licenses were granted, Ancora attempted to use the licenses as a sword (to show nonobviousness) and as a shield (to prevent Appellees from obtaining information about the licenses that might undermine Ancora's arguments). This case is thus on all fours with *Iron Grip*. Ancora suggests that this case differs from *Iron Grip* because the licenses there were not in evidence. BlueBr58. But *Iron Grip* does not suggest as much, nor did the Court base its holding on that alleged fact. In any event, mere production of heavily redacted licenses, with no other context, does not cure the deficiency found in *Iron Grip*.

Ancora's nexus arguments are also undermined by three *other* licenses Ancora initially failed to produce or cite in its patent owner response, all of which paint a very different picture than what Ancora presented to the Board (and this Court). Appx616; Appx4986-4987. Two of those licenses party and party were for

[redacted] and [redacted], well *below* what Ancora alleges is the median cost of litigation ($4M). Appx2104; Appx2098. The third license [redacted] *was for $0*. Appx2097. Notably, both [redacted] and [redacted] settled *after* [redacted] and [redacted] had asserted Hellman and Chou against the ’941 patent. Appx615-616; Appx2097; Appx2098-2099. In particular, [redacted] filed an IPR petition against the patent asserting the very same Hellman-Chou ground that the Board found compelling here. Two days after the Board instituted trial on that ground, Ancora gave [redacted] a $0 settlement and a license. Appx616 (citing Appx2097). And after the Board instituted trial on [redacted] copycat petition, Ancora gave [redacted] a [redacted] settlement and a license. *Id.* (citing Appx2098-2099).

The implication could not be clearer: Ancora was willing to literally give away its patent rights to make IPR trials involving the Hellman-Chou combination go away because it feared invalidation. And that is exactly what happened once the Hellman-Chou combination was actually adjudicated in the IPRs on appeal here. Far from supporting nonobviousness, Ancora’s licensing activity shows that the ’941 patent is overwhelmingly weak.

Ancora cites *Iron Grip* for the proposition that the low-value licenses are “of little significance in the obviousness analysis.” BlueBr61 (quoting 392 F.3d at 1324) (cleaned up). In Ancora’s view, it can freely point to high-value licenses to show nonobviousness, but Appellees may not point to low-value licenses to rebut those

arguments. *Iron Grip* says no such thing. Rather, as explained above, the Court found that the licenses at issue were of little significance because the patentee failed to provide affirmative evidence of *nexus* to the claimed invention. 392 F.3d at 1324; *supra* pp.60-61. The Court said nothing about low-value settlements, much less their effect on the obviousness analysis.

In other cases, this Court has held that low-value licenses *are relevant* and, at the very least, diminish the probative value of other licenses. *See Cole Kepro Int'l, LLC v. VSR Indus., Inc.*, 695 F. App'x 566, 572 (Fed. Cir. 2017) (affirming Board's finding that low-value license (among other things) "weakened" the patentee's licensing evidence and was "difficult to square with [the patentee's] assertion that the total value of each of the licenses exceeded potential litigation costs"); *see also Siemens*, 825 F. App'x at 874 (affirming Board's no-nexus finding where one of the proffered licenses "was provided only for a 'nominal fee'"). Thus, at the very least, given Ancora's failure to provide details about its high-value licenses, and in view of the low-value licenses cited above, the Board appropriately "decline[d] to give significant weight" to the high-value licenses.[14] Appx49; Appx51.

[14] Ancora quibbles with a statement by one of the patent judges at the oral hearing that "it seems like maybe [Ancora] struck the lotto a couple times." BlueBr7 (quoting Appx5167(79:14)). But, when read in context, it is clear that the judge was asking Ancora's counsel why it would be permissible to look at the high-value licenses in a vacuum, without considering the low-value licenses as well. *See* Appx5164-5169(76:4-81:8).

Finally, Ancora attempts to analogize to cases such as *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013), *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340 (Fed. Cir. 2012), and *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). But those cases are inapposite, as they did not involve low-value licenses that detracted from the patentee's nexus arguments (as here) and *did* involve compelling evidence regarding many other objective factors (unlike here). *Transocean*, 699 F.3d at 1349 ("Transocean presented substantial evidence from which a reasonable jury could find that each of the seven objective factors supports the non-obviousness of Transocean's claims."); *Institut*, 738 F.3d at 1347 (dozen license agreements, as well as evidence of praise and copying, which the Court characterized as having "strong probative value"); *WMS Gaming*, 184 F.3d at 1360 (strong evidence of commercial success, long-felt need, and licensing). Further, *Transocean* addressed whether substantial evidence supported a jury's verdict of nonobviousness. This case presents the opposite posture—the Board found that Ancora *failed* to show nonobviousness, and that finding is entitled to deference.

### B. The Board properly weighed the record evidence and found Ancora's evidence did not outweigh Appellees' obviousness case

In the end, whether the deficiencies in Ancora's evidence go to nexus or weight does not matter because the Board considered all of Ancora's evidence. The

Board assessed the evidence for its probative value and weighed it against Appellees' evidence supporting obviousness. Appx51.

Based on the totality of the record, the Board concluded that Ancora's objective evidence of nonobviousness was "weak in comparison to the evidence regarding the prior art under the first three *Graham* factors." Appx51. The Board's analysis is factually supported and legally correct. *See W. Union*, 626 F.3d at 1373 ("[W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness."). The Court should affirm.

## CONCLUSION

The Court should affirm the Board's finding of unpatentability of claims 1-3, 6-14, and 16 of the '941 patent.

Respectfully submitted,

/s/Richard Crudo
Richard Crudo

*Counsel for Appellees Roku, Inc., VIZIO, Inc.*

/s/Jerry A. Riedinger
Jerry A. Riedinger

*Counsel for Appellees Nintendo Co., Ltd. and Nintendo of America Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). The brief contains 13,926 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2016 and 14-point Times New Roman type.

Dated: October 18, 2023

/s/Jerry A. Riedinger
Jerry A. Riedinger

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains nine unique words marked confidential. This number does not exceed the maximum of 15 words permitted by Federal Circuit Rules 25.1(d)(1)(A) and (C).

Dated: October 18, 2023

/s/Jerry A. Riedinger
Jerry A. Riedinger

## Certificate of Authority

I certify that I have the authority of Richard Crudo, Jon E. Wright, and Jerry A. Riedinger to file this document with their electronic signatures. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 18, 2023

/s/Andrew T. Dufresne
Andrew T. Dufresne