**2023-1674, 23-1701**

# United States Court of Appeals for the Federal Circuit

ANCORA TECHNOLOGIES, INC.,

*Appellant,*

– v. –

ROKU, INC., VIZIO, INC., NINTENDO CO., LTD., NINTENDO OF AMERICA INC.,

*Appellees.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2021-01406 and IPR2021-01338*

## NON-CONFIDENTIAL REPLY BRIEF FOR APPELLANT

ANDRES HEALY
STEVEN M. SEIGEL
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 516-3880
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

ALEXANDRA G. WHITE
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366
awhite@susmangodfrey.com

*Counsel for Appellant*

DECEMBER 8, 2023

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

ARGUMENT ............................................................................................3

I. The "agent" is an OS-level program. ..................................................3

A. The "agent" must be construed in the context of the intrinsic record.....................................................................................3

B. The context of the intrinsic record makes clear that the "agent"—and only the "agent"—writes and erases data in BIOS.........................................................................................4

C. The intrinsic record defines the entity that writes and erases data in BIOS as an "OS level program." ...................................5

D. Petitioners do not dispute the futility of remand. .....................13

II. The "agent" is software-only...........................................................14

III. The Board's obviousness conclusion lacks substantial evidence even under its erroneous construction. .......................................................17

A. The Hellman-Chou combination is inoperable.........................17

B. The Hellman-Chou combination is redundant.........................18

C. The Hellman-Chou combination omits using an agent to set up a verification structure in BIOS memory.................................19

IV. The Board's lack-of-nexus findings for Ancora's praise and licensing evidence rest on legal error and lack substantial evidence. ................24

A. Ancora tied its praise to the '941 patent. .................................24

B. Ancora established a nexus between its high-value licenses and the challented claims of the '941 patent. .................................27

CONCLUSION........................................................................................33

CERTIFICATE OF SERVICE .................................................................35

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from pages 26-29 and 31-33, describe confidential license agreements between Ancora Technologies, Inc., and certain third parties relating to U.S. Patent No. 6,411,941. The names of third-party licensees are omitted from pages 26-29 and 31-33. Confidential payment terms, royalty-rate terms, and execution dates are omitted from pages 26, 27, 29, and 31-32.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*,
797 F.3d 1350 (Fed. Cir. 2015) ....................26

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014) .................... *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ....................12, 20

*Cole Kepro Int'l, LLC v. VSR Indus., Inc.*,
695 F. App'x 566 (Fed. Cir. 2017) ....................33

*In re Cree*,
818 F.3d 694 (Fed. Cir. 2016) ....................26

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) ....................16

*Eidos Display, LLC v. AU Optronics Corp.*,
779 F.3d 1360 (Fed. Cir. 2015) ....................8

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................21

*In re Hodges*,
882 F.3d 1107 (Fed. Cir. 2018) ....................14

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ....................30

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ....................27

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ....................19

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................18

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ....................12

*Phillips v. AWH Corporation*,
415 F.3d 1303 (Fed. Cir. 2005) ....................4, 14

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010) ....................24, 25

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ....................25, 28, 32

*In re Rijckaert*,
9 F.3d 1531 (Fed. Cir. 1993) ....................22

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
962 F.3d 1362 (Fed. Cir. 2020) ....................26

*Siemens Mobility, Inc., Iancu*,
825 F. App'x 867 (Fed. Cir. 2020)....................33

*Soverain Software LLC v. Newegg Inc.*,
705 F.3d 1333 (Fed. Cir. 2013) ....................26

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) ....................27

*Uship Intell. Properties, LLC v. United States*,
714 F.3d 1311 (Fed. Cir. 2013) ....................9

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Cir. 2017) ....................19

*WMS Gaming, Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999) ....................32

**Other Authorities**

37 C.F.R. § 42.23(b) ....................30

77 Fed. Reg. 48,768 (Aug. 14, 2012) ....................29

## INTRODUCTION

Of the Board's errors, the most glaring—and dispositive—is its refusal to credit the patentee's unwavering description of the "agent" as an "OS-level program." Appx2979. In their Response ("Red"), Petitioners' only argument in support of the Board's position on this point is that the cited portions of the file history "did not rely on, or even mention, the [word] 'agent.'" Red18. The record demonstrates that Petitioners' argument is meritless.

The context is clear. As shown below, the "agent" limitation was added to the claims during prosecution to identify the specific entity responsible for performing the "storing a verification structure" operation:

> using an agent to sett~~ing~~ up verification structure in the ~~second~~ erasable, non-volatile memory of the BIOS, the ~~verfication~~ verification structure accommodatinges data that includes at least one license record,

Appx2956. And the applicants (and Examiner) repeatedly explained that the "agent"—and only the "agent"—could write data to BIOS in the claimed invention, reciting: *e.g.*, "using an agent to set up a verification structure in computer memory," Appx2969; "('agent') used in the license collation process …. to store these keys in non-volatile memory," Appx2970-2971; "using an agent program embedded in each software application," Appx2972; "'storing' … [is] performed by the agent," Appx2987; "us[ing] agents to manage software licenses, and stor[ing] the licenses

in persistent non-volatile storage," Appx2987; and "using an agent to set up a verification structure," Appx2988; Appx2989 (same).

Accordingly, the applicants' post-amendment, February 2002 remarks regarding the need to use an OS-level program to "stor[e] a verification structure … in the BIOS of a computer ***as is recited in the present claims***," Appx2977, plainly referred to and defined the "agent"—explaining that "[s]oftware license management applications, such as the one of ***the present invention, are operating system (OS) level programs***." Appx2979.

For the same reason, the applicants plainly referred to and defined the "agent" when they confirmed that the "present invention proceeds against conventional wisdom" in doing something ordinary "***OS level*** application programmers" would not think to do: use "the BIOS as a storage medium for license data." Appx2980. And they likewise plainly contemplated the need for the "agent" to be OS-level (not BIOS-level) when they disclaimed the prior art's approach of "writing to the BIOS area [being] performed by the ***BIOS routines***." Appx2979. In short, the context of the applicants' amendment and subsequent explanations make crystal clear that the statements Ancora pointed to define the "agent."

And critically, Petitioners do not dispute that, if "agent" is construed to require an "OS-level program," remand would be futile because Hellman discloses no

operating system or BIOS and thus no OS-level "agent" that writes data to BIOS memory. Accordingly, if the Court adopts Ancora's construction, it should reverse.

Petitioners' attempts to cure the Board's other errors fare no better. First, the intrinsic record confirms that the "agent" is software-only. Second, the evidence before the Board shows that the Hellman-Chou combination is inoperable, redundant, and fails to disclose setting up a verification structure in BIOS memory. And, third, the Board also applied a legally flawed nexus standard in disregarding Ancora's evidence of industry praise and licensing.

For each (or any) of these reasons, the Board's decision should be reversed.

# ARGUMENT

## I. The "agent" is an OS-level program.

As noted above, the thrust of Petitioners' response is their argument that whenever the applicant or Examiner describes "OS level" programs, it is talking about something *other than* the claimed "agent." That is wrong for two main reasons. First, the agent is the ***only*** entity that writes data to BIOS memory. Second, this entity is uniformly described in the intrinsic record as an "(OS) level program."

### A. The "agent" must be construed in the context of the intrinsic record.

As an initial matter, Petitioners first argue that the term "agent" purportedly "is not limited to 'OS-level' functions" ***outside*** the context of the '941 patent and thus, per Petitioners, "cannot be so limited absent lexicography or disavowal."

Red21-22. Petitioners are wrong. As this Court reiterated in *Phillips v. AWH Corporation*, "[w]e cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) (citation omitted). And here, as Ancora explained in its opening brief at Blue19-25, and further explains below, the context of the written description and prosecution history indisputably demonstrates that the "agent" is limited to being an "(OS) level program."

**B. The context of the intrinsic record makes clear that the "agent"—and only the "agent"—writes and erases data in BIOS.**

As noted above, the history of how (and why) the term "agent" was added to the claims is critical to understanding its scope and meaning. And to be clear, that history is undisputed. The parties agree that the applicants introduced the "agent" term in response to an erroneous enablement rejection based on the Examiner's "mistaken assumption that [BIOS] EEPROM could be rewritten only with a special device at the factory." Red6-7; Appx2934-2935. The parties likewise agree that the applicants resolved that issue by amending the claims in November 2001 to specify that it was the "agent" that writes and erases data in BIOS memory. Red7; Appx2945-2953; Appx2956. Specifically, as shown above, the applicants amended

claim 1 to require "***using an agent*** to set up a verification structure in … BIOS." Appx2956.[1]

Critically, no other claim element is disclosed as performing this task. Indeed, the parties agree that the "agent" is the ***only*** entity in the record that can "read and write to [BIOS] memory." Appx731 (26:18-24); Appx733 (28:15-18). Frankly, Petitioners could not dispute it, as the applicants and Examiner repeatedly explained that it is the "agent"—and only the "agent"—that can write data to BIOS, reciting: *e.g.*, "'storing…' … [is] performed by the agent," Appx2987; *see* Appx2969-2972; Appx2986-2989.

In addition to being necessary, these concessions are dispositive. Simply put, because the "agent" is the only entity the applicants disclosed that writes data to BIOS, whenever the applicants describe the characteristics of the software that writes data to BIOS they necessarily describe the "agent." And because the applicants repeatedly describe the software that writes data to BIOS as an "OS level program," the applicants necessarily defined the "agent" as an "OS level program."

### C. The intrinsic record defines the entity that writes and erases data in BIOS as an "OS level program."

As further detailed below, when viewed through the lens of this critical context, none of Petitioners' arguments have any merit. Rather, the intrinsic record

---

[1] Dependent claims 3, 7, and 14 elaborate on this task. Appx118.

(*e.g.*, the claims, specification, and prosecution history) repeatedly and indisputably discloses that (1) the software that performs the claimed writing to the BIOS is an "(OS) level program," Appx2979, and (2) that the "agent"—and only the "agent"—performs that function.

**<u>February 2002 Amendment</u>**: In their February 2002 remarks, Appx2976-2981, the applicants explained that "[t]he cited references [Misra and Ewertz] do not render the present invention obvious as they do not teach or suggest, among other things, ***storing*** a verification structure, such as a software license information, ***in the BIOS*** of a computer ***as is recited in the present claims***." Appx2977. This statement plainly is directed to the "agent."

Simply put, as detailed above, the "present claims" are those amended three months earlier (in November 2001) to add "***using an agent*** to set up a verification structure in the … memory of the BIOS."

> <u>using an agent to </u>set~~ting~~ up verification structure in the ~~second~~ <u>erasable, </u>non-volatile memory <u>of the BIOS, </u>the ~~verfication~~-<u>verification </u>structure accommodat<u>ing</u>~~es~~ data that includes at least one license record,

Appx2956; Appx2957-2958. And the intrinsic record (*e.g.*, the claims, specification, or prosecution history) discloses only one thing that is able to "store a verification structure … in the BIOS": the "agent." Appx117 (1:64-65); Appx2969-2972; Appx2986-2989. Given these remarks, it thus is clear that the applicants defined the

"agent" as OS-level when explaining that the software that writes data to BIOS is OS-level.

*First*, the applicants' statement that "[s]oftware license management applications, such as the one of the ***present invention, are operating system (OS) level programs***" refers to the "agent." Appx2979.

Indeed, the best Petitioners muster in response is their speculation that the application is "not the agent" but merely "*uses* an 'agent' capable of setting up a verification structure in BIOS." Red25. Not so. For one thing, the applicants' remarks refute this theory by confirming that the agent ***cannot be*** a BIOS-level program, as described on Blue26 and pp. 8-9 below. For another, the Examiner equated "software license management application" with "agent" when explaining that "Misra … ***uses agents to manage software licenses***, and ***stores*** the licenses in persistent non-volatile storage," but fails to "teach[] utilizing BIOS … for storing a licensed software verification structure." Appx2987-2988.[2]

Petitioners alternatively speculate that the applicants' statement that the "present invention" is an "(OS) level program[]" was directed to "'the verifying software' that … perform[s], for instance, the 'verifying' step of claim 1." Red25;

[2] Petitioners also offer no affirmative explanation of what the "software license management application" refers to. Nor can they. Across six pages, Appx2976-2981, the applicants made over a dozen references to the agent's task of storing data in BIOS.

Red29; Red31-32. Petitioners' theory backfires. The February 2002 remarks never discuss the "verifying" step. But even if they did (and they do not) Petitioners ignore that in claim 18, the patent recites also "using an agent to … ***verify***[] the application software program." Appx118.[3] By conceding that the applicants' "comment[s] about OS-level programs 'referred to the verifying software,'" Red25, Petitioners also concede that the "agent" is OS-level software. *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1366 (Fed. Cir. 2015) (refusing to "ascribe a different meaning to the same limitation" across claims).

*Second*, the applicants again described the "agent" as OS-level when explaining how "the present invention proceeds against conventional wisdom in the art" by "using BIOS to ***store*** application data." Appx2980-2981. The invention was novel because "ordinary" "***OS-level*** application programmers" did not "consider the BIOS as a storage medium to preserve application data," which is why the "present invention['s]" use of OS-level software to write data to BIOS memory was novel. *Id.*

*Third*, as Ancora explained at Blue21 and Blue25-26, the applicants confirmed that the "agent" could ***only*** be OS-level by distinguishing their invention from Ewertz. Unlike the "present invention," the prior art "Ewertz teaches that

---

[3] The Examiner confirmed that for claim 18, "'***verifying***...' [is] ***performed by the agent***." Appx2986-2987; *see* Appx2989 ("The present invention … utilize[es] an agent to verify the application software.").

writing to the BIOS area is performed ***by the BIOS routines***." Appx2979. This Court likewise confirmed that "the applicants distinguished their invention … [from] storage in the BIOS memory area by the BIOS software itself." *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014). Petitioners completely ignore this disclaimer because it permits only one inference: the "agent" cannot be BIOS-level and must therefore be OS-level.

As a fallback, Petitioners argue that the applicants' remarks are legally irrelevant because the "agent" term "was not added … to overcome any prior art." Red24; Red28. Not so. This Court has squarely rejected Petitioners' "proposition that prosecution disclaimer applies only when applicants attempt to overcome a claim rejection." *Uship Intell. Properties, LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013). Rather, all of the "applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer." *Id.* Although disclaimer is not required, *see* Blue17-18, here the applicants clearly disclaimed agents that were not "(OS) level programs." Appx2979.

**Reasons for Allowance**: Petitioners' attempt to recast the Examiner's reasons for allowance, Appx2987-2990, fares no better. Petitioners first argue that Examiner's "comment said nothing about the 'agent'" but concerned "*licensed programs* running at the OS level." Red26. This Court debunked Petitioners' argument in *Ancora v. Apple*, explaining: "[A]lthough the examiner stated in his

reasons for allowance that 'the closest prior art systems, singly or collectively, do not teach ***licensed programs*** running at the OS level interacting with a program verification structure stored in the BIOS,' … that statement is at worst a slip: under the claims, it is indisputably ***the verifying software*** that interacts with the verification structure." 744 F.3d 732, 736-37 (Fed. Cir. 2014) (emphases added). The Examiner's discussion of "OS level" programs thus describes the "verifying software," as Petitioners concede. Red25; Red29. And because the agent ***is*** the verifying software in claim 18, the agent must be OS-level.

Petitioners also speculate that when the Examiner said the "present invention overcomes *this difficulty*," he was referring ***not*** to "programs running at the OS level interacting with a program verification structure stored in the BIOS," Appx2988, but instead "the ability to store data in BIOS." Red26. Wrong again. The applicants and the Examiner both confirmed that the prior art already taught the ability ***of BIOS routines*** to store data in BIOS. Appx2979 ("Ewertz teaches that writing to the BIOS area is performed by the BIOS routines."); Appx2988 ("Ewertz" teaches using "BIOS memory for storing licenc[es]"). Accordingly, if the "agent" was not an OS-level program, then it would have been no different from the prior art systems. And as the Examiner made clear, the invention at issue was radically different. As he explained, "the closest prior art systems, singly or collectively, do not teach licensed

***programs running at the OS level*** interacting with a program verification structure stored in the BIOS." Appx2988.

In short, the difficulty the present invention overcame was not simply storing data in BIOS. It was using an ***OS-level*** program to do it. Appx2980; Appx2988.

**Beeble Embodiment**: Petitioners claim that the Beeble embodiment "never mentioned an 'agent' or otherwise characterized one as 'OS level.'" Red27. That is simply not true. As explained at Blue23, the Beeble paper identified the entity that stores data in BIOS as a "kernel mode ***windows driver***" that uses E$^2$PROM manipulation commands to "write DMI structures to EEPROM." Appx3007; Appx3009-3010.




Figure 2: Beeble Client Architecture

Appx3007. And the applicants confirmed that "windows" refers to the Microsoft ***operating system***. Appx2979 (Misra "is OS level based" because it "run[s] [on] Windows … operating systems").

Petitioners miss the point in arguing that "the Beeble paper at most described an embodiment." Red27. Consistent with the applicants' and Examiner's statements, this embodiment shows "repeated and consistent remarks during prosecution [that] define a claim term by demonstrating how the inventor understood the invention," *Personalized Media Commc'ns, LLC v. Apple Inc.* ("*PMC*"), 952 F.3d 1336, 1340 (Fed. Cir. 2020)—*i.e.*, that the "agent" is OS-level.

**Specification**: Petitioners do not dispute that the specification confirms the agent cannot be BIOS because it "interact[s] with the BIOS." Blue28 (citing Appx116 (3:6-7)). And try as they might, Petitioners cannot erase their own expert's statement describing $E^2$PROM manipulation commands—discussed in the specification at Appx115 (1:65-2:5)—as "***OS-level agents***." Appx1502.

**The *Apple* and *HTC* Decisions**: Petitioners adopt the same blinkered approach to this Court's prior decision—ignoring that both decisions repeatedly address the agent's task of "storing [software] verification information in a space that is harder and riskier for a hacker to tamper with." *Apple*, 744 F.3d at 734; *see id.* at 735-36; *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1346-48 (Fed. Cir. 2018). Even Petitioners cannot deny that this Court described the invention as

software that (1) "*both* ***operated as an application running through an operating system*** *and* used the BIOS level for data storage and retrieval" and (2) did *not* include "storage in the BIOS memory area by the BIOS software itself." *Apple*, 744 F.3d at 735.

**<u>Ancora's Prior Litigations</u>**: Petitioners concede that Ancora consistently "described the 'agent' as OS-level," Red32 n.4, but argue that because Ancora proposed a broader construction in prior proceedings (which pre-dated Petitioners' IPRs), Ancora cannot seek a narrower construction now. No legal principle supports this argument.

### D. Petitioners do not dispute the futility of remand.

Petitioners devote only three sentences to justifying their argument that, "if the Court concludes that 'agent' is limited to 'OS-level' operation, the case should be remanded" because they purportedly "presented evidence" that Hellman taught an OS-level agent, which they claim the Board did not address "because it rejected Ancora's construction." Red32. Not so.

Petitioners make no attempt to address Ancora's argument at Blue37 that Hellman ***cannot disclose an OS-level agent***, because "Hellman discloses only hardware, … and Chou discloses only a 'BIOS routine' that is materially indistinct from the Ewertz reference that the applicants overcame during prosecution." Nor could they. Their expert admitted that Hellman discloses neither an operating system

nor BIOS. Appx4085 (31:13-25). They also do not dispute that, as Ancora explained, Hellman's purported agent, update unit 36, "is hardware, connected to other hardware elements by wires and an epoxy-covered switch 41." Blue40 (citing Appx1267 (11:5-10)).

By failing to address Ancora's arguments, Petitioners concede that the only permissible factual finding on this record is that Hellman neither teaches nor renders obvious an OS-level agent that interacts with BIOS memory. *In re Hodges*, 882 F.3d 1107, 1113-14 (Fed. Cir. 2018) (reversing Board's obviousness finding).

## II. The "agent" is software-only.

Petitioners next resort to irrelevant attacks to distract from the Board's error in concluding that the agent "may be software, ***hardware, or both***." Appx18.

*First*, Petitioners argue that the "ordinary meaning" of agent includes hardware. Red33. But as explained, a term's "ordinary meaning" must be determined "in the context of the written description and the prosecution history," not "in a vacuum." *Phillips*, 415 F.3d at 1313. And as explained above and at Blue 29-33, the intrinsic record uniformly and repeatedly describes the software-only entity that writes data to BIOS (the agent) as an "OS level program."

*Second*, Petitioners claim that Ancora forfeited its software-only construction because it "first appeared in Ancora's sur-reply." Red33. Incorrect. Ancora raised this construction in its preliminary response, stating that "agent" should be construed

as "an OS-level software program or routine" that operates "without the need for additional or specialized hardware." Appx290-291. The Board rejected it. Appx349. In its Response, Ancora acknowledged that the Board rejected "Patent Owner's proposed construction" but urged it to "consider[] the [additional] reasoning above." Appx508. Petitioners addressed the construction in their Replies, Appx604-608; Appx4970, Ancora in its sur-replies, Appx649-652; Appx5014-5015, and both parties at trial, Appx714; Appx4493; Appx5093 (5:17-22).[4]

*Third*, Petitioners argue that if the specification disclaimed hardware methods by criticizing them, then it necessarily "would have disclaimed software agents too" by criticizing prior-art software. Red35. But the specification makes clear that the patentee did not disclaim ***all*** software methods—only those that were "vulnerable to attack" by "hackers" for failing to store sensitive licensing data in BIOS. Appx115-116 (1:19-26, 3:5-16).

*Fourth*, Petitioners suggest that a software-only construction cannot help Ancora because "the Board found that Hellman disclosed or at least rendered obvious a software-only agent." Red36. Petitioners do not quote the decision—with

---

[4] Petitioners say that Ancora changed positions in arguing that the "'agent excludes 'additional' hardware." Red33 n.5. Wrong. Ancora's position has always been that the agent excludes all hardware except the general-purpose computer on which it runs. Appx290-291; Appx508; Appx649-652; *see Apple*, 744 F.3d at 733-34 (the "method makes use of the existing computer hardware (eliminating the expense and inconvenience of using ***additional*** hardware)").

good reason. It never states that Hellman disclosed a "software-only" agent. The Board instead prefaced its conclusion by stating:

> Although Patent Owner further contends that Hellman discloses hardware … wherein replacing Hellman's hardware with software would not have been obvious …, we do not find such contention persuasive. ***Such argument is premised on Patent Owner's proposed claim construction requiring that the agent is "software only," which, as discussed above, we decline to adopt***.

Appx29 (emphasis added); Appx7 (construction was "necessary" to its decision).

In the ensuing discussion, the Board never states that it would rule in Petitioners' favor under Ancora's software-only construction. *See also* Appx36 ("Patent Owner's argument is premised on [its] construction … which … we decline to adopt."). Because the Board did not invalidate Ancora's claims under a software-only construction, its decision cannot be affirmed on that basis. *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1360 (Fed. Cir. 2020) (vacating where Board's reasoning was "unclear").

*Fifth*, Petitioners fail to distinguish Ancora's cited cases holding that the file history informs claim construction even without express disclaimers or lexicography. Blue18-21 (citing *PMC*, *Shire*, *UMass*, *Jansen*, and *Canopy Growth*). Petitioners argue that these cases are "inapposite, as each involved clear and consistent statements and/or amendments that supported a construction consistent with other intrinsic evidence." Red37. But that is why Ancora cited them: because

the file history here clearly and uniformly describes the agent as (1) only software; and (2) non-BIOS, "(OS) level programs." Appx2979.

If the agent is construed to be software-only, the Board's decision must be reversed or vacated.

### III. The Board's obviousness conclusion lacks substantial evidence even under its erroneous construction.

If the Court rules for Ancora on either claim-construction argument, it need not address the Board's substantive errors in its obviousness analysis. But these errors provide an independent basis for reversing or vacating the Board's decision.

#### A. The Hellman-Chou combination is inoperable.

Petitioners argue (at Red41) that Ancora "never presented" its inoperability argument—*i.e.*, that Hellman's update unit 36 would overwrite BIOS routines stored in Hellman's non-volatile-memory 37. Blue43-44. Incorrect. *See* Appx665-666 (Hellman discourages adding "BIOS routines and data … to the existing information in Hellman's EEPROM" and "storing Hellman's 'M' in the memory area of the BIOS"); Appx5029-5030 (same); Appx3207-3208; Appx3428-3429; Appx4314-4315; Appx8060-8061; Appx8282; Appx9167-9168. And the Board understood Ancora's argument concerning the risk of "caus[ing] terrible problems for the – for the computer if you're directly into the BIOS. And you could, you know, overwrite things." Appx749; Appx1467 (describing "overwrite" problem).

On the merits, Petitioners' primary argument is their expert's speculation that a skilled artisan who used Hellman's memory 37 for storing BIOS routines and data ***could*** discern a way to avoid overwriting BIOS routines and data. Red42 (citing Appx1116-1118). But "th[is] reasoning seems to say no more than that a skilled artisan, once presented with the two references, would have understood that they *could be* combined. And that is not enough: it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017).

Petitioners also argue that Ancora's "own patent … does not teach how to avoid the purported overwrite problem." Red42. But that ignores that the '941 patent does not present the overwrite problem in the first place. Unlike Hellman, which randomly generates addresses for license storage, the '941 patent claims an agent specifically programed to ***non-randomly*** write to BIOS memory. Appx115(2:1-5).

### B. The Hellman-Chou combination is redundant.

The Board next concluded that a "POSITA would have been motivated to ***add a BIOS*** to the computer (base unit 12) of Hellman," Appx82 (Roku/Vizio), despite also holding that all computers, including Hellman, have a BIOS. Appx27 ("all computers must have a BIOS"); Appx33. Petitioners do not defend the Board's conclusion as written. *See* Red44-46. Instead, they make two technical arguments, both of which fail.

*First*, Petitioners again argue forfeiture despite conceding that the Board's "add a BIOS" rationale differs from the "proposed combination" Petitioners' presented to the Board. Red43-44. Under such circumstances, Ancora unquestionably is entitled to challenge the Board's rationale. *See In re NuVasive, Inc.*, 841 F.3d 966, 972 (Fed. Cir. 2016) (patent owner must have "opportunity to respond" to new factual finding adopted by Board).

*Second*, Petitioners argue that because the "add a BIOS" conclusion appears only in the Roku/VIZIO decision, there is no error in the Nintendo decision. Red44. This ignores the realities of these parallel IPRs, which had identical panels, identical evidence, and nearly identical arguments and decisions. A reasoning in error in the Roku/VIZIO decision reflects the Board's incorrect understanding of Petitioners' obviousness grounds across both IPRs—a fact that this Court may consider when reviewing them together. *See Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1321 (Fed. Cir. 2017) (holding that the "Board's legal error is underscored by its opinion issued on the same day in the related reexamination of the '021 patent").

### C. The Hellman-Chou combination omits using an agent to set up a verification structure in BIOS memory.

Attempting to bolster the Board's incorrect conclusion that Hellman taught "using an agent to set up a ***verification structure***," Appx117, Petitioners offer a *post hoc* rationale that the Board never adopted and Petitioners' expert never supported.

Before addressing *Petitioners*' error, it is key to understand the *Board*'s error. As Petitioners correctly explain, "The Board found that Hellman's update unit set up a 'verification structure' by storing one or more ***license values*** at specific memory locations determined by an addressing algorithm." Red19-20. The problem is that claim 1 requires more. In addition to storing a "license value" (or record) in BIOS, the agent must ***also*** store a "verification structure in … BIOS, the verification structure accommodating data that includes at least one license record." Appx117; *see* Blue48. As this Court explained, the license record(s) and verification structure are distinct, and the agent must ***store both*** in BIOS memory:

- "[T]he claimed invention ***moves*** a software-verification structure to a BIOS location…." *HTC*, 908 F.3d at 1350.
- "The method calls for storage of a license record in a 'verification structure' ***created*** in a portion of BIOS memory…." *Id.* at 1345
- "The claimed method here specifically identifies how … a structure containing a license record is ***stored*** in a particular, modifiable, non-volatile portion of the computer's BIOS." *Id.* at 1348.[5]

In Hellman, storing licensing data at address H (which is determined by hash generator 33) is at most storing a ***license record*** at a pre-existing memory address,

[5] The intrinsic record supports the Court's description. *See* Appx2918 ("a verification structure is ***formed***"); Appx2953 ("the verification structure is ***stored***"); Appx2969 ("using an agent to ***set up*** a verification structure"); Appx2977 ("***storing*** a verification structure"); Appx2987 ("***storing*** a verification structure"); Appx2988 ("***storing*** a licensed software verification structure").

which exists whether or not any data is stored there. Storing data at address H is not setting up a separate verification structure, as the claims require.

Recognizing this failing, Petitioners seek to backfill the Board's decision by arguing that "Hellman's verification structure was, ***for example***, a ***table of license records*** (M values) in EEPROM." Red47; *see* Red46. There are four fatal problems with Petitioners' new "table" theory.

*First*, the Board never relied on it. Its decisions never mention a "table" and never state that Hellman stores "a table of license records (M values)" in non-volatile memory 37. What the Board ***does*** rely on at Appx35-37 is paragraphs 133-138 of the Wolfe Declaration (Appx1123-1128), which does not articulate Petitioners' "table" theory either.

Petitioners' citations in support of their "table" theory at Red46-48 instead point to Dr. Wolfe's ***Reply*** Declaration (Appx1489, Appx1505-1506), and his deposition transcript (Appx4084). The Board cited neither, likely because "an IPR petitioner may not raise in reply 'an entirely new rationale' for why a claim would have been obvious." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330-31 (Fed. Cir. 2019).

*Second*, Dr. Wolfe never "explained" that "the license records ***took the form of*** a table of M values" as Petitioners claim. Red46. Dr. Wolfe said only that Hellman's memory "***could***" be a table:

permitted. *Id.*, ¶136. As I explained in my deposition, Hellman's memory structure could be a data "table" that uses H values as an index. EX2026, 30:1-22. An example of such a table is shown below:

| Memory Address | M Value |
|---|---|
| Address Defined by (H1) | M1 |
| Address Defined by (H2) | M2 |
| Address Defined by (H3) | M3 |

Appx1505. Opining that an element "is 'probably satisfied' by the prior art is speculative and therefore does not establish a *prima facie* case of unpatentability." *In re Rijckaert*, 9 F.3d 1531, 1533 n.3 (Fed. Cir. 1993). And Petitioners cite nothing in Hellman itself, because Dr. Wolfe cites nothing, to support their "table" theory.

*Third*, the "table" theory collapses on itself because it conflates claim 1's "non-volatile memory of the BIOS" with the "verification structure." According to Petitioners, their "table" consists of consecutive rows of M-values (M1-M3) at consecutive addresses (H1-H3). But Hellman does not order the data it stores. In Hellman, hash generator 33 outputs hash value H, which update unit 36 (the alleged agent) then uses as the address for storing value M in non-volatile memory 37. *See* Blue47; Red45. Because H is just the output of a hash function, there will only ever be a set of randomized H addresses, each storing its own M value. Hellman thus will not generate consecutive addresses H1-H3. Rather, the generator will output unrelated hash values. As a result, non-volatile memory 37 must accommodate every H value generated, as Petitioners' own expert admitted, Appx4084 (30:14-19)—

meaning that Petitioners' "table" must include *all* of non-volatile memory 37. Hellman's non-volatile memory 37 thus becomes ***both*** the claimed "memory of the BIOS" and the "verification structure"—an impermissible result. Petitioners' expert further confirmed this by conceding that "a POSA would have recognized that this memory structure ***is*** a verification structure." Appx1125.

*Fourth*, Petitioners further mislead the Court because the "table" theory contradicts what Petitioners argued in their original Petitions, which was that "[s]toring the value M at the address H constitutes setting up a verification structure." Appx211 (Nintendo); Appx4621 (Roku/VIZIO).

Even ignoring the failings of their "table" theory, Petitioners remain unable to explain how the purported agent, update unit 36, "sets up" the verification structure. Petitioners argue that it does so by "***allocating memory*** and ***storing the license records***." Red48. Update unit 36 may store the purported "license record" (value M) at address H. But it does not "allocate memory"—and Petitioners never argued that it did. Instead, Petitioners argued that "M is stored in plaintext at an address location ***determined*** by hash value H." Appx216; Appx4626 (same). And as Hellman's Figure 6 shows, H is ***determined*** by "a specific algorithm for allocating memory addresses" in hash generator 33, ***not*** update unit 36. Appx609; *see* Appx24 ("one-way hash function generator 33 … produce[s] an output signal which represents hash value H").




Appx1260.

The Board's finding that Hellman disclosed using an agent to set up a verification structure lacks substantial evidence and must be reversed.

## IV. The Board's lack-of-nexus findings for Ancora's praise and licensing evidence rest on legal error and lack substantial evidence.

### A. Ancora tied its praise to the '941 patent.

To show nexus, a patent owner must "link[] that industry praise with the patented invention." *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010). Ancora did precisely that: it linked its praise to the '941 patent claims by showing that AMI praised the '941 patent itself as well as a commercial embodiment of at least claim 1. That is all that is required.

The Board's conclusion that there was no "nexus between the merits of the *challenged claims* and the … praise" because "the press release and Alliance

Agreement refer not to the claims of the ’941 patent, but more broadly to the ’941 patent itself,” Appx44, takes a too-narrow understanding of Ancora’s evidence, which extends beyond the face of the Release (Appx4120) and Agreement (Appx4127). Petitioners also cited the testimony of the ’941 patent’s inventor and Ancora’s President, Miki Mullor, to show how the praised technology “embodied the ’941 patent.” Appx668 (citing Appx1531(51:22-53:2)); Appx5033 (same). Mr. Mullor explained that the praised technology “used a unique ID” in the “BIOS on the computer to generate … a signature …. And then the software that was running in the browser would interact with BIOS and store, set up—what we would call back then—something in the BIOS that was later used to authenticate the banking software every time the consumer tried to run it.” Appx1531 (51:3-52:20); Appx4137-1438. Ancora linked AMI’s praise ***directly*** to claim 1’s four steps: selecting a to-be-licensed program, setting up a verification structure and license records in BIOS, verifying the program using the structure, and acting on the verification. Appx117 (claim 1). The Board erred when it “did not address any of this evidence.” *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013).

The Board also erred in concluding that Ancora’s evidence of praise would be entitled to “little weight” because AMI and Ancora worked together to commercialize the invention. Appx46. Petitioners concede (at Red56) that: AMI had to approve the press release; AMI and Ancora were not joint venturers; and AMI co-

authored the document. *See* Appx1531 (49:1-7). These facts show that the praise was not “self praise,” but required drafting and approval by a third party in an arms-length relationship. Petitioners also cite *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1346-47 (Fed. Cir. 2013), arguing that because AMI paid no royalties, the Agreement is irrelevant. But *Soverain* concerned only “commercial success,” not industry praise.[6]

Petitioners’ cited cases offer them no support. In *In re Cree*, the Board concluded that the praise was “directed to the Fraunhoffer Institute’s own work, not the work of the inventors.” 818 F.3d 694, 702 (Fed. Cir. 2016). In *Firebug*, the praise “comprised only characterizations by the inventor of statements of industry reaction allegedly reported to him by others.” *Shoes by Firebug LLC v. Stride Rite Children’s Grp., LLC*, 962 F.3d 1362, 1373 (Fed. Cir. 2020). And in *ABT Systems*, the patentee proffered only “commercial success” evidence. *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361 (Fed. Cir. 2015).

[6] Ancora did not “misle[ad]” the Court. Red57. The Agreement required AMI to pay Ancora a “royalty rate” [redacted] royalty on revenues for products sold that used the ’941 patent. Appx4125-4130 (¶1.1, ¶4.2(2)). Petitioners’ argument about offsetting royalties ignores that Ancora’s obligations to AMI at ¶4.2(1) are for sales of technology unrelated to the patent, *see* ¶1.4, ¶2.1(2), whereas AMI’s “royalty rate” [redacted] obligation to Ancora relates only to the ’941 patent, *see* ¶1.1.

### B. Ancora established a nexus between its high-value licenses and the challenged claims of the ’941 patent.

The Board separately erred in concluding that Ancora “d[id] not demonstrate a sufficient nexus between the challenged claims and” Ancora’s licenses to [redacted] [redacted] and [redacted]. Appx48. It legally erred by adopting a never-before-applied nexus standard. And its conclusion lacked substantial evidence because the Board misread the [redacted] [redacted] license, used speculation to discount the [redacted] [redacted] license, and discarded the [redacted] [redacted] license in violation of Board rules.

“The significance of licensing a patent as a secondary consideration … is that an independent party with an interest in being free of the patent has chosen to respect it and pay a royalty under it rather than litigate and invalidate it.” *Teva Pharms. Int’l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1363 (Fed. Cir. 2021). To rely on such evidence, the patentee must show “more than the mere existence of the license,” such as “evidence that [the licensee’s] motivation for entering into the license was ***related to*** the validity or enforceability of the … challenged patent[.]” *Id.*

Ancora showed that [redacted] licensed the ’941 patent “rather than litigate and invalidate it,” *id.*, because they risked infringing a valid patent. Petitioners do not even dispute that:

- Each license conveys rights ***only*** to the ’941 patent, rendering this case unlike those where a license conveys rights to “several other patents.” *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 838 (Fed. Cir. 2015).

- Each license exceeded median litigation costs by multiples. Blue56-57.
- Ancora “asserted the same claims challenged in these IPRs.” Blue56.
- The licensees were all aware of the Hellman-Chou combination, and “licensee” settled even after the Board had instituted IPRs on identical grounds. Blue59-60.
- The licenses were executed on the eve of trial for “licensee” and after four years of litigation for “licensee”. Blue56.

Only by resorting to “speculat[ion]” and misreading the evidence could the Board find that there was no nexus between these licenses and the claims. Appx50 (“We are ***left to speculate*** as to whether the licensee settled ‘for reasons unrelated to the unobviousness of the licensed subject matter.’”). But such speculation is error—and is what led this Court to vacate a nearly identical finding by the Board in *Rambus*, 731 F.3d at 1257. There, Rambus introduced licenses with industry leaders, but the “Board held that this evidence lacked a nexus because ‘competitors have many reasons for taking licenses which are not necessarily related to unobviousness.’” *Id.* This Court held that the Board’s speculation “lacks any supporting evidence,” and further explained that “there is no evidence in the record to support the PTO’s assertion that the commercial value of the licenses stemmed from other licensed Rambus patents.” *Id.*

Other errors abound. As to the “licensee” license, Petitioners do not dispute that the Board misread it as extending a license to other patents and patent applications, Appx48-49, which it unequivocally did not. Blue61. And Petitioners’ complaints

about [redacted]-imposed redactions ignore that the unredacted portions show the relevant terms: the royalty amount and the license's scope (to only the '941 patent).

As to the [redacted] license, the Board asserted that "Patent Owner provides no information about what claims it asserted or how much it was demanding in damages." Appx49. Ancora showed that the "claims it asserted" were the same as those challenged in IPR. Appx2182.[7] And neither the Board nor Petitioners have identified ***any*** authority requiring a patentee to produce evidence of the damages it sought in litigation. *See* Red60. For good reason. Such evidence may not exist: parties may settle before damages expert reports are exchanged, or negotiate a license without litigation. Nor is it clear how such evidence would be used—*e.g.*, given [redacted] decision to settle for [redacted], does a damages theory of $50M vs. $500M strengthen or undermine the license's nexus to the claims?

As to the [redacted] license, Petitioners argue that the Board was "within its discretion" to *sua sponte* exclude it even though they concede that *Petitioners* put the license into the record, Appx4969, Appx620-623, never moved to exclude it, and admitted at trial that "the evidence before us includes the … [redacted] … license[,]"

---

[7] Petitioners speculate that in the [redacted] litigation, Ancora might have ***dropped*** some of its asserted claims prior to settlement. Red59 n.11. They cite nothing supporting this conjecture. Regardless, even if Ancora dropped claims, that means only that [redacted] risked infringing a subset of *challenged* claims. Petitioners never argue (or offer evidence) that *unchallenged* or *unasserted* claims motivated [redacted] to settle.

Appx5161; Appx779-780. Petitioners also do not dispute that the Board's rules grant Ancora an affirmative right to "rely upon" the license given that it was "evidence that has been previously submitted in the proceeding." 77 Fed. Reg. 48,756-01, 48,768 (Aug. 14, 2012). Petitioners posit that the Board *could have* excluded the license under 37 C.F.R. § 42.23(b), which the Board did not rely on, and which by its terms does not apply to evidence that *Petitioners* introduced and cited in their Reply, *see* Appx623; Appx4961; Appx4986.

Petitioners defend the Board's reliance on *Iron Grip* even though, as Ancora demonstrated (at Blue58) the bare-bones record there bears no resemblance to this case. Petitioners assert that "*Iron Grip* does not suggest" the licenses were not in evidence, "nor did the Court base its holding on that alleged fact." Red61. That's wrong. As the Court explained, Iron Grip's licensing evidence was only at Appendix "J.A. at 2121-22," *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004), which is the "Declaration of Mr. Michael Rojas" which only vaguely described the licenses:

**b. Commercial Success / Licensing**

Iron Grip next asserts that commercial success and licensing of the '015 patent support the nonobviousness of the '015 patent. Iron Grip's only evidence relevant to these secondary considerations is the Declaration of Mr. Michael Rojas, which is set forth below in part relevant to its argument:

> [Since 2002], a majority of all retail free weight suppliers . . . have introduced a weight plate that, in our view, infringes the '015 patent. . . . It is beyond dispute that this particular design, along with Iron Grip's proprietary two grip design, are the two preferred plate designs in the weight plate market today. The following companies currently market and sell three grip plates:
>
> ICON Health & Fitness. In resolution of litigation with Iron Grip, Iron Grip licensed the '015 Patent to ICON in the summer of 2003.
>
> CAP Barbell, Inc. CAP took a license [to] Iron Grip's '015 Patent in September 2003.
>
> TKO Sports. Iron Grip is currently litigating a co-pending case against TKO Sports . . . related to three grip plates.
>
> Nautilus Group, Inc. Iron Grip is currently in negotiations with Nautilus on terms for a license of the '015 Patent.
>
> USA Sports, Inc. The defendant in this litigation produces two lines of three grip plates which this Court has already determined infringe the '015 Patent.
>
> The Sports Authority. At the most recent trade show, The Sports Authority, a prominent retailer of sports equipment, introduced its own three grip weight plate.

A2121-22. These assertions are not sufficient to raise a genuine issue of material

Brief for Defendant-Appellee (Original Image), *Iron Grip Barbell Co. v. USA Sports, Inc.*, 2004 WL 3763496, at *60 (Fed. Cir. May 24, 2004).

As a fallback, Petitioners argue that three of Ancora's other licenses to “licensee”/Sony/TCL undermine the nexus of the “licensee” licenses. Red61-62. As a matter of logic and law, Petitioners are wrong.

First, no one relied on the “licensee” license, including the Board. Nor is it probative because it resolved non-patent counterclaims brought against Ancora and Mr. Mullor in his personal capacity. Appx7172 (¶C).

Second, Petitioners omit Ancora's [redacted] [redacted] license, which also exceeds litigation costs. Appx2143-2146 (¶3.1).

Third, Petitioners argue that the Sony/TCL less-than-the-cost-of-litigation licenses outweigh the [redacted] licenses because, according to Petitioners, "Ancora was willing to literally give away its patent rights to make IPR trials involving the Hellman-Chou combination go away because it feared invalidation." Red62. This is ***rote speculation*** with ***no evidence***, which the Board cannot rely on. *Rambus*, 731 F.3d at 1257.

Petitioners' theory is also illogical. Petitioners cannot explain why [redacted] and [redacted] settled for large amounts ***even after the Board instituted IPRs on the same grounds***. Blue59-60.[8] They cannot explain how the Board could permissibly wield the Sony/TCL licenses *against* Ancora when no record evidence shows that Ancora's settlement was related to the merits of their IPRs (which are ***identical*** to the instant IPRs which have not settled). And they do not dispute that even if the Board included Sony/TCL licenses in its analysis, the average license value ($13.5 million) is still over three times higher than the cost of litigation. That alone provides

[8] [redacted] settled on [redacted] (Appx4150), two months *after* the Board instituted trial in TCT's IPR2020-01609, Paper 7 (Feb. 16, 2021), but four days *before* TCT/Ancora moved to terminate, Paper 16 (April 5, 2021). [redacted] settled on [redacted] (Appx2081), four days *after* the Board instituted trial in Sony's IPR2021-00663, Paper 17 (June 10, 2021), but one month *before* Sony/Ancora moved to terminate, Paper 18 (July 12, 2021).

"'strong indicia … that the patent is not obvious.'" *WMS Gaming, Inc. v. Int'l Game Tech.***,** 184 F.3d 1339, 1360 (Fed. Cir. 1999).

Citing *Cole Kepro Int'l, LLC v. VSR Indus., Inc.*, 695 F. App'x 566 (Fed. Cir. 2017), Petitioners argue that "low-value licenses … diminish the probative value of other licenses." Red63. This Court held no such thing. It affirmed the Board's decision rejecting a patent owner's ***arguments*** about its licenses: that the "the total value of each … exceeded potential litigation costs." 695 F. App'x at 572. And in *Siemens Mobility, Inc. v. Iancu*, this Court affirmed the Board's decision to scuttle two licenses where, among other failings, one had its "royalty information redacted" and the other was "only for a 'nominal fee.'" 825 F. App'x 867, 874 (Fed. Cir. 2020).

The Board erred in disregarding the "licensee" licenses for lack of nexus.

## CONCLUSION

The Board's decision should be reversed. At a minimum, the Court should reverse the construction of "agent," vacate and remand.

Dated: December 8, 2023

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ *Andres C. Healy*
Andres C. Healy
Steven M. Seigel

SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
ahealy@susmangodfrey.com
sseigel@susmangodfrey.com

*Attorneys for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1674, -1701

**Short Case Caption:** Ancora Technologies, Inc. v. Roku, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,998 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- ☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 12/08/2023

Signature: /s/ Andres C. Healy

Name: Andres C. Healy

Save for Filing